## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br>BROADBAND OFFICE, INC.<br><br>Debtor. | C.A. No. 04-407 (GMS) |
| BROADBAND OFFICE, INC.,<br><br>        Plaintiff,<br><br>  v.<br><br>TECHNOLOGY CREDIT<br>CORPORATION d/b/a EXTREME<br>NETWORKS CREDIT CORPORATION,<br>and EXTREME NETWORKS, INC.,<br>and<br>KEY EQUIPMENT FINANCE, INC. f/k/a<br>KEY CORPORATE CAPITAL, INC. f/k/a<br>LEASETEC CORPORATION,<br><br>        Defendants. | Bankruptcy C.A. No. 01-1720 (GMS)<br>Chapter 11 |

## DEFENDANT KEY EQUIPMENT FINANCE INC.'S REPLY BRIEF
## IN SUPPORT OF ITS MOTION TO DISMISS

**BLANK ROME LLP**
Steven L. Caponi (DE. I.D. 3484)
1201 N. Market Street, Suite 800
Wilmington, DE 19801
(302) 425-6408

and

Regina Stango Kelbon, Esquire
Blank Rome LLP
One Logan Square
130 N 18th St
Philadelphia, PA 19103
Phone: (215)569-5507

Attorneys for Defendant
Key Equipment Finance Inc.

Dated: March 27, 2006

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT ...........................................................................................................................2

I.   THIRD CIRCUIT PRECEDENT REQUIRES THAT THE MOTION TO
     DISMISS BE GRANTED ...................................................................................................2

     A.    Technology Credit Corporation Did Not Act As Key's Agent When It
           Executed The Tolling Agreement ...........................................................................4

           1.    Key Was Never Intended to Be a Party to the Tolling Agreement ..............4

           2.    Broadband Cannot Establish an Agency Relationship .................................5

           3.    The Doctrine of Equitable Tolling is Inapplicable .....................................7

II.  RELATION BACK UNDER F.R.C.P. 15(C) IS UNAVAILABLE AND
     UNHELPFUL TO BROADBAND ........................................................................................9

     A.    The Court Need Not Consider F.R.C.P. 15(c) .........................................................9

     B.    Broadband Cannot Prove Mistake Under Rule 15(c) .............................................10

III. COUNT THREE OF THE COMPLAINT FAILS TO ASSERT A CASE OR
     CONTROVERSY THAT IS RIPE FOR ADJUDICATION ...........................................................12

CONCLUSION ......................................................................................................................13

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Allen v. National Railroad Passenger Corp.*,
  2004 U.S. Dist. LEXIS 24846 (E.D. Pa. 2004) ............................................................10

*American Telephone and Telegraph Company v. Winback and Conserve
  Program, Inc.*,
  42 F.3d 1421 (3d Cir. 1994)......................................................................................5, 6

*Anderson v. General Motors Corp.*,
  2004 U.S. Dist. LEXIS 5430 (Mar. 29, 2004) ...............................................................3

*Bailey v. Glover*,
  88 U.S. 342 (1875).......................................................................................................7

*Kemp Industries, Inc. v. Safety Light Corp.*,
  1994 U.S. Dist. LEXIS 21466 (D.N.J. 1994) .............................................................11

*Kinnally v. Bell of Pennsylvania*,
  784 F. Supp. 1136 (E.D. Pa.  1990) ...........................................................................10

*Lehigh Cement Co. v. Steadfast Insurance Co.*,
  2006 U.S. Dist. LEXIS 429 (E.D. Pa. 2006) ..............................................................12

*Lenard v. Parry*,
  219 F.3d 25 (3d Cir. 2000).........................................................................................10

*Lyons v. Lyons*,
  130 B.R. 272 (N.D. Ill. 1991) ......................................................................................7

*Nelson v. Adams USA, Inc.*,
  529 U.S. 460 (2000)....................................................................................................10

*Oshiver v. Levin, Sishbein, Sedran & Berman*,
  38 F.3d 1380 (3d Cir. 1994).................................................................................2, 8, 9

*Robinson v. Johnson*,
  313 F.3d 128 (3d Cir. 2002)......................................................................................1, 2

*Shea v. Esensten*,
  208 F.3d 712 (8th Cir. 2000) ......................................................................................10

*Suslick v. Rothschild Securities Corp.*,
  741 F.2d 1000 (7th Cir. 1984) ......................................................................................7

*Watson v. Beneficial Delaware, Inc.*,
    2005 U.S. Dist. LEXIS 17482 (Aug. 22, 2005)..............................................................2

*Wells v. HBO & Co.*,
    813 F. Supp. 1561 (N.D. Ga. 1992) .............................................................................11

## FEDERAL STATUTES

11 U.S.C. § 544.......................................................................................................................2

11 U.S.C. § 546.......................................................................................................................1

F.R.C.P. 9    ....................................................................................................................6, 8, 9

F.R.C.P. 12(b)(6) ...................................................................................................................1

F.R.C.P. 15(c) ........................................................................................................................9

## MISCELLANEOUS

6A Charles Alan Wright, et al., *Federal Practice and Procedure* § 1498 (2d ed.
    1990 & 2004 Pocket Port)........................................................................................10

iii

## PRELIMINARY STATEMENT

Key Equipment Finance Inc. ("Key") filed the Motion to Dismiss because it is clear, based solely upon the allegations in the Amended Complaint, that this action was filed over two and one-half (2-1/2) years after expiration of the statute of limitations period set by 11 U.S.C. § 546. Unable to refute the merits of the Motion to Dismiss or justify the failure to initiate this proceeding within the limitations period, Broadband is relegated to raising procedural arguments. Specifically, Broadband suggests that the Motion to Dismiss is procedurally premature because discovery is necessary to determine whether the statute of limitations period should be tolled. Broadband's effort to survive a motion to dismiss by demanding discovery, however, has been squarely rejected by the Third Circuit, which requires the dismissal under F.R.C.P. 12(b)(6), without the benefit of discovery, when it is clear from the face of the complaint that the statute of limitations period has expired. *Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002).

Accordingly, under well established Third Circuit precedent, Broadband's claims under Sections 544, 547 and 548, as set forth in Counts One and Two, must be dismissed with prejudice.

## ARGUMENT

## I.    THIRD CIRCUIT PRECEDENT REQUIRES THAT THE MOTION TO DISMISS BE GRANTED

In its Answering Brief Broadband seeks to avoid discussing the merits of the Motion to Dismiss – a discussion it knows it will lose - by arguing that it is procedurally improper to grant such a motion when it is based on the expiration of a statute of limitations. Broadband maintains that "whether a statute of limitations was tolled involves issues of fact which [cannot] be resolved on the face of [a] complaint." (Ans. Br. at 12). Relying on this incorrect contention, Broadband demands that the Motion to Dismiss be denied and that it be permitted to conduct discovery that could justify tolling the limitations period. Broadband's attempt to cure its defective pleading by demanding discovery, however, has been rejected by both the Third Circuit and this District.

Settled law of the Third Circuit permits a statute of limitations defense to be raised by a 12(b)(6) motion when it is clear on the face of the complaint that the "cause of action has not been brought within the statute of limitations." *Robinson*, 313 F.3d at 135. Once raised, a motion to dismiss must be granted where the claim is facially non-compliant with the limitations period. *Watson v. Beneficial Delaware, Inc.*, 2005 U.S. Dist. LEXIS 17482 (Aug. 22, 2005) (citing *Oshiver v. Levin, Sishbein, Sedran & Berman*, 38 F.3d 1380, 1385 n.1 (3d Cir. 1994)). When a statute of limitations period has expired, the Plaintiff has the affirmative burden of pleading in the complaint facts that would justify tolling the limitations period. *Id.* at *3.

Here the Amended Complaint asserts causes of action that are subject to the two year limitations period of 11 U.S.C. § 544. Paragraph 8 of the Complaint states that Broadband filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code on May 9, 2001. Therefore, the statute of limitations period under Section 546 expired on May 9, 2003. The

original Complaint was filed on December 23, 2003, nearly eight months after the limitation period expired, while the Amended Complaint was filed two years after that on December 23, 2005. From the face of the Complaint it is clear that this litigation was initiated outside the time proscribed by Section 544. According to Third Circuit precedent, Broadband had the affirmative obligation to plead facts in the Amended Complaint that would excuse the late filing against Key – a burden it has failed to carry.

The only allegation in the Amended Complaint that arguably touches upon the statute of limitations is paragraph 19, which states:

> The Debtor and **Defendant, Technology Credit Corporation**, entered into a Stipulation Tolling Statue of Limitations dated as of April 10, 2003, ("Tolling Agreement"), in which **Technology Credit Corporation** and the Debtors agreed to toll and extend the deadline for the Debtor to file Avoidance Actions through and including December 31, 2003. A copy of the Tolling Agreement is attached hereto as Exhibit B.

Compl. at para. 19 (emphasis added). As evidenced by their clear terms, neither paragraph 19 nor the Tolling Agreement, which was attached to and incorporated into the Amended Complaint, directly or indirectly mention Key. Similarly, Broadband has failed to identify in its Answering Brief a single allegation in the Amended Complaint that would satisfy Third Circuit pleading requirements requiring a justification for the late filing.

Although a dispositive issue, Broadband has chosen not to address the absence in the Amended Complaint of an allegation that would justify tolling the statute of limitations with respect to Key. As a result, the Amended Complaint is facially non-compliant with the applicable statute of limitations period and must be dismissed. *Anderson v. General Motors Corp.*, 2004 U.S. Dist. LEXIS 5430, *6 (Mar. 29, 2004) (grating motion to dismiss and denying leave to amend).

3

## A.    Technology Credit Corporation Did Not Act As Key's Agent When It Executed The Tolling Agreement

Painfully aware of the obvious pleading deficiencies in the Amended Complaint, Broadband argues, without any support, that this Court should deny the Motion to Dismiss in favor of permitting discovery. Broadband suggests discovery is appropriate because it <u>may</u> show that "Technology Credit Corporation had actual or apparent authority" to bind Key to the Tolling Agreement or that it is appropriate to apply the doctrine of equitable tolling. (Ans. Br. at 11). These arguments are fatally flawed because: (i) the Amended Complaint is devoid of allegations claiming Broadband believed TCC acted as Key's agent when it signed the Tolling Agreement; (ii) Broadband's admissions preclude finding an agency relationship; and (iii) the facts simply do not justify application of the doctrine of equitable tolling.

### 1.    Key Was Never Intended To Be A Party To The Tolling Agreement

As correctly noted on page 18 of Broadband's Answering Brief, on a motion to dismiss the Court cannot consider facts or allegations unless they are raised in the initial pleading or are subject to judicial notice. Despite quoting this rule, Broadband argues in its Answering Brief, without any support in the Amended Complaint, that TCC acted as an agent for Key when it executed the Tolling Agreement.[1]    Broadband fails, however, to cite any language in the Amended Complaint that states or suggest Broadband believed Key was intended to be bound by the Tolling Agreement at the time it was executed or that TCC signed the Tolling Agreement as Key's agent. In an effort to distract this Court from focusing on the merits of the Motion to Dismiss, Broadband improperly raises as "facts" bare allegations that are nowhere to be found in the Amended Complaint. Because Broadband's newly minted agency theory is unsupported by

---

[1]  Broadband tries to disguise its reliance upon extraneous allegations by arguing that Key, in its Opening Brief, admits TCC acted as its agent. No such admission was ever made. In footnote 1 on page 3 of the Opening Brief, Key expressly states that the facts in the Opening Brief were taken directly from the Amended Complaint and <u>presumed</u> as true. Furthermore, even if TCC acted as Key's agent for purposes of selling the equipment, it would not vest TCC with authority to enter into the Tolling Agreement on behalf of Key.

4

the allegations in the Amended Complaint, it must be disregarded by the Court when considering the merits of the Motion to Dismiss.

### 2.    Broadband Cannot Establish an Agency Relationship

Even if the Court were to entertain Broadband's new agency argument, which it should not, it is evident from face the of the Amended Complaint, the Tolling Agreement and the Answering Brief that Broadband cannot – as a matter of law - establish an agency relationship. To establish an agency relationship, Broadband must show that at the time of execution: (i) Broadband believed that TCC was executing the Tolling Agreement on behalf of Key and (ii) that Key vested TCC with either express or apparent authority to execute the Tolling Agreement on its behalf. *American Telephone& Telegraph Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1437-40 (3d Cir. 1994).

In a rush to raise the specter of an agency relationship, Broadband has ignored a crucial fact – Broadband and Key **never** discussed or intended for the Tolling Agreement to be binding on Key. This fact is fatal to the agency argument because, in the context of a contract, agents can bind principals only if the agent acts with actual or apparent authority. With actual authority, the principal informs the other party to the contract that the signatory is his agent and has authority to bind the principal. With apparent authority, the principal causes the other party to the contract to believe that the agent has authority to bind the principal when he in fact does not. In either circumstance, a necessary component to the formation of a binding contract is a meeting of the minds between the principal and the other party to the agreement.    The nature of the agency relationships only becomes relevant when it is clear the parties intended to enter a contract but there is disagreement over whether an agent had authority to bind the principal. *American Telephone & Telegraph*, 42 F.3d at 1440 (finding the focus of an agency analysis is on the principal's representations to the third party).

In the Answering Brief, Broadband confirms that, at the time it executed the Tolling Agreement, it believed TCC was the **only** other party to the Tolling Agreement. Page 11 of the Answering Brief states in part that:

> In this case **Broadband entered into a Tolling Agreement with Technology Credit Corporation**, which had been servicing the account for Key Equipment and who Broadband originally thought was the Defendant.

(Emphasis added). Similarly, when asking the Court to equitably toll the limitations period, in its Answering Brief Broadband states that:

> Broadband submits that it has been "actively misled" into believing TCC was **solely** liable for the avoidable payments due to the Defendants' convoluted, interwoven business practices.[2]

(Ans. Br. at 14) (emphasis added). As made clear from the above quotations, Broadband negotiated, came to a meeting of the minds with and entered into a tolling agreement with what it understood was the **only** potential defendant – i.e. TCC. This understanding is reflected by the terms of the Tolling Agreement, which fail to either mention Key or suggest that TCC was acting as an agent for Key. Furthermore, Broadband did not name Key as a defendant in the Original Complaint. Had it truly believed, as it now argues, that TCC executed the Tolling Agreement as Key's agent, Broadband would have named Key as a defendant in the Original Complaint. Its failure to do so is dispositive.

Broadband's admissions are also fatal to its effort to establish that TCC acted with apparent authority. Apparent authority arises when a principal causes persons with whom the agent deals to reasonably believe that the agent has authority despite the absence of an actual agency relationship. *American Telephone & Telegraph Co.*, 42 F.3d at 1439. If the principal

---

[2] By including this language in its Answering Brief, Broadband is attempting to argue without any support whatsoever, that Key acted in a fraudulent manner. It is clearly improper for Broadband to level an allegation that attacks the credibility of a party when the allegation is unsupported by the Amended Complaint or the type of particularized pleading required under F.R.C.P. 9.

6

subsequently tries to disavow the contract by arguing the "agent" did not in fact have actual

authority, the law will vest the agent with apparent authority. *Id.* For the doctrine of apparent

authority to have any application to this matter, the facts would need to show that Key led

Broadband to believe that TCC had authority to bind Key to the Tolling Agreement. As noted

above, Broadband negotiated the Tolling Agreement with TCC, not Key, because it believed

TCC was the true party in interest. In fact, Broadband has conceded that it was unaware of

Key's involvement with the underlying leases until long after execution of the Tolling

Agreement and expiration of the statue of limitations. In short, Broadband never relied on any

statements made by Key.

### 3.  The Doctrine of Equitable Tolling is Inapplicable

As a last resort, Broadband invokes the doctrine of equitable tolling to avoid the resulting

dismissal of the Amended Complaint, otherwise mandated by Section 546(a). As noted by the

United States Supreme Court, equitable tolling may apply:

> [W]hen there has been no negligence or laches on the part of a
> plaintiff in coming to the knowledge of the fraud which is the
> foundation of the suit, and when the fraud has been concealed, or is
> of such character as to conceal itself... .

*Bailey v. Glover*, 88 U.S. 342, 349-50 (1875); *Lyons v. Lyons*, 130 B.R. 272, 290 (N.D. Ill.

1991). Following *Bailey*, to invoke the doctrine of equitable tolling, plaintiffs must show that: (i)

despite diligent efforts, a fraud went undetected even though the defendant did nothing to

conceal it; or (ii) a fraud went undisclosed because of additional efforts by the defendant to

conceal the fraud. *Lyons*, 130 B.R. at 280; *Suslick v. Rothschild Secs. Corp.*, 741 F.2d 1000,

1004 (7th Cir. 1984). The absence of an affirmative allegation in the complaint that the

defendant deceived the plaintiff into postponing filing of suit precludes the application of

7

equitable tolling. *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1388 (3d Cir. 1994).

The facts in this matter simply do not justify, and in fact preclude, invoking the doctrine of equitable tolling. The Amended Complaint is devoid of a single allegation stating that Key "deceived [Broadband] into postponing the filing of a claim." *Oshiver*, 38 F.3d at 1388. This omission, standing alone, bars reliance on the doctrine of equitable tolling. Furthermore, the Amended Complaint does not suggest or allege that Key perpetrated any fraud on Broadband, let alone attempted to cover-up a fraud. Had Broadband honestly believed it was the victim of fraud, it would have included a count for fraud in the Amended Complaint. It did not. Notably, Broadband refused to allege fraud in the Amended Complaint where such allegations are subject to F.R.C.P. 9 and 11, choosing instead to improperly raise its unsupported allegation – for the first time – in its Answering Brief. Broadband's unwillingness to stand firmly behind the accusation speaks directly to its credibility.

Lastly, even if Broadband had been actively deceived, which it was not, it knew of Key's existence and interest in the underlying leases years before the statute of limitations had passed. By early 2000, three years before the limitations period expired, Broadband knew that TCC had transferred its interest in the equipment at issue to Key. In fact, Broadband signed and consented to the assignment of the TCC UCC-1 Financing Statements to Key. (Exhibit C to Opening Brief).[3] A year later and two years before the limitations period lapsed, Key filed a Proof of Claim in Broadband's bankruptcy proceeding in the amount of $6,066,838.91, under the name "Key Equipment Finance, a division of Key Corporate Capital, Inc., f/k/a Leasetec Corporation"

---

[3] Key's reliance on the UCC-1 and its proof of claim is appropriate. Federal Rule of Evidence 209 permits this Court to take "judicial notice of facts that are capable of accurate and ready determination by resorting to sources whose accuracy cannot reasonably by questioned." *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000). Here, the proof of claim and UCC-1 are public records that can by easily verified. Notably, Broadband does not question or challenge the accuracy of either document.

8

(Exhibit D to Opening Brief). Key's Proof of Claim identified the leases at issues by reference to Broadband's own Schedule of Assets and by attaching detailed payment histories for each lease. *Id.*

In light of Broadband's actual knowledge, as a matter of pleading, procedure and fact, Broadband cannot invoke the doctrine of equitable tolling and the Motion to Dismiss must be granted. *Oshiver*, 38 F.3d at 1388.

## II.    RELATION BACK UNDER F.R.C.P. 15(C) IS UNAVAILABLE AND UNHELPFUL TO BROADBAND

The final argument raised by Broadband in an effort to survive the Motion to Dismiss, is to suggest that F.R.C.P. 15(c) requires that the Amended Complaint relate back to the filing of the Original Complaint. This argument, however, has two fundamental flaws. First, the Court need not address the applicability of Rule 15(c) because, even if relation back is permitted, the Amended Complaint would still have been filed one year after the Section 546 statute of limitations period had expired. Second, as a matter of law and fact, Broadband cannot satisfy the third prong of the Rule 15 test, which requires that the failure to name Key as a defendant in the Original Complaint is the result of a mistake. In light of these deficiencies, the Court need not accept Broadband's invitation to engage in a Rule 15(c) analysis.

### A.    The Court Need Not Consider F.R.C.P. 15(c)

A lengthy analysis under Rule 15(c) would prove an exercise in futility and a waste of judicial resources. For under the most favorable application of Rule 15(c), the Amended Complaint would be deemed to have been filed on the same date as the Original Complaint, December 23, 2003. Unfortunately for Broadband, the statute of limitations under Section 546 expired on May 9, 2003. Thus, even with the benefit of relation back, the claims against Key would have been filed nearly eight months after the limitations period expired. As explained

9

above, Key was not a party to the Tolling Agreement and the doctrine of equitable tolling is inapplicable. Therefore, as a matter of fact and law, the Motion to Dismiss must be granted because, even with the benefit of Rule 15(c), the Amended Complaint was filed outside the limitations period.

### B.    Broadband Cannot Prove Mistake Under Rule 15(c)

It is black letter law that a mistake concerning the identity of the newly named defendant is a requirement for an amended complaint to relate back to an original complaint. *Allen v. Nat'l R.R. Passenger Corp.*, 2004 U.S. Dist. LEXIS 24846, *30 (E.D. Pa. 2004) (mistake of identity essential element of Rule 15(c)(3) standard) (citing *Nelson v. Adams USA, Inc.*, 529 U.S. 460, 467 n.1 (2000)). Broadband does not dispute this principle of law. Broadband, however, refuses to address its failure to name Key as a defendant in the Original Complaint, when undisputed public records prove Broadband was aware of Key and its relationship to the equipment leases at issue. As discussed below, there are a plethora of cases standing for the proposition that Broadband's decision to wait until after the statute of limitations expired to sue Key cannot be considered a "mistake" under 15(c).

The United States Supreme Court has firmly held that a party cannot satisfy the requirements of Rule 15(c) and be entitled to relate back to the initial pleading, when the plaintiff knew the identity of the new defendant and chose not to name them as a party to the original complaint. *Nelson v. Adams*, 529 U.S. 460, 467 n.1 (2000); *Lenard v. Parry*, 219 F.3d 25, 29 (3d Cir. 2000); *accord Shea v. Esensten*, 208 F.3d 712, 720 (8th Cir. 2000); *see also* 6A Charles Alan Wright, et al., *Federal Practice & Procedure* § 1498 (2d ed. 1990 & 2004 Pocket Part) (noting that notwithstanding adequate notice to the new party, an amendment substituting the proper party will not be allowed when the plaintiff's inexcusable neglect was responsible for the failure to name the correct party); *Kinnally v. Bell of Pa.*, 784 F. Supp. 1136, 1142 (E.D. Pa. 1990)

10

(relation back permitted where the wrong party is blamed while the real culprit remains unknown).

The above citations and multitude of similar cases all stand for the same proposition – a plaintiff may not merely fail to sue the proposed party; rather, the plaintiff must have initially intended to sue the proposed party, sued the wrong party and be attempting to correct the mistake. *Kemp Indus., Inc. v. Safety Light Corp.*, 1994 U.S. Dist. LEXIS 21466, *38 (D.N.J. 1994). Here, it is undisputed that Broadband did not intend to sue Key when it filed the Original Complaint. Broadband's own statements confirm that it intended to sue TCC, the party with whom it executed the Tolling Agreement, and only TCC. Had Broadband truly intended to sue Key, the Amended Complaint would have substituted Key for TCC. Instead, it added Key as an additional Defendant and continues to assert causes of action against both companies.

Furthermore, Broadband cannot claim it was unaware of Key at the time it filed the original complaint. The undisputed facts prove that Broadband was well aware of Key's involvement with the equipment leases long before the limitations period expired. On March 17, 2000, Broadband signed and consented to the assignment of the UCC-1 Financing Statements from TCC to Key. (Exhibit C to Opening Brief). Broadband further concedes that on June 29, 2001, Key filed a Proof of Claim in the amount of $6,066,838.91 under the name "Key Equipment Finance, a division of Key Corporate Capital, Inc., f/k/a Leasetec Corporation." (Exhibit D to Opening Brief). Broadband's proven knowledge of Key years before the limitations period expired precludes this Court from permitting relation back under Rule 15(c). *See Wells v. HBO & Co.*, 813 F. Supp. 1561, 1567 (N.D. Ga. 1992) (holding that a mistake does not include a deliberate decision not to sue a party whose identity the plaintiff knew from the outset).

11

## III.    COUNT THREE OF THE COMPLAINT FAILS TO ASSERT A CASE OR CONTROVERSY THAT IS RIPE FOR ADJUDICATION

Through its Opening Brief, Key has demonstrated that Count III of the Amended Complaint states a causes of action that is not ripe for adjudication. Broadband does not argue this point. Accordingly, this Court should follow Third Circuit precedent that hold ripeness affects justiciability and that unripe claims should be disposed of on a motion to dismiss. *Lehigh Cement Co. v. Steadfast Ins. Co.*, 2006 U.S. Dist. LEXIS 429, *10 (E.D. Pa. 2006).

## **CONCLUSION**

For all of the foregoing reasons, Defendant Key respectfully requests that this Honorable

Court grant its Motion to Dismiss dismissing the Amended Complaint with prejudice.

**BLANK ROME LLP**

Steven L. Caponi (DE. I.D. 3484)
1201 N. Market Street, Suite 800
Wilmington, DE 19801
(302) 425-6408

and

Regina Stango Kelbon, Esquire
Blank Rome LLP
One Logan Square
130 N 18th St
Philadelphia, PA 19103
Phone: (215)569-5507

Attorneys for Defendant
Key Equipment Finance Inc.

Dated: March 27, 2006

LEXSEE

## DEBRA ALLEN, et al., Plaintiffs, v. NATIONAL RAILROAD PASSENGER CORP., (AMTRAK), Defendant.

### CIVIL ACTION 03-CV-3497

### UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### 2004 U.S. Dist. LEXIS 24846; 60 Fed. R. Serv. 3d (Callaghan) 421; 95 Fair Empl. Prac. Cas. (BNA) 403

### December 7, 2004, Decided
### December 8, 2004, Filed; December 9, 2004, Entered

**SUBSEQUENT HISTORY:** Summary judgment granted by Allen v. Amtrak, 2005 U.S. Dist. LEXIS 19624 (E.D. Pa., Sept. 6, 2005)

**DISPOSITION:** Defendant's Motion for Partial Summary Judgment was denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff employees sued defendant employer, alleging racial discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq. The employer moved for partial summary judgment on all of the claims brought by four of the five employees, alleging that they were time-barred. The employees contested the motion.

**OVERVIEW:** After receiving right-to-sue letters, one employee sued on behalf of herself and the others. This complaint did not name all of the employees and it was not timely served. Three employees then filed separate suits, which they later voluntarily dismissed. The instant suit was timely served, but filed more than 90 days after receipt of the right-to-sue letters. The court held that the four employees were not parties to the original suit. They were not named in the caption or the body of the complaint. Further, the 90-day limitation period was not equitably tolled. The voluntary dismissal did not toll the limitation period. The employees were not misled or prevented from asserting their claims. Their unintentional failure to name the proper parties and timely rectify the mistake did not warrant equitable tolling. However, the court denied the motion. These claims were timely because they related back to the filing of the original complaint. They arose out of the same conduct. The employer had notice of the suit within the period for

service and was not prejudiced. Further, within the period for service, the employer knew that, except for the mistake, suit would have been brought.

**OUTCOME:** The court denied the employer's motion for partial summary judgment.

**CORE TERMS:** limitation period, notice, pro se, caption, civil action, right-to-sue, received notice, summary judgment, amended pleading, lawsuit, toll, tolling, tolled, matter of law, proper party, signature, asserting, voluntarily dismissed, expiration, statute of limitations, racial discrimination, limitations period, equitable tolling, original action, well-settled, designation, singular, summons, newly, declaration

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN1] In considering a motion for summary judgment, a court must determine whether the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Only facts that may affect the outcome of a case are "material." All reasonable inferences from the record are drawn in favor of the non-movant.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof*
*Civil Procedure > Summary Judgment > Supporting Papers & Affidavits*

[HN2] Although the movant on summary judgment has the initial burden of demonstrating the absence of genuine issues of material fact, the non-movant must then establish the existence of each element on which it bears the burden of proof. As the non-movant, a plaintiff cannot avoid summary judgment with speculation or by resting on the allegations in his pleadings, but rather must present competent evidence from which a jury could reasonably find in her favor.

*Civil Procedure > Pleading & Practice > Filing of Complaint*
*Civil Procedure > Pleading & Practice > Pleadings > Time Limitations*
*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Time Limitations*
[HN3] Under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., a plaintiff must file a civil action within 90 days of receiving notice of a right to sue from the Equal Employment Opportunity Commission (EEOC), unless the 90-day limitation period is tolled. 42 U.S.C.S. § 2000(e)-5(f)(1). Fed. R. Civ. P. 3 provides that a civil action is commenced by filing a complaint with the court. Typically, the EEOC provides notice in writing through a "right-to-sue" letter to the complaining party, with the 90-day period running upon receipt of the notice. In accordance with Fed. R. Civ. P. 6(e), absent evidence of the exact date of the receipt of the notice, it is presumed that the date of receipt of an EEOC right-to-sue letter is three days after its mailing. Fed. R. Civ. P. 6(e) provides for adding three days to a prescribed period when party must perform some task after service of notice upon party.

*Civil Procedure > Pleading & Practice > Pleadings > Interpretation*
[HN4] See Fed. R. Civ. P. 10(a).

*Civil Procedure > Pleading & Practice > Pleadings > Interpretation*
[HN5] The designation of "et al" in a complaint's caption, without an identification of the proper parties in the body of the complaint, does not satisfy the Fed. R. Civ. P. 10(a) identification requirement. This type of defective pleading fails to provide adequate notice to unnamed defendants, fails to inform the public of the facts surrounding court proceedings, and/or fails to apprise named defendants of the identities of additional plaintiffs or of parties similarly situated. The caption of a complaint must name both all of the plaintiffs and all of the defendants. A court lacks jurisdiction over a defendant not named in the complaint and who is thus not aware

that the complaint should have been brought against him or her.

*Civil Procedure > Joinder of Claims & Parties > Self-Representing Parties*
*Civil Procedure > Pleading & Practice > Pleadings > Interpretation*
[HN6] Fed. R. Civ. P. 11(a) requires a complaint to be signed by at least one attorney of record in the attorney's individual name, or, if the party is not represented by an attorney, to be signed by the party. Fed. R. Civ. P. 11(a). Most courts interpret Rule 11(a) to require all pro se plaintiffs to sign the complaint. Indeed, Rule 11(a) precludes one pro se plaintiff from signing on behalf of others.

*Governments > Legislation > Statutes of Limitations > Equitable Estoppel*
*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Time Limitations*
[HN7] The 90-day window during which a plaintiff may file a lawsuit after receipt of an Equal Employment Opportunity Commission right-to-sue letter is non-jurisdictional in nature. This means that the 90-day limitation period may be tolled in appropriate, albeit "sparing," circumstances. The United States Court of Appeals for the Third Circuit has declared that the 90-day limitation period may be tolled in three instances: (1) when the defendant has actively misled the plaintiff; (2) when the plaintiff has in some "extraordinary way" been prevented from asserting her rights, or (3) when plaintiff has timely asserted her rights mistakenly in the wrong forum. To invoke the benefit of this doctrine, a plaintiff must exercise due diligence in pursuing her claim.

*Governments > Legislation > Statutes of Limitations > Equitable Estoppel*
*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Time Limitations*
[HN8] The United States Supreme Court has identified a list of unique situations that prevent a plaintiff from asserting her rights and that may justify tolling the statutory period, such as when a plaintiff received inadequate notice of the time limit to file a civil action; when a motion for appointment for counsel is pending and equity would justify tolling the statutory period until the motion is acted upon; or when the court affirmatively led plaintiff to believe that she successfully met the requirements for bringing a Title VII of the Civil Rights Act of 1964, 32 U.S.C.S. § 2000e et seq., claim.

2004 U.S. Dist. LEXIS 24846, *; 60 Fed. R. Serv. 3d (Callaghan) 421;
95 Fair Empl. Prac. Cas. (BNA) 403

***Civil Procedure > Dismissal of Actions > Voluntary
Dismissal***

***Governments > Legislation > Statutes of Limitations >
Equitable Estoppel***

***Labor & Employment Law > U.S. Equal Employment
Opportunity Commission > Time Limitations***

[HN9] Despite the existence of the equitable tolling doctrine, it is well-settled that the voluntary dismissal of a complaint does not toll a statute of limitations, but, instead, leaves the parties in the position they were in prior to the filing of the original complaint. Courts have applied this well-settled principle to Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., claims. These courts reason that the failure to research the ramifications of a voluntarily dismissal constitutes a lack of due diligence in preserving one's legal rights, thereby precluding the tolling of the 90-day limitation period.

***Governments > Legislation > Statutes of Limitations >
Equitable Estoppel***

***Labor & Employment Law > U.S. Equal Employment
Opportunity Commission > Time Limitations***

[HN10] The unintentional failure both to properly name the appropriate parties and to rectify this mistake within the 90-day limitations period of 42 U.S.C.S. § 2000e-5(f)(1) constitutes a "garden variety claim of excusable neglect" on behalf of the plaintiffs, to which the principles of equitable tolling do not apply.

***Civil Procedure > Pleading & Practice > Pleadings >
Relation Back***

[HN11] Fed. R. Civ. P. 15(c) strikes a balance between the policy of adjudicating claims on their merits and the policy of avoiding prejudice to defendants by applying with fairness the relevant limitation period. To achieve this balance, Rule 15(c)(3) permits an amended pleading that seeks to add a party to relate back to the date of the original pleading upon the satisfaction of three elements. Fed. R. Civ. P. 15(c)(3). First, the claim or defense asserted in the amended pleading must arise out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading. Fed. R. Civ. P. 15(c)(3). Second, within the period provided by Fed. R. Civ. P. 4(m) for service of the summons and complaint, the party to be brought in has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits. Fed. R. Civ. P. 15(c)(3)(A). Third, within the period provided by Fed. R. Civ. P. 4(m), the defendant knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party. Fed. R. Civ. P. 15(c)(3)(B).

***Civil Procedure > Pleading & Practice > Pleadings >
Relation Back***

[HN12] Although the literal text of Fed. R. Civ. P. 15(c)(3) applies only to the naming of additional defendants, the United States Court of Appeals for the Third Circuit has applied the three-prong standard for relating back to an amended pleading that names additional plaintiffs.

***Civil Procedure > Pleading & Practice > Pleadings >
Relation Back***

***Civil Procedure > Pleading & Practice > Service of
Process > Time Limitations***

[HN13] Fed. R. Civ. P. 15(c)(3)(A) requires that a defendant have formal or informal notice of the institution of the action within the period provided by Fed. R. Civ. P. Rule 4(m) for service of the summons and complaint. Rule 4(m) sets the time for service at 120 days after the filing of the complaint, while giving a court the discretion to direct that service be effected within a specified time and to extend the time for service for an appropriate period. Fed. R. Civ. P. 4(m). This means that 120 days will not always be the applicable time frame for purposes of a Fed. R. Civ. P. 15(c)(3) analysis, and that the appropriate standard, in certain instances, may be whether the defendant received notice within any additional time resulting from any extension ordered by the court pursuant to that rule.

***Civil Procedure > Pleading & Practice > Pleadings >
Relation Back***

***Civil Procedure > Pleading & Practice > Service of
Process > Time Limitations***

[HN14] Because the prejudice element of the Fed. R. Civ. P. 15(c)(3)(A) analysis is dependent upon, rather than independent of, the notice requirement, notice of the matters raised in the amended pleading within the applicable time limit generally eliminates the prejudice a party may experience. Indeed, the type of prejudice that Rule 15(c)(3) refers to is not an increase in liability, which would apply regardless of when defendant received notice; but, instead, those strategic hardships imposed by the unreasonable passage of time upon a defendant's ability to present an effective defense.

***Civil Procedure > Pleading & Practice > Pleadings >
Relation Back***

***Civil Procedure > Pleading & Practice > Service of
Process > Time Limitations***

[HN15] A "mistake concerning the identity" of the newly named party is a requirement for an amended complaint

2004 U.S. Dist. LEXIS 24846, *; 60 Fed. R. Serv. 3d (Callaghan) 421;
95 Fair Empl. Prac. Cas. (BNA) 403

to relate back to an original complaint. Although some courts relax the mistake requirement when the amended complaint seeks to add new plaintiffs, the United States Court of Appeals for the Third Circuit continues both to demand the existence of a mistake concerning the identity of the new party and to couch this element in the reasonable knowledge of the defendant during the time provided by Fed. R. Civ. P. 4(m). The "mistake" element ensures the existing defendant's awareness that a new party, and potentially a new claim, might be added to the case and that plaintiff intended to add new parties at the time of the filing of the original complaint, rather than pursuing a deliberate strategy of piecemeal litigation.

*Civil Procedure > Pleading & Practice > Pleadings > Relation Back*

[HN16] A "mistake" within the meaning of Fed. R. Civ. P. 15(c)(3)(B) includes erroneous judgments of law and fact.

**COUNSEL:** [*1] For DEBRA ALLEN, BEVERLY GREEN, RONALD JONES, JOILYNN SCOTT, BILLY SHAW, YVONNE UPSHUR, Plaintiff: represented by DEBRA ALLEN, PHILADELPHIA, PA., PRO. SE. H. FRANCIS DELONE, WAYNE, PA.

NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK) Defendant: represented by JONATHAN R. NADLER, REED, SMITH, LLP, PHILADELPHIA, PA.

**JUDGES:** Legrome D. Davis, J.

**OPINIONBY:** Legrome D. Davis

**OPINION:**

ORDER

Davis, J.

December 7, 2004

Presently before this Court are Defendant's Motion for Partial Summary Judgment (Doc. No. 12), filed on July 9, 2004; Plaintiffs' Memorandum in Opposition to Defendant's Motion for Summary Judgment (Doc. No. 13), filed on July 26, 2004; Defendant's Reply Memorandum in Further Support of its Motion for Partial Summary Judgment (Doc. No. 16), filed on September 3, 2004; and Plaintiffs' Surreply Memorandum in Opposition to Defendant's Motion for Partial Summary Judgment (Doc. No. 19), filed on September 21, 2004.

For the following reasons, Defendant's Motion for Partial Summary Judgment on all claims brought by plaintiffs Ronald Jones ("Jones"), Joilynn Scott ("Scott"), Billy Shaw ("Shaw"), and Beverly Green ("Green") is DENIED.

**I. Factual and Procedural History**

Resolution of the merits [*2] of defendant's motion requires a full recitation of the procedural history of this case. On November 20, 2001, attorney David Wolf submitted a letter, labeled an "informal charge of discrimination," to the Equal Employment Opportunity Commission ("EEOC") on behalf of seven Amtrak employees. (See November 20, 2001 Letter to EEOC, attached as Ex. A to Def. Mot. For Summary Judgment). Five of these seven employees are named as plaintiffs in the instant litigation, including plaintiffs Debra Allen ("Allen"), Jones, Scott, Shaw, and Green. (See Am. Compl., PP1-10). The letter failed to contain signed, verified charges of discrimination by these five plaintiffs. (See EEOC Charges submitted by plaintiffs Green, Scott, Jones, Shaw, and Allen, attached as Ex. B-F of Def. Mot.). These verifications were not received until April 2003. (Id.). On May 19, 2003, the EEOC issued individual right-to-sue notices to each of the five plaintiffs. (See EEOC Notices of Right to Sue, attached as Ex. G-K of Def. Mot.).

On June 5, 2003, plaintiff Allen filed a *pro se* complaint with this Court (the "original complaint"), entitled "Debra Allen et al v. National Railroad Passenger Corporation [*3] (Amtrak)." (Doc. No. 1). The original complaint asserted claims for employment discrimination on the basis of race. (Id. at PP3, 5). The body of the original complaint referenced additional "employees" who were allegedly subject to discrimination by defendant, although the original complaint did not refer to these "employees" by name. (Id.). The original complaint was not served upon defendant within 120 days. (See Docket Report, attached as Ex. M to Def. Mot.; Declaration of Linda Damiano, attached as Ex. N to Def. Mot.).

Between July 25, 2003 and September 12, 2003, Scott, Shaw, and Jones filed individual complaints against Amtrak, alleging violations of Title VII. n1 The filing of the individual complaints took the following order. First, on July 25, 2003, Scott filed a motion to proceed *in forma pauperis* to proceed with a civil action against Amtrak. (See Certified Docket Entries for Civil Action No. 03-4352, attached as Ex. O to Def. Mot.). A complaint asserting Title VII claims was later filed on October 9, 2003, and, on November 10, 2003, plaintiff Scott attempted to serve process on the defendant. (See Docket Entry Nos. 3 and 8, attached as Exhibit [*4] O to Def. Mot.). Second, on August 1, 2004, plaintiff Shaw filed a *pro se* complaint against Amtrak, alleging viola-

Case 1:04-cv-00407-GMS   Document 23   Filed 03/27/2006   Page 22 of 76

2004 U.S. Dist. LEXIS 24846, *; 60 Fed. R. Serv. 3d (Callaghan) 421;
95 Fair Empl. Prac. Cas. (BNA) 403

tions of Title VII; however, process was not served on Amtrak. (See Docket Entry No. 1 for Civil Action No. 03-4479, attached as Ex. Q to Def. Mot.). Third, after filing a motion to proceed *in forma pauperis* on August 15, 2003, plaintiff Jones filed a *pro se* complaint alleging violations of Title VII on September 12, 2003; process was not served until October 17, 2003. (See Docket Entry Nos. 3 and 4 for Civil Action No. 03-4748, attached as Ex. R to Def. Mot.).

> n1 Plaintiff Green never filed a civil action against defendant following the issuance of the EEOC right-to-sue letter.

Sometime after the filing of their original complaints, Jones, Scott, and Shaw obtained legal representation. Through their attorney, H. Francis deLone, Jr., Jones, Scott, and Shaw voluntarily dismissed their original complaints against Amtrak in November 2003. (See Certified Docket Entry No. 8 for [*5] Civil Action No. 03-4748, attached as Ex. R to Def. Mot.; Certified Docket Entry No. 10 for Civil Action No. 03-4252, attached as Ex. O to Def. Mot.; Certified Docket Entry No. 9 for Civil Action No. 03-4479, attached as Ex. Q to Def. Mot.).

On January 26, 2004, plaintiffs' attorney filed an amended complaint in the instant case, asserting claims under Title VII and expressly naming Jones, Scott, Shaw, and Green as plaintiffs in the caption and in the body of the complaint. (Doc. No. 5). n2 Defendant was served with a copy of the amended complaint on the date that it was filed. (Doc. No. 5). However, because the original complaint had not yet been served on defendant, the Court on February 18, 2004 extended the deadline until March 3, 2004 for service of the complaint pursuant to Rule 4(m) of the Federal Rules of Civil Procedure. (Doc. No. 6). Defendant returned a signed waiver of service of summons on February 27, 2004, indicating that defendant received "a copy of the complaint in the action." (Doc. No. 7).

> n2 The amended complaint also sought to consolidate the claims of plaintiff Yvonne Upshur against defendant. Because defendant does not seek partial summary judgment on the claims of plaintiff Uphsur at this stage in the litigation, the procedural history behind plaintiff Uphsur's claims is irrelevant for resolution of defendant's instant motion.

[*6]

Plaintiffs' amended complaint contains six counts, all of which allege violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.. (Am. Compl. at P 14). Count I alleges that the defendant created a hostile work environment for plaintiffs. (Id. at PP19-28). Count II alleges that the defendant retaliated against plaintiffs after they filed claims with the EEOC. (Id. at PP29-34). Counts III-VI allege that the defendant failed to promote plaintiffs Jones, Scott, Shaw, and Upshur because of their race. (Id. at PP35-54).

## II. Discussion

### A. Summary Judgment Standard

[HN1] In considering a motion for summary judgment, the court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); Arnold Pontiac-GMC, Inc. v. General Motors Corp., 786 F.2d 564, 568 (3d Cir. 1986). [*7] Only facts that may affect the outcome of a case are "material." Anderson, 477 U.S. 242 at 248, 91 L. Ed. 2d 202. All reasonable inferences from the record are drawn in favor of the non-movant. See id. at 256.

[HN2] Although the movant has the initial burden of demonstrating the absence of genuine issues of material fact, the non-movant must then establish the existence of each element on

which it bears the burden of proof. See J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1531 (3d Cir. 1990) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)), cert. denied, 499 U.S. 921, 113 L. Ed. 2d 246, 111 S. Ct. 1313 (1991). As the non-movant, a plaintiff cannot avoid summary judgment with speculation or by resting on the allegations in his pleadings, but rather must present competent evidence from which a jury could reasonably find in her favor. Anderson, 477 U.S. at 248; Ridgewood Bd. of Educ. v. N.E. for M.E., 172 F.3d 238, 252 (3d Cir. 1999); Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989); Woods v. Bentsen, 889 F. Supp. 179, 184 (E.D. Pa. 1995). [*8]

### B. Defendant is not entitled to summary judgment on the claims of plaintiffs Jones, Scott, Shaw, and Green.

Defendant argues that it is entitled to partial summary judgment as a matter of law because the claims of Jones, Scott, Shaw, and Green are time-barred. (Def. Mot. Summary Judgment, at 9). [HN3] Under Title VII, a plaintiff must file a civil action within 90 days of re-

Case 1:04-cv-00407-GMS   Document 23   Filed 03/27/2006   Page 23 of 76

2004 U.S. Dist. LEXIS 24846, *; 60 Fed. R. Serv. 3d (Callaghan) 421;
95 Fair Empl. Prac. Cas. (BNA) 403

ceiving notice of a right to sue from the EEOC ("90-day limitation period"), unless the 90-day limitation period is tolled. See 42 U.S.C. § 2000(e)-5(f)(1); see Fed. R. Civ. P. 3 ("civil action is commenced by filing a complaint with the court"); Baldwin County Welcome Center v. Brown, 466 U.S. 147, 149-50, 80 L. Ed. 2d 196, 104 S. Ct. 1723 (1984). Typically, the EEOC provides notice in writing through a "right-to-sue" letter to the complaining party, with the 90-day period running upon receipt of the notice. In accordance with Federal Rule of Civil Procedure 6(e), absent evidence of the exact date of the receipt of the notice, it is presumed that the date of receipt of an EEOC right-to-sue letter is three [*9] days after its mailing. See Fed. R. Civ. P. 6(e) (adding 3 days to prescribed period when party must perform some task after service of notice upon party); see also Brown, 446 U.S. at 148 (presuming that date of receipt of right-to-sue notice is three days after issuance of letter).

In an attempt to defeat defendant's summary judgment motion, plaintiffs argue that their claims are not barred by the 90-day limitation period for three independent reasons. First, plaintiffs argue that they were parties to the original complaint, which was filed before August 20, 2003, the date of the expiration of the 90-day limitation period. (See Pl. Mem. In Opp'n to Def. Mot., at 3). Second, plaintiffs argue that the circumstances of the case equitably toll the 90-day limitation period. (Id. at 6). Third, plaintiffs imply that the amended complaint relates back to the filing of the original complaint for purposes of the 90-day limitation period. (Id. at 5-6). This Court agrees with plaintiffs' third argument.

**1. Plaintiffs Scott, Shaw, Jones, and Green were not parties to the original lawsuit.**

Plaintiffs argue that, by virtue [*10] of the "et al" designation in the caption of plaintiff Allen's original complaint, Scott, Shaw, Jones, and Green were parties to the original complaint. (Pl. Mem. In Opp'n to Def. Mot., at 4). On the other hand, defendant claims that Scott, Shaw, Jones, and Green were not parties to the original complaint because they were not listed as parties in the caption of the complaint or in the text of the complaint, as required by Federal Rule of Civil Procedure 10(a), and because none of the four plaintiffs signed the complaint, as required by Federal Rule of Civil Procedure 11(a). (Def. Mot., at 17-19).

Rule 10(a) of the Federal Rules of Civil Procedure requires every complaint to include the name of each party to the action. Fed. R. Civ. P. 10(a) ( [HN4] "Every pleading shall contain a caption setting forth the name of the court, the title of the action, the file number, and a designation as in Rule 7(a). In the complaint the title of the action shall include the names of all the parties . . ."). [HN5] The designation of "et al" in a complaint's [*11]

caption, without an identification of the proper parties in the body of the complaint, does not satisfy the Rule 10(a) identification requirement. See Ferdik v. Bonzelet, 963 F.2d 1258, 1262 (9th Cir. 1991) (dismissing pro se complaint that included "et al" in caption for failure to amend complaint in compliance with Rule 10(a)); Woods v. Goord, 2002 U.S. Dist. LEXIS 7157, 2002 WL 731691, at *1 n.2 (S.D.N.Y. April 23, 2002) (defendants not named in caption are parties to complaint because mentioned in body of complaint). This type of defective pleading fails to provide adequate notice to unnamed defendants, fails to inform the public of the facts surrounding court proceedings, and/or fails to apprise named defendants of the identities of additional plaintiffs or of parties similarly situated. See Bonzelet, 963 F.2d at 1262; Nat'l Commodity and Barter Assoc. v. Gibbs, 886 F.2d 1240, 1245 (10th Cir. 1989) (failure to expressly name members of organization in caption of complaint that refers to organization and its "members and subscribers" violates Rule 10(a) and deprives Court of jurisdiction over unnamed members because no action has commenced [*12] with respect to them); see also 27 Fed. Proc. L. Ed. § 62:101 (2004) ("The caption of the complaint must name both all of the plaintiffs and all of the defendants. The court lacks jurisdiction over a defendant not named in the complaint and who is thus not aware that the complaint should have been brought against him or her . . . .").

[HN6] Rule 11(a) requires a complaint to be "signed by at least one attorney of record in the attorney's individual name, or, if the party is not represented by an attorney, [to] be signed by the party." Fed. R. Civ. P. 11(a). Most courts interpret Rule 11(a) to require all pro se plaintiffs to sign the complaint. See, e.g., Simpson v. Department of Corrections, 1998 U.S. Dist. LEXIS 3422, 1998 WL 130102, at *1 (E.D. Pa. March 18, 1998) (interpreting Rule 11(a) as requiring that each pro se plaintiff sign the complaint); WGC, Jr. v. Roman Catholic Diocese of Paterson, 1996 WL 1177356, at *1 (D.N.J. Feb. 20, 1996) (pro se plaintiffs must sign their own names to complaint and must set forth own addresses and telephone numbers). Indeed, Rule 11(a) precludes one pro se plaintiff from [*13] signing on behalf of others. See, e.g., Abdul-Wadood v. Debruyn, 1996 U.S. App. LEXIS 15661, 1996 WL 359890, at *1 (7th Cir. June 10, 1996) (unpublished opinion).

Compliance with Rules 10(a) and 11(a) provides an accurate gauge as to whether a party is an official party to a lawsuit. It is indisputable that the caption of the original complaint failed to name Jones, Scott, Shaw, and Green in the caption. It is also indisputable that the body of the complaint failed to identify these plaintiffs by name. In fact, the only reference to other possible plaintiffs in the complaint is an allusion to "employees" who

were also allegedly subject to racial discrimination. Furthermore, none of the additional plaintiffs signed the complaint, as required by Rule 11(a), and defendant never received notice of the alleged parties to the original complaint until the filing of the amended complaint on January 26, 2004, 159 days after the expiration of the 90-day limitation period. To consider the claims of plaintiffs Jones, Scott, Shaw, and Green part of the original complaint would eviscerate the Supreme Court's declaration that "strict adherence to the procedural requirements specified by the legislature [*14] is the best guarantee of evenhanded administration of the law." Mohasco Corp. v. Silver, 447 U.S. 807, 826, 65 L. Ed. 2d 532, 100 S. Ct. 2486 (1980). Accordingly, even with this Court's obligation to liberally construe the inartful pleading of *pro se* complaints, this Court concludes that Jones, Scott, Shaw, and Green were not parties to the original complaint because they failed to comply with the requirements of Rules 10 and 11 of the Federal Rules of Civil Procedure. See, e.g., Boag v. MacDougall, 454 U.S. 364, 365, 70 L. Ed. 2d 551, 102 S. Ct. 700 (1982).

**2. The 90-day limitation period has not been equitably tolled.**

[HN7] The 90-day window during which a plaintiff may file a lawsuit after receipt of an EEOC right-to-sue letter is non-jurisdictional in nature. See Communications Workers of America v. New Jersey Dep't of Personnel, 282 F.3d 213, 216-17 (3d Cir. 2002) (filing of civil action under Title VII is "non-jurisdictional prerequisite, akin to statutes of limitations and . . . subject to waiver, estoppel and equitable tolling principles"). This means that the 90-day limitation period may be tolled [*15] in appropriate, albeit "sparing," circumstances. See, e.g., Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96, 112 L. Ed. 2d 435, 111 S. Ct. 453 (1991) (federal courts "only sparingly" toll statutory time limits applicable to Title VII claims). The Third Circuit has declared that the 90-day limitation period may be tolled in three instances: (1) when the defendant has actively misled the plaintiff; (2) when the plaintiff has in some "extraordinary way" been prevented from asserting her rights; n3 or (3) when plaintiff has timely asserted her rights mistakenly in the wrong forum. See Kocian v. Getty Refining & Marketing Co., 707 F.2d 748, 753 (3d Cir. 1983) (applying equitable tolling doctrine to Title VII claims). To invoke the benefit of this doctrine, a plaintiff must exercise due diligence in pursuing her claim. Id. at 151.

n3 [HN8] The Supreme Court has identified a list of unique situations that prevent a plaintiff from asserting her rights and that may justify tolling the statutory period, such as when a plaintiff received inadequate notice of the time limit to file

a civil action; when a motion for appointment for counsel is pending and equity would justify tolling the statutory period until the motion is acted upon; or when the court affirmatively led plaintiff to believe that she successfully met the requirements for bringing a Title VII claim. See Brown, 466 U.S. at 151-152.

[*16]

[HN9] Despite the existence of the equitable tolling doctrine, it is well-settled that the voluntary dismissal of a complaint does not toll a statute of limitations, but, instead, leaves the parties in the position they were in prior to the filing of the original complaint. See, e.g., Cardio-Medical Assoc., Ltd. v. Crozer-Chester Medical Center, 721 F.2d 68, 77 (3d Cir. 1983) ("It is a well recognized principle that a statute of limitations is not tolled by the filing of a complaint subsequently dismissed without prejudice. As regards the statutes of limitations, the original complaint is treated as if it never existed."); see also Wright & Miller, 9 Federal Practice and Procedure § 2367 (1995) ("A voluntary dismissal without prejudice leaves the situation as if the action never had been filed . . . The statute of limitations is not tolled by bringing an action that later is dismissed voluntarily under Rule 41(a)."). Courts have applied this well-settled principle to Title VII claims. See, e.g., Brown v. Hartshorne Public School District, 926 F.2d 959, 961 (10th Cir. 1991) (dismissing Title VII claim because plaintiff voluntarily dismissed [*17] complaint prior to start of trial due to attorney's injury and then refiled claim after 90-day limitation period); Price v. Digital Equip. Corp., 846 F.2d 1026, 1027 (5th Cir. 1988) (dismissal of Title VII claim for want of prosecution does not toll 90-day limitation period, even when plaintiff later refiles lawsuit); Neal v. Xerox Corp., 991 F. Supp. 494, 498 (E.D. Va. 1998) (refusing to equitably toll 90-day limitation period for Title VII claim because plaintiff voluntarily dismissed complaint, and then re-filed lawsuit after expiration of 90-day limitation period). These courts reason that the failure to research the ramifications of a voluntarily dismissal constitutes a lack of "due diligence in preserving [one's legal] rights," thereby precluding the tolling of the 90-day limitation period. See, e.g., Neal, 991 F. Supp. at 498.

Plaintiffs have presented no evidence that they were misled or prevented from asserting their claims. Nor did plaintiffs assert their claims in the wrong forum. Instead, Scott, Shaw, and Jones filed individual complaints within the 90-day limitation period, and, then, while represented by their [*18] current attorney, voluntarily dismissed those claims. The decision to voluntarily withdraw these complaints appears to have been the product of strategic, albeit erroneous, decision-making, and does not justify

Case 1:04-cv-00407-GMS   Document 23   Filed 03/27/2006   Page 25 of 76

2004 U.S. Dist. LEXIS 24846, *; 60 Fed. R. Serv. 3d (Callaghan) 421;
95 Fair Empl. Prac. Cas. (BNA) 403

tolling the 90-day limitation period. In response, plaintiffs baldly reference the proposition that "equitable tolling may be appropriate when a plaintiff has made diligent but technically defective efforts to act within the limitations period." (Pl. Surreply Mem. In Opp'n, at 2). n4 The crux of this argument seems to be that plaintiffs' *pro se* status not only excuses them from complying with the Federal Rules of Civil Procedure at the time of the filing of the original complaint, but also justifies their failure to comply with the Rules within the 90-day limitations period. Plaintiffs provide no applicable case law in support of this argument. Furthermore, this argument fails as a matter of law, because, in the instant situation, [HN10] the unintentional failure both to properly name the appropriate parties and to rectify this mistake within the 90-day limitations period constitutes a "garden variety claim of excusable neglect" on behalf of the plaintiffs, to which the principles [*19] of equitable tolling do not apply. Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96, 112 L. Ed. 2d 435, 111 S. Ct. 453 (1991) (refusing to toll limitations on basis that plaintiff's lawyer was absent from office when EEOC notice was received, even though plaintiff filed claim within statutory limit from the date on which he personally received notice); see also Brown, 466 U.S. at 151 (refusing to toll limitations for *pro se* plaintiff who mailed notice of EEOC right-to-sue letter to Court and who requested appointment of counsel, but who failed to file actual complaint within 90 days); Jones v. Next Day Motor Freight, Inc., 2002 U.S. Dist. LEXIS 25147, 2002 WL 31936688, at *2 (D. Kan. Dec. 19, 2002) (plaintiff's *pro se* status does not justify tolling 90-day limitation period when complaint alleging Title VII violations filed 109 days after receipt of right-to-sue notice).

n4 In support of this proposition, plaintiffs cite the lone case of Bowden v. United States, 323 U.S. App. D.C. 164, 106 F.3d 433 (D.C. Cir. 1997), in which the court declared that "courts have excused parties, particularly those acting pro se, who make diligent but technically defective efforts to act within a limitations period." Id. at 438. Unfortunately, Bowden does not discuss this equitable tolling exception, nor does it contain facts analogous to those in this case. Thus, Bowden does not provide legal support for equitably tolling the 90-day limitation in this litigation.

[*20]

Accordingly, because Scott, Shaw, and Jones chose to voluntarily dismiss their individual lawsuits against defendant after the expiration of the 90-day limitation, and because plaintiffs' counsel fails to provide any evidence why the 90-day limitation period should be tolled with respect to Scott, Shaw, Jones, and Green, this Court concludes that plaintiffs are not entitled to invoke the equitable tolling doctrine as a matter of law.

**3. The claims of Scott, Green, Shaw, and Jones in the amended complaint relate back to the date of the filing of the original complaint.**

Plaintiffs implicitly argue that the amended complaint relates back to date of the filing of the original complaint pursuant to Federal Rule of Civil Procedure 15(c), thereby satisfying the 90-day limitation period for filing a Title VII claim. Fed. R. Civ. P. 15(c). This Court agrees.

[HN11] Rule 15(c) strikes a balance between the policy of adjudicating claims on their merits and the policy of avoiding prejudice to defendants by applying with fairness the relevant limitation period. See, e.g., Olech v. Village of Willowbrook, 138 F. Supp. 2d 1036, 1042 (N.D. Ill. 2000). [*21] To achieve this balance, Rule 15(c)(3) permits an amended pleading that seeks to add a party to relate back to the date of the original pleading upon the satisfaction of three elements. Fed. R. Civ. P. 15(c)(3); see also Nelson v. County of Allegheny, 60 F.3d 1010, 1014 (3d Cir. 1995) (Rule 15(c)(3) applies to amended pleadings that seek to "add" new plaintiffs). First, "the claim or defense asserted in the amended pleading must arise out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Fed. R. Civ. P. 15(c)(3). Second, "within the period provided by Rule 4(m) for service of the summons and complaint, the party to be brought in . . . has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits." Fed. R. Civ. P. 15(c)(3)(A). Third, within the period provided by Rule 4(m), the defendant "knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against [*22] the party." Fed. R. Civ. P. 15(c)(3)(B).

[HN12] Although the literal text of Rule 15(c)(3) applies only to the naming of additional defendants, the Third Circuit has applied this three-prong standard for relating back to an amended pleading that names additional plaintiffs. See Nelson, 60 F.3d at 1014; see also Advisory Committee Notes to 1966 Amendment to Fed. R. Civ. P. 15(c) ("The relation back of amendments changing plaintiffs is not expressly treated in revised Rule 15(c) since the problem is generally easier. Again the chief consideration of policy is that of the statute of limitations, and the attitude taken in revised Rule 15(c) toward change of defendants extends by analogy to amendments changing plaintiffs."). In performing an analysis that is not contemplated by the literal language

Case 1:04-cv-00407-GMS   Document 23   Filed 03/27/2006   Page 26 of 76

2004 U.S. Dist. LEXIS 24846, *; 60 Fed. R. Serv. 3d (Callaghan) 421;
95 Fair Empl. Prac. Cas. (BNA) 403

of Rule 15(c)(3), it is vital to keep in mind the purpose of the Rule, which is to "prevent parties against whom claims are made from taking unjust advantage of otherwise inconsequential pleading errors to sustain a limitations defense." See Advisory Committee Notes to 1991 Amendment to Fed. R. Civ. P. 15(c) [*23] . Reflective of this purpose, the focus of the Rule 15(c)(3) analysis is on the defendant's "notice" of the new claims. See Schiavone v. Fortune, 477 U.S. 21, 31, 91 L. Ed. 2d 18, 106 S. Ct. 2379 (1986) ("The linchpin [of Rule 15(c)] is notice").

### A. Same Transaction or Occurrence

The first element of the Rule 15(c)(3) standard requires the claims of the amended pleading to arise out of the conduct, transaction, or occurrence set forth in the original complaint. Id. Defendant does not dispute that the majority of the claims of plaintiffs Shaw, Green, Scott, and Jones arise out of the subject matter of the original complaint. However, defendant argues that the claim asserted by plaintiff Shaw in Count V of the amended complaint, which alleges a failure to promote with respect to an "Advocate" position, fails to meet this standard. (Def. Mot., at 22).

The original complaint is quite broad in its description of the defendant's discriminatory behavior. It alleges that defendant's general manager "retaliated against employees and discriminated against them based on their race by not promoting to leads [sic] positions, changing shift assignments and scheduling, [and] adverse [*24] treatment regarding the terms and conditions of their employment." (Compl. at P3). In other words, the underlying conduct in the original complaint is the defendant's discriminatory behavior, which, according to the original complaint, took the specific form of retaliating against, failing to promote to important positions, and adversely treating African-American employees. Count V of the amended complaint, which alleges that defendant discriminated against Shaw by failing to promote him to an "advocate" position, certainly arises from the pattern of discriminatory conduct both generally and specifically described in the original complaint.

### B. Notice and Prejudice

The second prong of Rule 15(c)(3) evaluates whether defendant received notice of the institution of the action within the time provided by Rule 4(m) so that defendant would be prejudiced in maintaining a defense against the newly added parties. Fed. R. Civ. P. 15(c)(3)(A). Defendant claims that it had no knowledge of the institution of the original complaint within 120 days of its filing. (Def. Mot. at 21-22). Defendant also claims that it would suffer prejudice by allowing [*25] the four plaintiffs to assert claims in the instant action. (Id. at 22).

[HN13] Rule 15(c)(3)(A) requires that the defendant have formal or informal notice of the institution of the action within the period provided by Rule 4(m) for service of the summons and complaint. See, e.g., Advanced Power Systems, Inc. v. Hi-Tech Systems, Inc., 801 F. Supp. 1450, 1456 (E.D. Pa. 1992) (notice may be formal or informal). Rule 4(m) sets the time for service at 120 days after the filing of the complaint, while giving a court the discretion to direct that service be effected within a specified time and to extend the time for service for an appropriate period. Fed. R. Civ. P. 4(m). This means that 120 days will not always be the applicable time frame for purposes of a Rule 15(c)(3) analysis, and that the appropriate standard, in certain instances, may be whether the defendant received notice within any "additional time resulting from any extension ordered by the court pursuant to that rule . . . ." Advisory Committee's Note to 1991 Amendment to Fed. R. Civ. P. 15(c).

Applying this conceptualization [*26] of "notice" to the facts of this case, this Court finds that defendant had notice both of the original complaint and of the amended complaint within the time provided by Rule 4(m). Although the 120-day period ended on October 3, 2003, the Court issued an Order on February 18, 2004 that extended the deadline for plaintiffs to serve the original complaint and summons until March 3, 2004. (Doc. No. 5, 6). However unintended, the effect of the Order was to extend the time period for which notice could be provided to defendant pursuant to Rule 15(c)(3). It is undisputed that, prior to March 3, 2004, defendant was served with a copy of the amended complaint, which gave defendant notice of the new claims and of the existence of the original complaint. (Doc. No. 5, 7). Thus, although defendant did not receive notice of the original action within 120 days after the filing of the original complaint, defendant received notice both of the commencement of the original action and of the claims by the newly added parties within the time period provided by Rule 4(m).

The fact that defendant had notice of both the original complaint and the amended complaint within the period specified by Rule 4(m) [*27] does not mean that the defendant's presentation of its defense was not prejudiced by the delay in providing notice until after the expiration of the 90-day limitation period. Nonetheless, [HN14] because the prejudice element of the Rule 15(c)(3)(A) analysis is dependent upon, rather than independent of, the notice requirement, notice of the matters raised in the amended pleading within the applicable time limit generally eliminates the prejudice a party may experience. See, e.g., Sokolski v. Trans Union Corp., 178 F.R.D. 393, 398 (E.D.N.Y. 1988) (principal inquiry is whether defendant received adequate notice of matters raised in amended pleading by general fact situation alleged in original pleading); Wright, Miller, & Kane, 6A

Case 1:04-cv-00407-GMS   Document 23   Filed 03/27/2006   Page 27 of 76

2004 U.S. Dist. LEXIS 24846, *; 60 Fed. R. Serv. 3d (Callaghan) 421;
95 Fair Empl. Prac. Cas. (BNA) 403

Federal Practice and Procedure § 1501, at 154-155 ("As long as defendant is fully apprised of a claim arising from specified conduct and has prepared to defend the action, his ability to protect himself will not be prejudicially affected if a new plaintiff is added, and he should not be permitted to invoke a limitations defense."). Indeed, the type of prejudice that Rule 15 (c)(3) refers to is not an increase in liability, which would apply [*28] regardless of when defendant received notice; but, instead, those strategic hardships imposed by the unreasonable passage of time upon a defendant's ability to present an effective defense. See _Nelson, 60 F.3d at 1014-15 (prejudice defined as that "suffered by one who, for lack of timely notice that a suit has been instituted, must set about assembling evidence and constructing a defense when the case is already stale") (internal quotations omitted).

In this unique procedural situation, defendant received notice of the original complaint and of the amended complaint within the time provided by Rule 4(m). This means that defendant started defending the claims of the original plaintiff at the same time that defendant had notice of, and presumably started defending, the claims of the additional plaintiffs. As such, the addition of new plaintiffs through the amended complaint will not hinder the defendant's ability to conduct discovery. More importantly, because the amended complaint does not allege new types of facts, legal claims, or injuries, gathering and presenting evidence relevant to a defense against the additional Title VII claims will be nearly identical to [*29] the gathering and presenting of evidence relevant to a defense against the original Title VII claims brought by plaintiff Allen. Furthermore, defendant does not argue that evidence necessary to defend the claims of Shaw, Green, Scott, and Jones has been lost or destroyed. Nor does defendant argue that it has taken affirmative steps in reliance upon its belief that the claims of Shaw, Jones, Green, and Scott are time-barred. Therefore, this Court finds that defendant received timely notice and would not suffer prejudice by defending the claims of the additional parties. See, e.g., _Nelson, 60 F.3d at 1010 (no prejudice when new plaintiffs allege injury by the same conduct described in original pleading).

## C. Mistake Concerning the Identity of the Proper Party

The third prong of the Rule 15(c)(3) standard evaluates whether, within the time specified in Rule 4(m), the defendant knew or should have known that, but for a mistake concerning the identity of the proper party, the claims of the new parties would have been brought with the original action. Fed. R. Civ. P. 15(c)(3)(B). Defendant contends that none of the four [*30] plaintiffs can demonstrate that there was an actual "mistake concerning the identity of the proper party" because each of the four plaintiffs "made strategic decisions to pursue individual actions as they saw fit." (Def. Mot., at 22). Defendant further contends that even if a mistake was made, defendant had no knowledge that, but for this mistake, the claims of plaintiffs Jones, Scott, Shaw, and Green would have been brought with the original action. (Id., at 21).

[HN15] A "mistake concerning the identity" of the newly named party is a requirement for an amended complaint to relate back to an original complaint. See, e.g., Nelson v. Adams USA, Inc., 529 U.S. 460, 467 n.1, 146 L. Ed. 2d 530, 120 S. Ct. 1579 (2000) ("mistake" of identity essential element of Rule 15(c)(3) standard). Although some courts relax the mistake requirement when the amended complaint seeks to add new plaintiffs, the Third Circuit continues both to demand the existence of a mistake concerning the identity of the new party and to couch this element in the reasonable knowledge of the defendant during the time provided by Rule 4(m). Compare Nelson, 60 F.3d at 1014 (amended complaint adding [*31] new plaintiffs does not relate back because failure to add names to complaint was not due to mistake) with Olech,138 F. Supp. 2d at 1044 (refusing to impose mistake requirement when amended pleading seeks to add new plaintiffs because "mistake requirement would serve no substantive purposes, but only would erect a needless barrier to adjudication of claims on the merits"). The "mistake" element ensures the existing defendant's awareness that a new party, and potentially a new claim, might be added to the case and that plaintiff intended to add new parties at the time of the filing of the original complaint, rather than pursuing a deliberate strategy of piecemeal litigation. _Advanced Power Systems, Inc., 801 F. Supp. at 1457.

It is well-settled that [HN16] a "mistake" within the meaning of Rule 15(c)(3)(B) includes erroneous judgments of law and fact. See, e.g., _Dalicandro v. Legalgard Inc., 2002 U.S. Dist. LEXIS 25443, 2003 WL 182942, at *6 (E.D. Pa. Jan. 23, 2003) (purpose of Rule 15(c) is to protect plaintiffs who name the wrong parties due to mistake of law or fact); _Advanced Power Systems, Inc., 801 F. Supp. at 1457 ("courts have typically [*32] resisted a narrow reading of the mistake element and allowed the addition of responsible individual defendants when plaintiff simply made an error in legal judgment or form in suing only the corporation"); _Kinnally v. Bell of Pennsylvania, 748 F. Supp. 1136, 1142 (E.D. Pa. 1990) (mistake pursuant to Rule 15(c)(3) also "includes errors in legal form," such as "where a plaintiff has full knowledge of all relevant actors but lists the technically incorrect party in her complaint"; permitting *pro se* plaintiff's amended complaint naming additional parties who could have been included in original complaint to relate back because plaintiff's mistake was due to legal ignorance).

Case 1:04-cv-00407-GMS    Document 23    Filed 03/27/2006    Page 28 of 76

2004 U.S. Dist. LEXIS 24846, *; 60 Fed. R. Serv. 3d (Callaghan) 421;
95 Fair Empl. Prac. Cas. (BNA) 403

In applying the "mistake" requirement, courts focus on the reasons for the plaintiff's delay either in entering, or bringing a new defendant into, the litigation. See, e.g., Nelson, 60 F.3d at 1014 (focusing on whether plaintiffs "sat on their rights" before filing claims). For instance, it is well-settled that 15(c)(3)(B) is not met if the plaintiff is aware of the identity of the newly named parties when she files her original complaint and simply "chooses" not to name [*33] them at that time. See, e.g., Garvin v. City of Philadelphia, 354 F.3d 215, 221 (3rd Cir. 2003); Lundy, 34 F.3d 1173, 1184 (3d Cir. 1994) (no mistake because "no reason for another party to believe that plaintiff did anything other than make a deliberate choice"). On the other hand, however, the technical failure to name a party at the time of the original complaint, despite an intent to do so, constitutes a "mistake" within the meaning of Rule 15(c)(3). See, e.g., Urrutia v. Harrisburg County Police Dep't., 91 F.3d 451, 457-58 (3d Cir. 1996) ("mistake" element met because plaintiff "intended" to sue individual police officers in § 1983 claim, although plaintiff named only the police department in the original complaint); Woods v. Indiana Univ.-Purdue Univ. at Indianapolis, 996 F.2d 880, 888 (7th Cir. 1993) (finding counsel's "legal blunder" in pursuing state agencies rather than individual state actors constitutes mistake within meaning of Rule 15(c)(3)). This comports with the underlying purpose of the early amendments to Rule 15(c), which were "expressly intended to preserve legitimate suits despite such mistakes of law at the pleading stage. [*34] " Soto v. Brooklyn Correctional Facility, 80 F.3d 34, 36 (2nd Cir. 1996).

Applying this standard, the Court concludes that plaintiffs made a mistake in legal judgment and form within the meaning of Rule 15(c)(3). In November 2001, the attorney representing plaintiffs Shaw, Green, Scott, Jones, and Allen filed an informal charge of discrimination with the EEOC on behalf of all plaintiffs, alleging that each plaintiff was subject to the racial discrimination later described in the original and amended complaints. (See November 20, 2001 Letter to EEOC, attached as Ex. E to Pl. Mem. In Opp'n to Def. Mot.). n5 On May 19, 2003, the EEOC treated the plaintiffs' claims collectively and sent individual right-to-sue letters to each of the plaintiffs. (See Notices of Right to Sue, attached as Ex. G-K to Def. Mot.). Shortly after receiving these right-to-sue letters, plaintiff Allen filed the original complaint on behalf of her and plaintiffs Shaw, Green, Scott, Jones, and Upshur. (See Declaration, attached as Ex. C to Pl. Mem. In Opp'n to Def. Mot.). Indeed, according to their declarations, each plaintiff paid part of the filing fee, and each believed that he [*35] or she was part of that original suit. (See Declarations, attached as Ex. C to Pl. Mem. In Opp'n to Def. Mot.). In filling out the complaint, however, plaintiff Allen made the legal mistakes of placing only her name, followed by the designation "et al," on

the caption, of referring to the other intended plaintiffs as "employees" in the body of the complaint, and of filing the complaint without companion signatures by the other intended plaintiffs. (See Compl.). n6 These technical, unintended violations of Rules 10 and 11, while preventing Shaw, Green, Jones, and Scott from being considered parties to the original complaint, support plaintiffs' argument that the omission of their names was due to a legal mistake, rather than litigation strategy. Plaintiffs' continuing, albeit erroneous, belief that they remained parties to the original complaint also precludes a factual finding that plaintiffs slept on their rights and are now seeking to exploit the benefits of Rule 15(c)(3). See Nelson, 60 F.3d at 1015. Consequently, this Court finds that the legal errors made by the *pro se* plaintiffs in this litigation constitute "mistakes concerning the identity of the [*36] proper party." Fed. R. Civ. P. 15(c)(3)(B); see also Nelson, 60 F.3d at 1015 (no mistake when plaintiffs do not demonstrate that failure to add name to complaint was due to mistake). n7

n5 Specifically, the November 20, 2001 EEOC letter asserts that plaintiffs Allen, Green, Jones, Scott, and Shaw were "long time, senior employees" at defendant's Crew National Operations Center ("CNOC") in Wilmington, Delaware. (See November 20, 2001 EEOC Letter, at 1). The EEOC letter describes the "widespread posting" of a racially demeaning cartoon throughout the CNOC, the defendant's failure to investigate this incident, and the retaliatory acts suffered by plaintiffs for complaining about the cartoon. (Id.). The EEOC letter also alleges that this was "part of a larger pattern" of discrimination, in which plaintiffs suffered

> disparate and adverse treatment regarding the terms and conditions of their employment, including but not limited to, shift assignments and scheduling, lead person assignments, FMLA, personal and sick leave requests, application of Short Term Disability policies and procedures, application of discipline and attending policies and job bidding and assignments in general.

(Id. at 3). These factual allegations, along with the corresponding Title VII legal theories, form the substance of the original complaint and the amended complaint. (See Compl. and Am. Compl.).

Case 1:04-cv-00407-GMS  Document 23  Filed 03/27/2006  Page 29 of 76

2004 U.S. Dist. LEXIS 24846, *; 60 Fed. R. Serv. 3d (Callaghan) 421;
95 Fair Empl. Prac. Cas. (BNA) 403

[*37]

n6 Plaintiffs attribute the failure to comply with Rules 10 and 11 to the spatial limitations of the standard *pro se* complaint form distributed by the Court. Plaintiffs argue that the standard form contains "no room on the form for multiple names and addressed on the four lines provided for the address and telephone number (both stated in the singular) or for multiple signatures on either line that asks for a signature (with signature stated in the singular)." (Pl. Mem. In Opp'n to Def. Mot., at 4). Furthermore, plaintiffs claim that the "form contains no instructions about any need to list multiple names and addresses on the four lines provided for the address and telephone number (both stated in the singular) or to have multiple people sign the form in the small space allowed for the signature (stated in the singular)." (Id.). Although the alleged spatial limitations of the *pro se* complaint form do not justify a failure to comply with Rules 10 and 11, this Court takes these arguments into consideration in determining whether plaintiff Allen made a "mistake" within the meaning of Rule 15(c)(3).

n7 Although the filing of separate complaints by Shaw, Scott, and Jones on a *pro se* basis evinces an intent to strategically pursue individual claims, this decision is not incompatible with a corollary belief that they were still parties to the original complaint, the filing fee of which they partially paid. Plaintiffs' declarations confirm this belief, which is enhanced by the use of "et al" in the caption of the original complaint and its reference to additional "employees" who were subject to racial discrimination in violation of Title VII. (See Declarations, attached as Ex. C to Pl. Mem. In Opp'n to Def. Mot.).

[*38]

This Court also finds that the defendant "should have known" that, but for the mistake, additional parties would have joined the original complaint. Several reasons support this conclusion. First, defendant received notice of the amended complaint and the original complaint at the same time, prior to the end of the Rule 4(m) period. A cursory reading of the original complaint, followed by a comparison of the original complaint with the amended complaint, would have indicated that the plaintiffs intended to bring one lawsuit and that plaintiff Allen intended to assert in the original complaint the claims of those employees allegedly subjected to racial discrimina-

tion at defendant's Crew National Operations Center in Wilmington, Delaware. Second, prior to the end of the Rule 4(m) period, defendant was aware that individual claims had been brought by Jones, Shaw, and Scott, and that each of these individual claims was later voluntarily dismissed by the same attorney who filed the amended complaint on behalf of plaintiffs. Third, defendant received a copy of the November 20, 2001 EEOC discrimination charge, which was filed on behalf of plaintiffs Allen, Green, Jones, Scott, and Shaw,  [*39] thereby indicating to defendant that the claims of these employees were linked factually and legally and suggesting that these parties intended to pursue these claims together in a court of law. (See November 20, 2001 Letter to EEOC, attached as Ex. E to Pl. Mem. In Opp'n to Def. Mot.).

Based upon the body of the complaint, the affidavits provided by plaintiffs, and the procedural and administrative history of this case, this Court finds as a matter of law that defendant should have known that, but for the mistake, the claims of plaintiffs Shaw, Jones, Scott, and Green would have been brought with the original complaint. This holding is consistent with the text and purpose of Rule 15(c)(3), as it prevents the dismissal of claims due to an "otherwise inconsequential pleading error." See Advisory Committee Note to 1991 Amendment to Fed. R. Civ. P. 15(c).

### III. Conclusion

For the foregoing reasons, this Court finds that the claims of Green, Scott, Shaw, and Jones, as expressed in the amended complaint, relate back to the date of the filing of the original complaint. In turn, because these claims are treated as if they were filed [*40] on the date of the original complaint, they are not time-barred by the 90-day limitation period of 42 U.S.C. § 2000(e)-5(f)(1). Defendant's motion for partial summary judgment is therefore denied. An appropriate Order follows.

### ORDER

AND NOW, this 7th day of December 2004, upon consideration of Defendant's Motion for Partial Summary Judgment (Doc. No. 12), filed on July 9, 2004, Plaintiffs' Memorandum in Opposition to Defendant's Motion for Summary Judgment (Doc. No. 13), filed on July 26, 2004, Defendant's Reply Memorandum in Further Support of its Motion for Partial Summary Judgment (Doc. No. 16), filed on September 3, 2004, and Plaintiffs' Surreply Memorandum in Opposition to Defendant's Motion for Partial Summary Judgment (Doc. No. 19), filed on September 21, 2004, it is hereby ORDERED that Defendant's Motion for Partial Summary Judgment is DENIED.

BY THE COURT:

2004 U.S. Dist. LEXIS 24846, *; 60 Fed. R. Serv. 3d (Callaghan) 421;
95 Fair Empl. Prac. Cas. (BNA) 403

S/LEGROME D. DAVIS

Legrome D. Davis, J.

LEXSEE

## ROLAND ANDERSON, Plaintiff, v. GENERAL MOTORS CORP. and LOCAL 435 (UAW), Defendants.

### Civil Action No. 03-275 JJF

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

### 2004 U.S. Dist. LEXIS 5430; 174 L.R.R.M. 3372

### March 29, 2004, Decided

**DISPOSITION:** [*1] Defendants' motions to dismiss granted. Plaintiff's motion to amend denied. Judgment entered in favor of defendants and against plaintiff.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff former employee filed a Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C.S. § 2000e et seq., action against defendant former employer after he was laid off from his job. The suit was dismissed. The employee then filed a second Title VII action against the employer and defendant, his former union. Defendants moved to dismiss the complaint. The employee moved to amend his complaint.

**OVERVIEW:** The employee filed two complaints against the employer with the Equal Employment Opportunity Commission. It dismissed the first complaint, finding no Title VII violation, and dismissed the second claim as untimely filed. The employee's first Title VII action was dismissed on the grounds that he was not entitled to be recalled and had failed to show discriminatory conduct on the employer's part. In his second suit, the employee alleged that the employer had committed a second Title VII violation and that the union had breached its duty to him. He sought leave to amend his complaint to add a claim under § 301(A) of the Labor Management Relations Act (LMRA), 29 U.S.C.S. § 185(a), and other civil rights claims. Defendants moved to dismiss, asserting that the suit was futile. The court agreed. The employee had not timely filed his second charge with the EEOC as required by 42 U.S.C.S. § 2000(e)-5(e)(1); he presented no grounds for tolling the statute of limitations as to his Title VII claims. Amending the complaint would have been futile; the employee did not demonstrate an incapacity or illness that justified his extraordinary 20-year delay in asserting his LMRA claims.

**OUTCOME:** The court granted defendants' motion to dismiss. It denied, as moot, the employer's summary judgment motion. It denied the employee's motion to amend his complaint. The court entered judgment in favor of defendants and against the employee.

**CORE TERMS:** statute of limitations, lawsuit, motion to dismiss, futile, seniority, recalled, discriminated, timely manner, amend, equitably tolled, cause of action, filing period, infirmity, statute of limitations defense, continuing violation, discriminatory, demonstrating, concealed, tolling, tolled, limitations period, incapacity, six-month, asserting, withheld, entitle, hybrid, toll, motions to dismiss, failure to comply

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
*Governments > Legislation > Statutes of Limitations > Pleading & Proof*
*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses*
[HN1] When considering a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a court must accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom. A court will grant a defendant's motion to dismiss only if it appears that the plaintiff can prove no set of facts that would entitle him or her to relief. Failure to comply with the statute of limitations will justify granting a motion to dismiss where the claim is facially non-compliant with the limitations period and the affirmative defense of failure to comply with the statute of limitations clearly appears on the face of the pleading.

Case 1:04-cv-00407-GMS    Document 23    Filed 03/27/2006    Page 32 of 76

2004 U.S. Dist. LEXIS 5430, *; 174 L.R.R.M. 3372

*Civil Procedure > Pleading & Practice > Pleadings > Interpretation*
*Civil Procedure > Joinder of Claims & Parties > Self-Representing Parties*
[HN2] A court is to construe a handwritten pro se complaint liberally, holding it to a less stringent standard than pleadings drafted by attorneys.

*Civil Procedure > Trials > Judicial Discretion*
*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings*
[HN3] Fed. R. Civ. P. 15 permits a court to freely grant a party leave to amend his or her pleadings when justice so requires. The decision of whether to grant a motion to amend is within the discretion of the district court. However, a court should deny leave to amend if the moving party is guilty of undue delay, bad faith, dilatory motive, prejudice, or his or her amended claims are futile. An amendment to a pleading is deemed futile if the amendment could not withstand a motion to dismiss.

*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Time Limitations*
*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Exhaustion of Remedies*
[HN4] Under Title VII of the Civil Rights Act of 1964 (Title VII), an individual must file a charge of employment discrimination within 180 days of the unlawful employment practice or 300 days of the practice if the individual has initiated proceedings with a state or local agency who has the authority to grant relief. 42 U.S.C.S. § 2000(e)-5(e)(1). Under Delaware law, claimants who have filed with either the Equal Employment Opportunity Commission or the Delaware Department of Labor may assert the 300 day statute of limitations. Filing a charge under 42 U.S.C.S. § 2000(e)-5 is a prerequisite to a Title VII action.

*Labor & Employment Law > Collective Bargaining & Labor Relations > Unfair Labor Practices*
[HN5] See § 301(A) of the Labor-Management Relations Act, 29 U.S.C.S. § 185(a).

*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Labor & Employment Law > Collective Bargaining & Labor Relations > Unfair Labor Practices*
*Civil Procedure > State & Federal Interrelationships > Choice of Law*
[HN6] The Labor-Management Relations Act does not explicitly set forth a statute of limitations for Section

301(A) of the Act, 29 U.S.C.S. § 185(a), and a court must import the most analogous statute of limitations from state or federal law.

*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Labor & Employment Law > Collective Bargaining & Labor Relations > Unfair Labor Practices*
[HN7] A "hybrid" lawsuit under § 301(A) of the Labor-Management Relations Act, 29 U.S.C.S. § 185(a), is governed by a six-month statute of limitations borrowed from § 10(b) of the National Labor Relations Act. This statute of limitations begins to run when it becomes clear that further internal appeals would be futile.

*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Time Limitations*
*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Exhaustion of Remedies*
[HN8] Under the continuing violation exception, a plaintiff may pursue a Title VII of the Civil Rights Act of 1964 claim beyond the statute of limitations period if he can demonstrate that the alleged discrimination is part of an overall pattern or practice of discrimination. The plaintiff must show that at least one act of discrimination occurred within the filing period and that the discrimination is part of an ongoing practice and not an isolated or sporadic occurrence. If a plaintiff can meet this burden, the filing period is considered irrelevant and the plaintiff is allowed to bring in the prior acts of discrimination and recover for the entire violation.

*Governments > Legislation > Statutes of Limitations > Tolling*
[HN9] Del. Code Ann. tit. 10, § 8116 does not apply to discrimination actions and is inapplicable to a plaintiff's claims under Title VII of the Civil Rights Act of 1964 and the Labor-Management Relations Act.

*Governments > Legislation > Statutes of Limitations > Tolling*
*Civil Procedure > State & Federal Interrelationships > Application of State Law*
*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Time Limitations*
[HN10] State law tolling or savings provisions do not apply to the limitations periods expressly set forth in Title VII of the Civil Rights Act of 1964 (Title VII). However, the statute of limitations for Title VII can be equitably tolled. In the Third Circuit, there are three principal circumstances under which a statute of limita-

Case 1:04-cv-00407-GMS    Document 23    Filed 03/27/2006    Page 33 of 76

2004 U.S. Dist. LEXIS 5430, *; 174 L.R.R.M. 3372

tions can be equitably tolled: (1) where the defendant has actively misled the plaintiff respecting the plaintiff's cause of action; (2) where the plaintiff in some extraordinary way has been prevented from asserting his or her rights; or (3) where the plaintiff has timely asserted his or her rights mistakenly in the wrong forum.

***Governments > Legislation > Statutes of Limitations > Tolling***
***Labor & Employment Law > Collective Bargaining & Labor Relations > Unfair Labor Practices***
[HN11] There is no exception under § 301(A) of the Labor-Management Relations Act (LMRA), 29 U.S.C.S. § 185(a) or § 10(b) of the National Labor Relations Act that allows the statute of limitations to be tolled based on incapacity or infirmity. However, for hybrid actions under § 301(A) of the LMRA, the statute of limitations can be equitably tolled. Therefore, whether a plaintiff is entitled to relief from the statute of limitations under § 301(A) of the LMRA is an equitable determination.

***Governments > Legislation > Statutes of Limitations > Tolling***
***Governments > Legislation > Statutes of Limitations > Equitable Estoppel***
[HN12] Where a defendant has attempted to mislead a plaintiff from suing on time, a plaintiff can equitably toll the statute of limitations.

**COUNSEL:** Roland Anderson, Wilmington, Delaware. Pro Se Plaintiff.

Jennifer C. Bebko Jauffret, Esquire of RICHARDS, LAYTON & FINGER, Wilmington, Delaware.

Of Counsel: James M.L. Ferber, Esquire and Cheryl R. Hankerson, Esquire of LITTLER MENDELSON, P.C., Columbus, Ohio. Attorneys for Defendant General Motors Corporation.

Stephen B. Potter, Esquire of POTTER, CARMINE, LEONARD & AARONSON, P.A., Wilmington, Delaware.

Of Counsel: William T. Josem, Esquire and Cassie R. Ehrenberg, Esquire of CLEARY & JOSEM LLP, Wilmington, Delaware. Attorneys for Defendant Local 435 (UAW).

**JUDGES:** JOSEPH J. FARNAN, JR., UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** JOSEPH J. FARNAN, JR.

**OPINION:**

### MEMORANDUM OPINION

Wilmington, Delaware

**Farnan, District Judge.**

Presently before the Court is the Motion To Dismiss Or Alternatively [*2] For Summary Judgment of General Motors Corporation (D.I. 9-1; 9-2), the Motion To Dismiss The Complaint of Local 435 (UAW) (D.I. 12-1), and the Motion Not To Dismiss And 15A Amendment of Roland Anderson (D.I. 21). For the reasons discussed, the Court will grant both motions to dismiss and deny the motion to amend.

### BACKGROUND

On October 1, 1982, Roland Anderson was laid off from his manufacturing position at the Wilmington facility of General Motors Corporation ("GM"). On December 27, 1991, Mr. Anderson filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC") alleging that GM had discriminated against him and violated 42 U.S.C. § 2000e, et. seq. ("Title VII"). On March 10, 1992, the EEOC dismissed the charge, concluding that GM had not violated Title VII.

On June 8, 1992, Mr. Anderson brought a lawsuit in the United States District Court for the District of Delaware alleging GM violated Title VII. On September 18, 1992, GM moved to dismiss the complaint which the court treated as a motion for summary judgment. In Mr. Anderson's reply brief, he alleged a new claim that GM violated his recall rights granted under Paragraph [*3] 64(e) of the General Motors-United Auto Workers National Agreement ("the Agreement").

In granting GM's motion, the court held that Mr. Anderson alleged no facts or circumstances establishing GM's actions were racially discriminatory. The court also dismissed Mr. Anderson's new claim, finding he was not entitled to be recalled.

On September 6, 2002, Mr. Anderson filed a second discrimination charge with the EEOC and the Delaware Department of Labor ("DDOL") and alleged that GM violated Title VII by laying him off out of line with his seniority because of his race. The EEOC dismissed Mr. Anderson's charges as untimely.

On March 11, 2003, Mr. Anderson filed this lawsuit, alleging that GM violated Title VII when it laid him off out of line with his seniority and that his former union, Local 435 of the United Automobile Workers of America ("Local 435"), failed to inform him of GM's alleged discriminatory conduct.

Case 1:04-cv-00407-GMS    Document 23    Filed 03/27/2006    Page 34 of 76

2004 U.S. Dist. LEXIS 5430, *; 174 L.R.R.M. 3372

GM and Local 435 have each filed a motion to dismiss. Mr. Anderson filed a Motion Not To Dismiss And 15A Amendment. The 15A Amendment alleges GM and Local 435 violated Section 301(a) of the Labor-Management Relations Act ("LMRA"), 29 U.S.C. § 185, the [*4] American with Disabilities Act ("ADA"), and Section 1983.

## DISCUSSION

### I. Parties Contentions

Plaintiff asserts several claims:

1) that, he was laid off and not recalled by GM because of his race,

2) that, his union failed to make him aware of this violation of his rights,

3) that, under the LMRA, Local 435 did not fairly represent him, GM violated its arbitration agreement and committed other undefined violations,

4) that, GM and Local 435 violated the ADA, and

5) that, GM and Local 435 violated Section 1983.

GM and Local 435 (collectively "Defendants") contend that Mr. Anderson's claims must be dismissed. Defendants contend that Mr. Anderson's claims are barred by the statute of limitations for each cause of action. Alternatively, Defendants contend that Mr. Anderson's claims are barred by the doctrine of claim preclusion due to the judgment entered against him in his 1992 lawsuit, which Defendants contend involved the same issues and facts presented in the instant action. Finally, Defendants contend that Mr. Anderson has not alleged any circumstances that would entitle him to relief under the ADA or Section 1983.

As to Defendants' statute of limitations defense, [*5] Mr. Anderson contends that the statute of limitations applicable to his causes of action under Title VII and the LMRA should be tolled. Mr. Anderson argues his claims fall under the continuing violation exception to Title VII's statute of limitations because GM continued to discriminate against him while he was laid off by failing to recall him in line with seniority. Mr. Anderson also alleges that he suffers from Schizophrenia Paranoia, Major Depression, and Type 2 Diabetes. Mr. Anderson contends these disabilities excuse his failure to comply with the statute of limitations because they make him forgetful, confused, and unable to take care of his business in a timely manner. Finally, Mr. Anderson contends that Defendants wrongfully concealed information relating to his lawsuit, causing his delay and preventing the assertion of a statute of limitations defense.

Defendants respond that the statute of limitations should not be tolled. Defendants contend that Mr. Anderson has failed to allege any facts which demonstrate an ongoing pattern of discrimination which is necessary to maintain a continued violation defense. Defendants contend that Mr. Anderson has not sufficiently pled that [*6] he was mentally incompetent at the time of the alleged discriminatory action and has not pled an incompetence that justifies his extended delay in filing. Defendants contend that Mr. Anderson cannot rely on the doctrine of equitable estoppel because he has not alleged any facts demonstrating that GM wrongfully concealed any information relevant to his Title VII claim.

### II. Standard of Review

#### A. Motion to Dismiss

[HN1] When considering a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must "accept as true the factual allegations in the Complaint and all reasonable inferences that can be drawn thereform." Langford v. City of Atlantic City, 235 F.3d 845, 847 (3d Cir. 2000). A court will grant a defendant's motion to dismiss only if it appears that the plaintiff could prove no set of facts that would entitle him or her to relief. Failure to comply with the statute of limitations will justify granting a motion to dismiss "where the claim is facially non-compliant with the limitations period and the affirmative defense [of failure to comply with the statute of limitations] clearly [*7] appears on the face of the pleading." See Oshiver v. Levin, Fishbein, Sedran, & Berman, 38 F.3d 1380, 1385 n. 1 (3d Cir. 1994) (citing Trevino v. Union Pacific R.R. Co., 916 F.2d 1230 (7th Cir. 1990)). [HN2] A court is to construe a handwritten pro se complaint liberally, holding it to a less stringent standard than pleadings drafted by attorneys. Estelle v. Gamble, 429 U.S. 97, 106, 50 L. Ed. 2d 251, 97 S. Ct. 285 (1976).

#### B. Motion to Amend the Complaint

Federal Rule of Civil Procedure 15 [HN3] permits a court to freely grant a party leave to amend his or her pleadings "when justice so requires." Fed. R. Civ. P. 15. The decision of whether to grant a motion to amend is within the discretion of the district court. Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 230, 9 L. Ed. 2d 222 (1962). However, a court should deny leave to amend if the moving party is guilty of undue delay, bad faith, dilatory motive, prejudice, or his or her amended claims are futile. In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997). An [*8] amendment to a pleading is deemed futile if the amendment could not withstand a motion to dismiss. Satellite Fin. Planning Corp. v. First Nat'l Bank, 646 F. Supp. 118, 120 (D. Del. 1986).

2004 U.S. Dist. LEXIS 5430, *; 174 L.R.R.M. 3372

### III. Decision and Rationale

#### A. Title VII Claims

[HN4] Under Title VII, an individual must file a charge of employment discrimination within 180 days of the unlawful employment practice or 300 days of the practice if the individual has "initiated proceedings with a state or local agency who has the authority to grant relief." See 42 U.S.C. § 2000e-5(e)(1); See also West v. Philadelphia, 45 F.3d 744, 754 (3d Cir. 1995). Under Delaware law, claimants who have filed with either the EEOC or the DDOL may assert the 300 day statute of limitations. See Arasteh v. MBNA Am. Bank, N.A., 146 F. Supp. 2d 476, 490 (D. Del. 2001). Filing a charge under Section 2000e is a prerequisite to a Title VII action. West, 45 F.3d at 754.

In this case, the relevant labor agreement between GM and Local 435 requires GM to recall employees with seniority rights within 60 months (5 years) of being laid off. Thus, any obligation [*9] GM had to recall Mr. Anderson ended on October 1, 1987. Therefore, any cause of action Mr. Anderson had against GM and/or Local 435 in relation to Mr. Anderson's employment with GM expired 300 days after October 1, 1987.

There is no dispute that Mr. Anderson did not file his Complaint with the EEOC within 300 days of the allegedly discriminatory incident or the expiration of any recall rights he possessed. Therefore, the Court concludes Mr. Anderson's action is barred unless Mr. Anderson is entitled to a tolling of the statute of limitations.

#### B. LMRA Claims

Under Section 301(a) of the LMRA, 29 U.S.C. § 185(a),

> [HN5] suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

[HN6] The LMRA does not explicitly set forth a statute of limitations for Section 301(A), and a court must import the most analogous statute of limitations [*10] from state or federal law. See United Parcel Service, Inc. v. Mitchell, 451 U.S. 56, 60, 67 L. Ed. 2d 732, 101 S. Ct. 1559 (1981).

Mr. Anderson has moved to amend his Complaint to assert a claim under Section 301(A) of the LMRA. Mr. Anderson alleges that GM violated the collective bargaining agreement and Local 435 breached its duty of fair representation. Applying the limitations period set out in DelCostello v. International Brotherhood of Teamsters et. al., such lawsuits are [HN7] "hybrid" lawsuits and are governed by a six-month statute of limitations borrowed from Section 10(b) of the National Labor Relations Act ("NLRA"). 462 U.S. 151, 76 L. Ed. 2d 476, 103 S. Ct. 2281 (1983). This statute of limitations begins to run "when it becomes clear that further internal appeals would be futile." Scott v. Local 863, Scott v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen, and Helpers of America, 725 F.2d 226, 229 (3d Cir. 1984) (citing Clayton v. International Union, United Auto., 451 U.S. 679, 689-93, 68 L. Ed. 2d 538, 101 S. Ct. 2088 (1981)).

The alleged discrimination in this case occurred well outside the six-month period. Mr. Anderson had knowledge of GM's alleged acts of discrimination twenty years ago. There is no evidence that [*11] Mr. Anderson ever attempted to utilize the union to address GM's alleged discrimination, and therefore, there is no definitive date after which it can be said that Mr. Anderson should have known "further" union appeals would be futile. However, this date cannot be later than the last appeal attempted or deserted, which, in the circumstances of this case, certainly occurred more than six months ago.

Unless Mr. Anderson is entitled to a tolling of the statute of limitations, Mr. Anderson's proposed LMRA claim is barred by the statute of limitations and amending his Complaint to allow the claim would be futile.

#### C. Section 1983 and ADA Claims

Mr. Anderson has made abstract, conclusory assertions that Section 1983 and the ADA were violated, but has failed to state a claim under either law. Therefore, amending Mr. Anderson's complaint to add the proposed claims would be futile and his motion to amend must be denied as to Section 1983 and the ADA.

#### D. Whether the Statute of Limitations for Title VII and the LMRA should be stayed

Mr. Anderson contends he is entitled to the continuing violation exception to the statute of limitations. [HN8] Under this exception, a plaintiff may pursue [*12] a Title VII claim beyond the statute of limitations period if he can demonstrate the alleged discrimination is part of an overall pattern or practice of discrimination. See West v. Philadelphia Elec. Co., 45 F.3d 744, 754. (citing Bronze Shields v. New Jersey Dep't Of Civ. Serv., 667 F.2d 1074, 1081 (3d Cir. 1981)). The plaintiff must show that at least one act of discrimination occurred within the

Case 1:04-cv-00407-GMS    Document 23    Filed 03/27/2006    Page 36 of 76

2004 U.S. Dist. LEXIS 5430, *; 174 L.R.R.M. 3372

filing period and that the discrimination is part of an on-going practice and not an isolated or sporadic occurrence. Id. at 754-55. If a plaintiff can meet this burden, the filing period is considered irrelevant and the plaintiff is allowed to bring in the prior acts of discrimination and recover for the entire violation. Id. at 755.

The Court concludes that Mr. Anderson does not qualify for the continuing violation exception. He has not alleged any facts demonstrating that GM discriminated against him during the filing period. Mr. Anderson has also not alleged facts demonstrating an overall campaign of discrimination. He has alleged no facts to show he was discriminated against while employed at GM.

Mr. Anderson also argues that the statute of [*13] limitations for both Title VII and the LMRA should be suspended because his various infirmities prevented him from handling his personal business in a timely manner. As support for his defense, Mr. Anderson cites a Delaware statute, 10 Del. C. § 8116, [HN9] which does not apply to discrimination actions and is inapplicable to his claims under Title VII and the LMRA.

[HN10] "State law tolling or savings provisions do not apply to the limitations periods expressly set forth in Title VII." Wade v. Knoxville Utils. Bd., 259 F.3d 452, 461 (6th Cir. 2001). However, the statute of limitations for Title VII can be equitably tolled. Smith-Haynie v. District of Columbia, 332 U.S. App. D.C. 182, 155 F.3d 575, 579 (Fed. Cir. 1998). In the Third Circuit, there are three principal circumstances under which a statute of limitations can be equitably tolled: "(1) where the defendant has actively misled the plaintiff respecting the plaintiff's cause of action; (2) where the plaintiff in some extraordinary way has been prevented from asserting his or her rights; or (3) where the plaintiff has timely asserted his or her rights mistakenly in the wrong forum." Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1387 (3d Cir. 1994) [*14] (citing Sch. Dist. of Allentown v. Marshall, 657 F.2d 16, 19-20 (3d Cir. 1981).

[HN11] There is no exception under Section 301(A) of the LMRA or Section 10(b) of the NLRA that allows the statute of limitations to be tolled based on incapacity or infirmity. However, for hybrid actions under Section 301(A) of the LMRA, the statute of limitations can be equitably tolled. See Chapple v. Nat'l Starch & Chem. Co. and Oil, 178 F.3d 501, 505 (7th Cir. 1999); Cook v. Columbian Chems. Co., 997 F.2d 1239 (8th Cir. 1993). Therefore, whether Mr. Anderson is entitled to relief from the statute of limitations under Section 301(A) of the LMRA, is also an equitable determination. See Chapple, 178 F.3d 501, 505 (7th Cir. 1999).

Mr. Anderson asserts he suffers from Schizophrenia Paranoia, Type 2 Diabetes, and Major Depression and that these illnesses prevented him from filing his EEOC charges in a timely manner. As evidence of his problems, Mr. Anderson has offered a 1997 letter to his insurance company from his psychologist, Dr. Leland Orglov, which states he is unable to appreciate the consequences of filing in a timely manner to receive [*15] his insurance benefits, a 1991 letter from Dr. Orglov stating that a highly stressful work environment can cause an individual to be unable to function, a 1983 letter stating that Mr. Anderson had begun psychological examination, and a 1997 doctor's note stating Mr. Anderson has diabetes and that the disease can cause forgetfulness.

After reviewing Mr. Anderson's submissions, the Court concludes that Mr. Anderson is not entitled to equitable relief based on his infirmities. Mr. Anderson has failed to plead or demonstrate an incapacity or illness which justifies his extraordinary delay in filing his charges. Further, despite his afflictions, Mr. Anderson was able to file his 1992 lawsuit, and should have been able to file the instant action earlier.

Finally, Mr. Anderson asserts GM and Local 435 should be equitably estopped from asserting the statute of limitations defense because they purposely concealed information, causing him to delay filing his lawsuit. [HN12] Where a defendant has "attempted to mislead the plaintiff from suing on time," a plaintiff can equitably toll the statute of limitations. Oshiver, 38 F.3d at 1389 (construing and following Cada v. Baxter Healthcare Corp., 920 F.2d 446 (7th Cir. 1990). [*16] Mr. Anderson alleges the GM withheld information which showed that he was not recalled in line with his seniority rights and alleges Local 435 knew of GM's actions and did not inform him. Further, Mr. Anderson has produced the recall lists to show his name was left off. Mr. Anderson has not demonstrated how the failure to be given this list prevented him from filing his claim within the statute of limitations. Mr. Anderson has long known that he was not recalled and has long believed that he was discriminated against. In these circumstances, the Court concludes that an allegation that the union withheld a document listing recalled workers is insufficient to toll the statute of limitations.

## CONCLUSION

For the reasons discussed, the Court will grant the Defendants' motions to dismiss.

An appropriate Order will be entered.

## ORDER

At Wilmington, this 29th day of March, 2004, for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that:

Case 1:04-cv-00407-GMS   Document 23   Filed 03/27/2006   Page 37 of 76

2004 U.S. Dist. LEXIS 5430, *; 174 L.R.R.M. 3372

1) The Motion to Dismiss of General Motors Corporation (D.I. 9-1) is **GRANTED;**

2) The Motion to Dismiss of Local 435 (UAW) (D.I. 12-1) is **GRANTED;**

3) The Motion [*17] for Summary Judgment of General Motors Corporation (D.I. 9-2) is **DENIED** as moot;

4) The Motion to Amend of Roland Anderson (D.I. 21) is **DENIED.**

JOSEPH J. FARNAN, JR.

UNITED STATES DISTRICT JUDGE

**FINAL JUDGMENT IN A CIVIL CASE**

At Wilmington, this 29th day of March 2004, for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that judgment is entered in favor of General Motors Corporation and Local 435 (UAW) and against Roland Anderson.

JOSEPH J. FARNAN, JR.

UNITED STATES DISTRICT JUDGE

Dated: March 29, 2004

LEXSEE

**KEMP INDUSTRIES, INC. and APOLLO ASSOCIATES, LTD., Plaintiffs, v. SAFETY LIGHT CORP., USR INDUSTRIES, INC., USR CHEMICALS, INC., USR LIGHTING, INC., USR METALS, INC. U.S. NATURAL RESOURCES, INC., THE PRUDENTIAL INSURANCE COMPANY OF AMERICA AND JOHN DOES I-X, Defendant.**

CIVIL ACTION NO. 92-95 (AJL)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

1994 U.S. Dist. LEXIS 21466

January 25, 1994, Decided
January 25, 1994, Filed

**DISPOSITION:** [*1] Prudential's motion for summary judgment granted as to Counts III, IV, V and VI of the Second Amended Complaint. Summary judgment granted to Prudential on Count II to the extent that count seeks contribution for Plaintiffs' removal of the Waste Pile; summary judgment on Count II denied to the extent that count seeks contribution for other removal costs incurred by Plaintiffs.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff landowner filed an action against defendants potentially responsible parties and sought contribution for cleaning up a toxic waste site on its property. Defendant former owner moved for summary judgment on five counts of the landowner's second amended complaint on the ground that those counts were time-barred as to the former owner and substantively deficient as a matter of law.

**OVERVIEW:** The court considered the issues of whether the landowner's second amended complaint related back to its initial filing and, if not, whether its claims were barred by the applicable statutes of limitations. The court held that because the landowner had not submitted anything to suggest its failure to name the former owner in the initial complaint was due to a mistake within the meaning of Fed. R. Civ. P. 15(c)(3), did not improperly name the original defendant when it had intended to name the former owner, and later sought to add the former owner, not to correct a prior mistake, but as a separate act of trial strategy, the amended complaint could not relate back to the date of the filing of the complaint. The court further held that the landowner's causes of action against the former owner accrued more than six

years prior to the date upon which it filed its amended complaint and were therefore time barred. The landowner's knowledge of the identity of the responsible third party was not necessary for its causes of action to accrue.

**OUTCOME:** The court granted the former owner's motion for summary judgment is granted as to four counts of the landowner's second amended complaint and granted summary judgment to the former owner on an additional count to the extent that count sought contribution for the removal of a toxic waste pile. The court denied summary judgment on the additional count to the extent that it sought contribution for other removal costs incurred by the landowner.

**CORE TERMS:** prudential, cadmium, statute of limitations, cause of action, Spill Act, summary judgment, removal, contamination, environmental, cleanup, limitations period, common law, accrued, hazardous substance, hazardous, ground water, ownership, discovery rule, accrue, notice, site, waste, proper party, fault, elevated, time-barred, fictitious, radiation, radiological, deposition

**LexisNexis(R) Headnotes**

---

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN1] To prevail on a motion for summary judgment, the moving party must establish that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. A district court may not resolve factual disputes in a motion for summary judgment. All evidence submitted must be viewed in a light

most favorable to the party opposing the motion. Any unexplained gaps in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment.

### Civil Procedure > Summary Judgment > Summary Judgment Standard

[HN2] Although the summary judgment hurdle is a difficult one to overcome, it is by no means insurmountable. Once the party seeking summary judgment has pointed out to the court the absence of a genuine issue of material fact, its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.

### Civil Procedure > Summary Judgment > Summary Judgment Standard

[HN3] If the evidence submitted by a party opposing summary judgment is merely colorable, or is not significantly probative, summary judgment may be granted. One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and it should be interpreted in a way that allows it to accomplish this purpose.

### Civil Procedure > Summary Judgment > Burdens of Production & Proof

[HN4] Once a case has been made in support of summary judgment, the party opposing the motion has the affirmative burden of coming forward with specific facts evidencing a need for trial.

### Civil Procedure > Pleading & Practice > Pleadings > Relation Back

[HN5] See Fed. R. Civ. P. 15 (c ).

### Civil Procedure > Pleading & Practice > Pleadings > Relation Back

[HN6] The language of Fed. R. Civ. P. 15(c)(3), and particularly of subpart (B) thereof, indicates that the rule allows for relation back only where the plaintiff was mistaken as to the identity of the proper party in filing the original complaint, and had actually intended to sue the party to be added by amendment. The rule also requires that the defendant to be added knew or should have known there was such a mistake within 120 days of fil-

ing of the original complaint. The rule does not appear, on its face, to provide for relation back where the initial party sued was intended to be sued, and the omission of the second defendant was, or reasonably appeared to be, a strategic decision and not a mistake concerning the identity of the proposed defendant.

### Civil Procedure > Pleading & Practice > Pleadings > Relation Back

[HN7] The mistake condition is not limited to cases of misnamed or misdescribed parties, rather Fed. R. Civ. P. 15(c ) is widely understood to allow the addition of new parties that were never named or described.

### Civil Procedure > Pleading & Practice > Pleadings > Relation Back

[HN8] In accordance with the language and purpose of Fed. R. Civ. P. 15(c)(3), courts have repeatedly held that in order for an amendment adding a defendant to relate back under Rule 15(c)(3), a plaintiff may not merely have failed to sue the proposed party; rather, the plaintiff must have initially intended to sue the proposed party, sued the wrong party and be attempting to correct the mistake.

### Civil Procedure > Pleading & Practice > Pleadings > Relation Back

[HN9] Lack of knowledge of the proper party does not permit an amendment to relate back under the mistake prong of Fed. R. Civ. P. 15(c).

### Civil Procedure > Pleading & Practice > Pleadings > Relation Back

[HN10] As indicated by the language of Fed. R. Civ. P. 15(c)(3), the plaintiff's mistake is not itself sufficient to permit relation back. The defendant added by amendment must, within 120 days of the filing of the original complaint, have known, or have reasonably been able to know, that it was intended to be sued in the original complaint and was omitted by mistake. Courts have stressed that it is crucial to fulfillment of the mistake condition that the proposed defendant did not have reason to believe that its omission from the initial complaint was a deliberate strategy, rather than an error in pleading.

### Civil Procedure > Pleading & Practice > Pleadings > Relation Back

[HN11] If the party originally named in the complaint was not mistakenly named, and was in fact a proper party, the unnamed defendant will have reason to believe

it was not omitted by mistake, but by strategy. Similarly, if the omitted defendant would be liable to the plaintiff under a different theory than is alleged against the named plaintiff, the unnamed defendant may be led to conclude that it was intentionally omitted from the action. Also, if the unnamed defendant's potential liability is so apparent that the plaintiff, with the exercise of reasonable diligence, should know of such potential liability, the plaintiff's failure to name the defendant may well appear as a deliberate strategy rather than a mistake.

### Civil Procedure > Summary Judgment > Burdens of Production & Proof
### Civil Procedure > Pleading & Practice > Pleadings > Relation Back

[HN12] When opposing a motion for summary judgment based on a statute of limitations defense, the plaintiff bears the burden of establishing a record and a factual basis for its assertion that a mistake was made concerning the identity of the party he seeks to add as a defendant.

### Civil Procedure > Pleading & Practice > Pleadings > Relation Back

[HN13] The relation back rule is intimately connected with the policy of the statute of limitations. It is designed to operate equally with that statute, to accommodate the statute of limitations policies that prevent stale claims from being litigated, and permit their repose. The relation back rule was not designed to provide a means to either circumvent or expand the limitations period.

### Civil Procedure > Pleading & Practice > Pleadings > Relation Back

[HN14] New Jersey has addressed the limitations problem caused by unknown or unknowable defendants by way of the fictitious party, or 'John Doe,' practice. New Jersey's fictitious party practice permits a plaintiff who does not know the identity of the defendant to file an action against a fictitious name and later amend the complaint to state the defendant's true name. Under this practice, an amendment substituting a known defendant for an unknown 'John Doe' defendant will relate back to the original complaint, even where the amendment is made after the running of the statute of limitations.

### Governments > Legislation > Statutes of Limitations > Time Limitations
### Torts > Real Property Torts > Trespass

[HN15] Pursuant to N. J. Stat. Ann. § 2A:14-1, actions at common law for trespass to real property, for any tortious injury to real or personal property or for any tortious injury to the rights of another, other than personal injury, libel or slander, shall be commenced within six years next after the cause of any such action shall have accrued. This six-year statute of limitations is applicable to environmental tort actions at common law, and more specifically to environmental actions based on strict liability.

### Governments > Legislation > Statutes of Limitations > Time Limitations

[HN16] Ordinarily, the statute of limitations for an action begins to run when all the elements of the cause of action are present, or, more plainly, from the moment of the wrong. In some situations, however, the law of New Jersey recognizes the discovery rule, an equitable principle whose purpose is to avoid harsh results that otherwise would flow from mechanical application of a statute of limitations.

### Governments > Legislation > Statutes of Limitations > Time Limitations

[HN17] Under the discovery rule, a cause of action does not accrue, for the purpose of the statute of limitations until the plaintiff learns, or reasonably should learn, the existence of that state of facts which may equate in law with a cause of action. As the Supreme Court of New Jersey has explained, the discovery rule places emphasis upon the factual nature of an injured party's knowledge of a basis for a cause of action. A plaintiff must have an awareness of material facts relating to the existence and origin of his injury rather than comprehension of the legal significance of such facts. Moreover, the statute is triggered by a plaintiff's knowledge of 'material facts,' not by conclusive proof of every relevant fact.

### Environmental Law > Litigation & Administrative Proceedings > Toxic Torts
### Governments > Legislation > Statutes of Limitations > Time Limitations

[HN18] It is the province of the court to take into account and balance all the equities of each case for the purposes of determining whether the party invoking the rule is equitably entitled to its benefit. Courts have recognized that the size and complexity of environmental cases may present difficulties with regard to statutes of limitations. In light of the difficulty of ascertaining the existence of and responsibility for environmental injuries, courts have commonly applied the discovery rule in environmental tort cases.

Governments > Legislation > Statutes of Limitations > Tolling
Environmental Law > Litigation & Administrative Proceedings > Toxic Torts
[HN19] The discovery rule does not toll the statute of limitations until the precise parties responsible for the injury are known, but only until it is or should be apparent that some other party is at fault.

Governments > Legislation > Statutes of Limitations > Time Limitations
Environmental Law > Litigation & Administrative Proceedings > Nuisances, Trespasses & Strict Liability
[HN20] An environmental strict liability claim accrues when the plaintiff knew or should have known of its injury and that the injury was the fault of another.

Governments > Legislation > Statutes of Limitations > Time Limitations
[HN21] Under the discovery rule, the statute of limitations begins to run when the plaintiff knew or reasonably should have known of the facts which would support the cause of action. The discovery rule, therefore, requires diligence and reasonable investigative efforts on the part of the plaintiff to determine the existence of injury. Moreover, the statute is triggered by a plaintiff's knowledge of material facts' not by conclusive proof of every relevant fact.

Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally
[HN22] Statutes of limitations serve important policies which may not lightly be disregarded. A statute of limitations has two purposes. The first is to stimulate litigants to pursue a right of action within a reasonable time so that the opposing party may have a fair opportunity to defend, thus preventing the litigation of stale claims. The second function of to penalize dilatoriness and serve as a measure of repose.

Civil Procedure > State & Federal Interrelationships > Application of State Law
[HN23] In the absence of an authoritative pronouncement from the state's highest court, the task of a federal court is to predict how that court would rule.

Environmental Law > Litigation & Administrative Proceedings > Toxic Torts
Governments > Legislation > Statutes of Limitations > Time Limitations

[HN24] Pursuant to N. J. Stat. Ann. § 2A:14-1, actions at common law for trespass to real property, for any tortious injury to real or personal property or for any tortious injury to the rights of another, other than personal injury, libel or slander, shall be commenced within six years next after the cause of any such action shall have accrued. This six-year statute of limitations is applicable to environmental tort actions at common law. Such environmental actions are the common law actions most analogous to a private action for contribution under the New Jersey Spill Compensation and Control Act, N. J. Stat. Ann. § § 58:10-23.11 et seq. (Spill Act). Accordingly, it appears that New Jersey's six-year limitations period for property damage actions would be applicable to private actions under the Spill Act.

Governments > Legislation > Statutes of Limitations > Time Limitations
[HN25] Where an applicable statute of limitations precedes the enactment of a cause of action, absent an expression of legislative intent to the contrary, the new cause of action should be subject to the limitations period to the same extent as any other cause of action. In other words, the new cause of action should be barred to the extent it accrued further in the past than the limitations period allows.

Environmental Law > Litigation & Administrative Proceedings > Toxic Torts
Governments > Legislation > Statutes of Limitations > Time Limitations
[HN26] A cause of action under N. J. Stat. Ann. § 58:10-23.11f(a)(2) can accrue only when a plaintiff has engaged in cleanup and removal of a discharge of a hazardous substance.

COUNSEL: Bruce D. Nimensky, Esq., Berger & Bornstein, P.A., Morristown, New Jersey, for Plaintiffs.

Samuel P Moulthrop, Esq., Laura M. Massaia, Esq., Riker, Danzig, Scherer, Hyland & Perretti, Morristown, New Jersey, for The Prudential Insurance Company of America, Defendant.

JUDGES: LECHNER, District Judge.

OPINIONBY: LECHNER

OPINION: LECHNER, District Judge

This is an action by Kemp Industries ("Kemp") and Apollo Associates, Ltd. ("Apollo") (collectively the "Plaintiffs") against Safety Light Corporation ("Safety Light"), USR Industries, Inc. ("USR Industries"), USR

Chemicals, Inc. ("USR Chemicals"), USR Lighting, Inc. ("USR Lighting"), USR Metals, Inc., ("USR Metals"), U.S. Natural Resources, Inc. ("USNR") and The Prudential Insurance Company of America ("Prudential") (collectively the "Defendants") for declaratory, [*2] injunctive and monetary relief under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § § 9601 et seq., the New Jersey Spill Compensation and Control Act (the "Spill Act"), N.J.S.A. § § 58:10-23.11 et seq., Federal common law and New Jersey common law.

Currently before the court is Prudential's motion for summary judgment on the Plaintiffs' New Jersey statutory cause of action and all but one of the Plaintiffs' common law causes of action. n1 For the reasons set forth below, Prudential's motion for summary judgment is granted as to the common law counts, and granted in part as to New Jersey statutory count.

> n1 In support of its motion for summary judgment, Prudential has submitted: Defendant The Prudential Insurance Company of America's Brief in Support of its Motion for Summary Judgment (the "Moving Brief"), including Statement Pursuant to Local Rule 12G (the "Prudential 12G"); Defendant The Prudential Insurance Company of America's Reply Brief in Support of its Motion for Summary Judgment (the "Reply Brief"); Certification of Richard E. Pigott (the "Pigott Cert."); Certification of Samuel P. Moulthrop (the "Moulthrop Cert."), including as Exhibit A, transcript of deposition of John Davenport (the "Davenport Dep.") and as Exhibit K, transcript of deposition of Thomas O'Mara (the "O'Mara Dep."); Certification of Laura M. Massaia (the "Massaia Cert."), including as Exhibit B, transcript of continued deposition of Thomas O'Mara (the "O'Mara Cont. Dep.").
>
> In opposition to Prudential's motion for summary judgment, Plaintiffs have submitted: Plaintiff's Brief in Opposition to Defendant the Prudential Insurance Company of America's Motion for Summary Judgment (the "Opp. Brief"), including Statement Pursuant to Local Rule 12G (the "Plaintiffs' 12G"); Certification of Bruce D. Nimensky (the "Nimensky Cert."), including as Exhibit D, affidavit of Maxwell Pollack (the "Pollack Aff."), as Exhibit E, transcript of deposition of Maxwell Pollack (the "Pollack Dep."), as Exhibit F, transcript of deposition of Thomas O'Mara (the "Plaintiffs' O'Mara Dep."), as Exhibit G, Certification of Lawrence S. Berger (the "Berger Cert."), as Exhibit H, transcript of deposition

of Lawrence S. Berger (the "Berger Dep."), as Exhibit I, Certification of K. Paul Steinmeyer (the "Steinmeyer Cert."), and as Exhibit M, transcript of deposition of John W. Wilson (the "Wilson Dep.").

> On 27 December 1993, Plaintiffs submitted a letter-brief, dated 23 December 1993, supplementing their Opposition Brief (the "23 December Letter-Brief"). By Order, dated 13 October 1993, it was directed that opposition briefs be served by 3 November 1993; no provision for supplemental opposition or sur-reply briefs was made. Moreover, pursuant to Rule 12N and Appendix N of the General Rules for the District of New Jersey, all motion papers were to be submitted no later than sixteen business days prior to the motion's return date. In this case, the return date was 10 January 1993, and the deadline for submissions on the motion was 15 December 1993. The 23 December Letter-Brief was therefore submitted in an untimely and inappropriate manner. However, in light of Plaintiffs' representation that they came upon the information contained in the 23 December Letter-Brief only after the submissions on this motion were made, the 23 December Letter-Brief will be considered. Attached to the 23 December Letter-Brief were the Certification of Irving D. Cohen (the "Cohen Cert.") and the transcript of the 21 December 1993 deposition of Irving D. Cohen (the "Cohen Dep."). These will also be considered in conjunction with the instant motion.
>
> Oral argument on this motion was heard on 10 January 1993. References to the transcript of the oral argument will be as: "Tr. at ."

[*3]

Facts

Kemp is a corporation organized and existing under the laws of the state of Delaware and has a place of business in West Milford, New Jersey. See Complaint, filed 1 June 1993 (the "Second Amended Complaint"), P 4. n2 Kemp is currently owner of the land and premises designated as lots 12 ("Lot 12") and 13 ("Lot 13") in Block 3901 on the tax map of the Township of Hanover, Morris County, New Jersey (collectively, the "Hanover Site"). Id.; see Opp. Brief at 1-2. Until at least February 1987, Kemp was known as Van Dyk Research Corporation ("Van Dyk"). See Second Amended Complaint, P 5; Plaintiffs' O'Mara Dep. at 87-90.

n2 The Second Amended Complaint is the pleading upon which Plaintiffs rely as of the writing of this opinion. Prior pleadings and the nature of the amendments thereto are discussed infra 1994 U.S. Dist. LEXIS 21466, *22-27.

Apollo is a limited partnership organized and existing under the laws of New Jersey and has a place of business in Morristown, New Jersey. See Second Amended Complaint, P 6. [*4] Apollo is the owner of lands adjacent to the Hanover Site (the "Adjacent Lands"). Id., P 8. Apollo is also prospective purchaser of the Hanover Site. Id., P 6; Opp. Brief at 3 & n.8.

United States Radium ("USR") was a corporation existing under the laws of Delaware, engaged in, among other things, the production of phosphors. See Moving Brief at 4. In or about 1980, USR underwent corporate restructuring. As a result of the reorganization, USR formed Safety Light, USR Industries, USR Chemicals, USR Lighting, USR Metals and USNR (collectively, the "USR Companies"). Second Amended Complaint, P 8A; Moving Brief at 4 n.3. Before 1950, USR owned the Lot 13. Opp. Brief at 1.

In the late 1940s, USR decided to construct a facility on Lot 13 to accommodate anticipated expansion of its phosphor production operations. Moving Brief at 4; Davenport Dep. at 8. USR required financing for the project, and approached Prudential n3 to secure such financing.

n3 Prudential is a corporation organized and existing under the laws of New Jersey and has its principal place of business in New Jersey.

[*5]

On 10 July 1950, USR and Prudential entered into an agreement whereby Prudential would acquire title to Lot 13 from USR and pay for the cost of a building to be erected thereon according to USR's specifications (the "1950 Sale Contract"). Moulthrop Cert., Ex. B. Title to Lot 13 was conveyed to Prudential on 21 December 1950. See id., Ex. C.

Also pursuant to the 1950 Sale Contract, Prudential and USR agreed to enter into a lease agreement whereby Prudential would lease Lot 13 to USR for a term of 25 years (the "Lease Agreement"). See Moving Brief at 5; Opp. Brief at 1; Moulthrop Cert., Ex. D. Under the Lease Agreement, USR was obligated to pay property taxes on, purchase insurance for, and bear the risk of loss from damage to Lot 13. Moulthrop Cert., Ex. D.

USR occupied Lot 13 as tenant of Prudential for approximately fourteen years. During this time, USR operated a phosphor production facility on Lot 13. Opp. Brief at 1. Prudential states, and Plaintiffs do not dispute, that Prudential "neither conducted any activity on Lot 13 nor participated in any manner in the operation or management of [Lot 13]" during the time it held title to the lot. Moving Brief at 5.

On or about 24 July 1964, Prudential [*6] reconveyed title to Lot 13 to USR (the "1964 Sale"). See Moulthrop Cert., Ex. E. The leasehold created by the Lease Agreement was merged into the 1964 Sale. Id. USR thereafter continued to operate its phosphor production facility located on Lot 13. Opp. Brief at 2.

In or about May 1956, USR acquired title to Lot 12. Moulthrop Cert., Ex. F. By agreement, dated 17 November 1969, USR sold the Hanover Site, consisting of Lot 12 and Lot 13, to Van Dyk (the "1969 Sale Contract"). n4 See Nimensky Cert., Ex. B. By agreement, dated 8 December 1969, USR agreed to make certain improvements to the Hanover Site, including, inter alia, the drainage of "the race pond located upon the lands (the "Race Pond")...." Id., Ex. C (the "1969 Improvements Contract").

n4 Prudential appeared as a prior owner of Lot 13 on the deed that transferred the Hanover Site from USR to Van Dyk. Massaia Cert., Ex. C. Prudential's dates of ownership were also reflected. Id.

As a condition precedent to approval of Van Dyk's [*7] use of the Hanover Site, the Township of Hanover required the Race Pond to be drained, filled in and levelled by October 1970. Pollack Aff., P 6. In the spring of 1970, when Van Dyk determined that USR was not going to fulfill its obligation under the 1969 Improvements Contract to drain the Race Pond before the township's October 1970 deadline, Van Dyk began drainage of the pond. See id., PP 5-7.

Upon draining the Race Pond, Van Dyk discovered "a yellowish sludge ... in the pond bed." Id., P 7. At Van Dyk's direction, the sludge was subjected to chemical analysis. The analysis revealed "that the sludge had a high content of cadmium sulfide and zinc sulfide." Id., P 8. Kemp has conceded that as of 1970, Max Pollack ("Pollack"), then president of Van Dyk, was "aware that the [Race Pond] contained cadmium." Moulthrop Cert., Ex. I (Kemp's response to Prudential's Second Set of Interrogatories) at 6. Later in 1970, Van Dyk "had the sludge removed from the [Race Pond], thus creating [a] waste pile [(the "Waste Pile")]." Id. at 19.

In early 1970, Van Dyk began to manufacture copying machines at the Hanover Site. Opp. Brief at 2. Van Dyk ceased to use the Hanover [*8] Site for any purpose by 1984, and at that time entered into negotiations with Apollo for the sale of the Hanover Site. Plaintiffs' O'Mara Dep. at 40. On 17 August 1984 Van Dyk entered into a contract to sell the Hanover Site to Apollo (the "1984 Sale Contract"). n5 Moulthrop Cert., Ex. G.

> n5 It does not appear that, as of the time this action was instituted, Kemp had actually transferred the Hanover Site to Apollo. See Second Amended Complaint, P 4 (Kemp is owner of Hanover Site).
>
> The 1984 Sale Contract was amended on 7 January 1985 and 4 February 1987. See Moulthrop Cert., Ex. H; Plaintiffs' O'Mara Dep. at 87-90. Neither of the amendments appear to bear on the instant inquiry.

Earlier, in February 1984, Van Dyk submitted to the Township of Hanover a completed Hazardous Substances Questionnaire (the "February 1984 Questionnaire"). n6 See id., Ex. J. The February 1984 Questionnaire requested that Van Dyk list "all hazardous substances at [the Hanover Site], with maximum quantity of each [that] [*9] would be present at any one given time during the year." Id. at 1. Van Dyk responded, inter alia:

> We also have on the property (sketch attached) about 400,000 lbs of a mixture of Cadmium Sulfide and Zinc Sulfide. It is about 25% moisture. We estimate 60,000 lbs of cadmium Sulfide and 240,000 lbs. of Zinc Sulfide. This material was on the property when Van Dyk purchased it in 1969. It was then in an acidic slurry which we dried out.

Id. at 2 (Addendum # 1). A hand-sketched map is attached to the February 1984 Questionnaire, showing the size and placement of the hazardous waste deposit mentioned by Van Dyk. According to the map, which contains a scale, a "pile of Cadmium Sulfide & Zinc Sulfide, estimate: 60,000 lbs. CdS, 240,000 lbs ZnS," is located approximately one hundred yards from a building labeled "Bldg H." Id. at 6.

> n6 The parties have not indicated the reason Van Dyk was required to submit the February 1984 Questionnaire.

Thomas O'Mara ("O'Mara"), president of Van Dyk in 1984, [*10] testified that the Waste Pile was "approximately 12, 15 feet high, approximately 15 to 20 feet wide [and] approximately 30 feet long." O'Mara Dep. at 28. O'Mara confirmed that prior to August of 1984, he was "aware ... that [the Waste Pile] had cadmium compounds in it," id. at 47, and "that the Waste Pile was something to be concerned about." Id. at 62.

It appears Apollo was first alerted to the presence of hazardous substances on the Adjacent Lands by a report from TRC Environmental Consultants, Inc. ("TRC"), n7 dated 20 June 1984 (the "20 June 1984 TRC Report"). See Moulthrop Cert., Ex. L at 19 (Apollo's response to Prudential's Second Set of Interrogatories; Responding to interrogatory 32, which asks when Apollo "became aware of the presence of hazardous substances or wastes on the Adjacent Lands," Apollo stated: "See TRC report of June 20, 1984."); id., Ex. M (20 June 1984 TRC Report). The 20 June 1984 TRC Report stated:

> A waste pile alleged to contain heavy metals is still present on the [Hanover Site]. Apollo had conducted analyses of soils on [the Adjacent Lands] where run-off was evident from the Waste Pile[]. These analyses ... show elevated levels [*11] of cadmium, lead and zinc. TRC understands that Apollo had been involved in an effort to have the present owner, Van Dyk, remove or control the Waste Pile. The Waste Pile [is] also [a] potential source[] of heavy metal contamination to ground water flowing under the Apollo property.

Id. The 20 June 1984 TRC Report was forwarded to Apollo on 26 July 1984. See Moulthrop Cert., Ex. N.

> n7 The signing of the 1984 Sale Contract triggered a review pursuant to the New Jersey Environmental Cleanup Responsibility Act ("ECRA"), N.J.S.A. 13:1K-6 et seq., as a precondition to the transfer of the Hanover Site. See N.J.S.A 7:26B-1.6(a)(1); Plaintiffs' O'Mara Dep. at 46. Van Dyk hired TRC for the purpose of ensuring compliance with environmental laws and regulations before transferring the Hanover Site to Apollo. See Berger Cert., P 4. As the prospective purchaser of the Hanover Site, Apollo also had an interest in the Hanover Site's environmental compliance, and had developed an expertise in environmental compliance matters. In September 1984, Van Dyk authorized Apollo to act as its agent with regard to environmental issues

which might arise in connection with ECRA compliance. Id., P 5. As Van Dyk's Agent, Apollo was aware of TRC's work for Van Dyk. Id., P 6.

[*12]

On 8 January 1985, Van Dyk filed with the New Jersey Department of Environmental Protection ("DEP") n8 an "Initial Notice" of the proposed sale of the Hanover Site. Id., Ex. O at 1. On 15 January 1985, Radiation Safety Associates ("RSA") performed and reported on a radiological evaluation of the Hanover Site at the request of TRC (the "RSA Report"). See Moulthrop Cert., Ex. Q. The RSA Report identified a radioactive "hot spot" on the "extreme eastern end of the property." Id. The RSA Report stated that "as it exists, ... it is [RSA's] opinion that [the hot spot] does not constitute an immediate public health hazard from a radiological standpoint." Id. RSA recommended, however, "that this spot be excavated with a health physicist present, and the source of this radiation be identified and disposed of in an appropriate manner." Id. The RSA Report also reported background radiation at two to five times the level which could normally be expected. n9 Id.

n8 The title of the DEP has since been changed to the Department of Environmental Protection and Energy. For the purposes of this opinion, the entity will be referred to as "DEP."

[*13]

n9 The RSA Report contains a scaled map of the Hanover Site which places the Waste Pile less than sixty feet from a metal storage building, and less than two hundred feet from a building containing a machine shop, storage facility and lab. See Moulthrop Cert., Ex. Q.

On 18 January 1985, DEP received from Van Dyk a "Site Sampling Plan" for the Hanover Site (the "Sampling Plan"), prepared by TRC. See Moulthrop Cert., Ex. O at 4, Ex. P. Under the heading "Areas of Environmental Concern," the Sampling Plan listed the Waste Pile, as well as "possible radiological contamination throughout the [Hanover] Site." Moulthrop Cert, Ex. P at 2.

The Sampling Plan also described the danger of exposure from the Waste Pile:

The most probable route of exposure from these sources would be the ground water.

Radiological contamination has been detected in the ground water at the adjacent downgradient site. Surface water runoff from the Waste Pile flows to the north corner of the property in a low swampy area. ... Present information for the area indicates that the ground water flow is in a southerly [*14] direction towards the Whippany River.

Id. The Sampling Plan also stated: "The Waste Pile is a result of the excavation of an effluent disposal lagoon used by U.S. Radium during [its] manufacturing operations." Id.

The Sampling Plan further indicated that "previous investigations at the [Adjacent Lands] have indicated elevated levels of radiation and phenols in the ground water." Id. at 12. The Sampling Plan indicated that the Waste Pile was the likely source of such contamination:

Since the contaminated water was from an upgradient well, the likely source is the Van Dyk property [, the Hanover Site]. ... Also, since there was a cadmium sulfate pile on the site, the eight EP toxic metals will be analyzed in both soil and ground water.

Id.

On 4 February 1985, DEP received from Van Dyk a revision to the Sampling Plan, dated 30 January 1985 (the "Revised Sampling Plan"), also prepared by TRC. See Moulthrop Cert., Ex. T. The Revised Sampling Plan reiterated the "Areas of Environmental Concern" and information regarding the contamination of the Adjacent Lands contained in the Sampling Plan. Id. at 2, 12. A second revision to the Sampling [*15] Plan, dated 25 April 1985 (the "Second Revised Sampling Plan"), also prepared by TRC, was received by DEP on 7 June 1985. See Moulthrop Cert., Ex. U. The Second Revised Sampling Plan again listed the Waste Pile and "a small area of elevated radiological levels on the [Hanover] Site" as being "areas of environmental concern." Id. at 2.

A third revision to the Sampling Plan, dated 27 August 1985 (the "Third Revised Sampling Plan") was received by DEP on 20 September 1985. See Moulthrop Cert., Ex. V. Among its listing of "areas of environmental concern," the Third Revised Sampling Plan included the Waste Pile, "three settling lagoons operated by [USR] that have since been backfilled (possible source of radiation)" and an "above ground tank farm

operated by [USR] and later decommissioned by Van Dyk." Id. at 2. The Third Revised Sampling Plan also listed "ground water quality in general" as being among areas of concern on the Hanover Site. Id.

At some point during 1985, Van Dyk commenced removal of the Waste Pile as the "first step to comply with ECRA." O'Mara Cont. Dep. at 120. The removal of the Waste Pile eventually resulted in an expenditure of approximately [*16] $ 68,000 on the part of Van Dyk. See Moulthrop Cert., Ex. W at 14. The record indicates that the removal of the Waste Pile was completed by, at latest, 30 January 1985. See Moulthrop Cert., Ex. T at 4 (figure to Revised Sampling Plan, indicating position of "former cadmium sulfate waste pile"); id., Ex. S at 2 (DEP Site Evaluation Submission, dated 25 January 1985, indicating "Cadmium Sulfate Waste Pile" was "removed").

Also as part of the ECRA compliance process, TRC conducted soil analysis at the Hanover Site in September 1985 (the "September 1985 Soil Analysis"). See Moulthrop Cert., Ex. W, Table 1. Plaintiffs state the results of the September 1985 Soil Analysis were available in February 1986. Tr. at 6-7. The September 1985 Soil Analysis showed surface cadmium levels of up to 7,700 ppm, and cadmium levels well in excess of 1,000 ppm at depths up to six feet. Moulthrop Cert., Ex. W, Table 1. One soil sample revealed a cadmium concentration of 28,000 ppm at a depth of two to four feet. Id.

On 13 February 1986, Lawrence Berger ("Berger"), an officer of Apollo, n10 met with officials of the DEP at the DEP's offices (the "DEP Meeting"). Berger Cert., P 9. During [*17] the DEP Meeting, a DEP official, upon reviewing test data concerning the Hanover Site, told Berger that the data indicated cadmium levels "greatly in excess of those permissible under DEP's standards." n11 Id., P 15; see Berger Dep. at 52-53. The DEP official also informed Berger that such levels of cadmium "might constitute a health hazard." n12 Berger Cert., P 16.

> n10 Berger is president of United States Realty Resources, which is the general partner of United States Land Resources. United States Land Resources is a general partner of Apollo. Berger Cert., P 1.

> n11 In a letter to Berger, dated 23 June 1986 (the "DEP Letter"), the DEP summarized the results of the DEP meeting:

>> During a meeting at the Bureau's offices on February 13, 1986, the Bureau indicated its comments on the "draft" analytical data submitted in January 1986.

>> The data indicated unacceptable elevated levels of petroleum hydrocarbons, metals and the base neutrals in the soils on-site. In addition, elevated levels of gross beta and gross alpha have been noted due to the radiological "hot spot."

> Nimensky Cert., Ex. J.

[*18]

> n12 Plaintiffs concede that "the data that the [DEP] highlighted during the [DEP Meeting] indicated that cadmium was present in elevated levels not only in the lagoon area, but also in other locations throughout the Hanover Site." Opp. Brief at 5 (emphasis in original). Plaintiffs therefore concede they received indication during the DEP Meeting that the elevated level of cadmium at the Hanover Site was caused by an "abnormally dangerous activity that was entirely distinct from" the Waste Pile. Id. at 6.

Berger states that the moment of the DEP official's statements during the DEP Meeting on 13 February 1986 "was the first time that anyone had informed [him] of the presence of cadmium on the [Hanover Site] in excess of what might be considered acceptable levels." Id., P 17; see Berger Dep. at 52-53. Berger states he had discussions with TRC on areas of environmental concern prior to the DEP Meeting, but was unaware of the extent of the cadmium problem before the DEP Meeting:

> At no time during these discussions [(between TRC and Berger)] did we discuss cadmium as [*19] a potential environmental problem. In fact, prior to [the DEP Meeting] I was unaware of the existence of cadmium on the [Hanover Site] at levels that would pose a health concern.

> At the time of the [DEP Meeting], it was my understanding that the levels of radiation that had been identified did not constitute a public health concern. I had been so advised by the environmental consultants. n13

Berger Cert., P 11-12. Burger has further testified: "It would seem to me that TRC should have known that [cadmium contamination] was the problem and we

should have dealt with it long before what I found to be a fairly embarrassing meeting." Berger Dep. at 52.

> n13 By way of affidavit, Berger has also stated: "It is my understanding that before February 13, 1986, Van Dyk was similarly unaware of the existence of cadmium and radiological substances on the subject property at levels that would pose a health concern." Berger Cert., P 13.
>
> Rule 27A of the General Rules for the District of New Jersey provides: "Affidavits shall be restricted to statements of fact within the personal knowledge of the affiant." The "state of mind" of Van Dyk with respect to cadmium contamination at the Hanover Site cannot be within the personal knowledge of Berger, who is at most an officer of Apollo. Accordingly, Berger's assertion as to Van Dyk's state of mind will be disregarded.

[*20]

By letter, dated 27 May 1986, TRC gave Berger "a brief overview of the problems found" on the Hanover Site (the "27 May 1986 TRC Letter"). See Moulthrop Cert., Ex. X. The 27 May 1986 TRC Letter stated: "Much of the surface and subsurface soils in the northern 1/3 of the property are contaminated with either cadmium, barium, and/or zinc. Id. The 27 May 1986 TRC Letter further notified Berger of "one very localized area (approximately one foot by one foot) of high radioactivity." Id. TRC explained: "The metal contamination is probably the result of improper wastes generated by U.S. Radium, the former property owner. Likewise, the localized area of high radioactivity is probably from U.S. Radium activities." Id.

In spite of its findings of contamination and radioactivity, TRC concluded that the "health risk potential" from these environmental conditions was "minimal." Id. However, TRC advised Berger that "during remediation the health risk potential will need to be redefined." Id.

On 15 January 1992, Plaintiffs filed a seven-count complaint (the "Complaint") against Safety Light as successor to USR, demanding that Safety Light be compelled to "commence removal [*21] and remedial action" with respect to environmental hazards on the Hanover Site, as well as other declaratory and monetary relief. The Complaint alleged that USR "utilized unsafe and improper methods to dispose of large quantities of liquid and solid waste," including, inter alia:

> (a) the indiscriminate burying of radio active wastes;

> (b) the stock piling upon the [Hanover Site] of a cadmium sulfate waste pile;
> (c) the discharging of liquid hazardous waste onto the subject premises and into affluent lagoons and other detention and catch basins.

Complaint, P 10.

Count one of the Complaint ("Count I") alleged that these illegal acts entitled Plaintiffs to declaratory, injunctive and monetary relief under CERCLA. Id, PP 16-27. Count two of the Complaint ("Count II") sought relief under the Spill Act. Id., PP 28-36. Count three ("Count III") sought recovery under Federal common law. Id., PP 37-42. Count four ("Count IV") sought to hold Safety Light strictly liable for the damages and cleanup costs and responsibilities associated with the Hanover Site. Id., PP 43-50. Count five ("Count V") sought recovery on the theory of negligence. Id., PP 51-54. Count [*22] six ("Count VI") sought recovery on the theory of nuisance. Id., PP 55-65. Finally, count seven ("Count VII") sought recovery on the basis of alleged fraud and deceit on the part of Safety Light. Id., PP 67-70.

On 26 August 1992, Plaintiffs amended the Complaint to include Prudential as a defendant (the "Amended Complaint"). The Amended Complaint is in all other respects substantially identical to the Complaint.

Plaintiffs argue that they first learned in May of 1992 that Prudential held title to part of the Hanover Site from December 1950 through July 1964. See Opp. Brief at 7-8. Plaintiffs point to Safety Light's response to Plaintiffs' interrogatories, dated 1 May 1992 (the "May 1992 Safety Light Response"), where Safety Light disclosed this information. n14 See Nimensky Cert., Ex. A at 2. Plaintiffs further state that it was from the May 1992 Safety Light Response that they first learned that USR's use of cadmium "might perhaps have dated back to Prudential's period of ownership." n15 Opp. Brief at 8 (citing Nimensky Cert., Ex. A at 6, where Safety Light responds that cadmium was used at the Hanover Site "at least" during 1966-67).

> n14 Prudential's ownership of Lot 13 was reflected on the deed transferring ownership of the Hanover Site to Van Dyk. Tr. at 4; Massaia Cert., Ex. C. Moreover, Plaintiffs concede that the chain of title for the Hanover Site is a matter of public record. Tr. at 8.

[*23]

n15 In its supplemental responses to Plaintiffs' interrogatories, dated 4 December 1992 (the "December 1992 Supplemental Response"), Safety Light confirmed that cadmium was used at the Hanover Site from 1956 to 1967. See Nimensky Cert., Ex. K at 4.

It was also disclosed in the 4 December 1992 Safety Light Response that, as early as 1950, USR channelled effluent waste from a settling pond into a local brook. Id. at 7. In October 1993, it was confirmed that waste containing cadmium was channelled from a settling pond to the Whippany River from 1950 to approximately 1955. See Wilson Dep. at 20-21.

Prudential has certified, by its Associate Regional Counsel, Richard E. Pigott ("Pigott"), that "Prudential had no notice, formal or informal," of the instant action until receipt of the Amended Complaint in September 1992. Pigott Cert., PP 4-5. Prudential states that upon receipt of the Amended Complaint, it began a search of internal files for documents referring to the instant litigation, and found nothing other than a file relating to Prudential's former ownership of Lot 13. Id., PP [*24] 5-6.

Plaintiffs assert, however, that Prudential obtained informal notice of the suit on or about 8 May 1992. To this end, Plaintiffs point to the oral and written testimony of Irving D. Cohen ("Cohen"), president of Enviro-Sciences, Inc. ("ESI"). n16 See 23 December Letter-Brief. At his 21 December 1993 deposition, Cohen testified Prudential is a client of ESI. Cohen Dep. at 9. Cohen testified that on 6 May 1992, he received a letter from Plaintiffs' counsel enclosing the May 1992 Safety Light Response. Id. at 7. Cohen stated that in reviewing the May 1992 Safety Light Response on or about 8 May 1992, he noticed that Prudential was in the chain of title to Lot 13. Id. at 8-9. Cohen testified that he recognized a potential conflict of interest between his representation of Prudential and of Plaintiffs. Id.

n16 ESI replaced TRC as Plaintiffs' environmental consultant in 1988. See Moulthrop Cert., Ex. W. at 1.

Cohen stated that he immediately telephoned Harris Sanders, Prudential's director [*25] of environmental affairs ("Sanders"), to inform him of the potential conflict (the "8 May Phone Conversation"). Id. Cohen indicated that during the 8 May Phone Conversation, he told Sanders that there was a "potential for a lawsuit." Id. at 9. Cohen testified:

Since the information was provided to us, to us as a part of a lawsuit against Safety Light, which was [USR], I would have indicated to Harris that we're working a site with Kemp and Apollo and ... Berger and it came to my attention that through this information that ... there is a court case and I found a potential for conflict through lawsuit if they were brought into the picture and at that point in time that it hadn't been decided yet.

Id. at 9-10. Cohen also answered affirmatively when asked whether he informed Sanders that Plaintiffs "were considering whether or not to bring Prudential into the case." n17 Id. at 10.

n17 Later during his deposition, Cohen stated that when he indicated what he "would" have told Harris, he intended to indicate what he had actually told Harris. Cohen Dep. at 24.

[*26]

In October 1992, ESI conducted soil sampling at the Hanover Site (the "October 1992 Soil Analysis"). See Nimensky Cert., Ex. L. During the October 1992 Soil Analysis, "ESI discovered a plastic bag of material (a yellow/green fluorescent-like powder ...) at a depth of approximately 48" below grade. This on-site location is known as the former cadmium sulfide/zinc sulfide Waste Pile area. The material was analyzed and found to contain cadmium at a concentration of 176,000 ppm." n18 Id. at 4.

n18 In January 1993, ESI returned to the Hanover Site to investigate the extent of burial of materials near the former location of the Waste Pile (the "January 1993 Soil Analysis"). Two excavations were made in the immediate vicinity of the excavation made during the October 1992 Soil Analysis. Both these excavations uncovered cadmium compounds at depths of approximately three feet, buried both in plastic bags and without containers. See Nimensky Cert., Ex. L at 4-5; Opp. Brief at 9 n.12.

As stated, the Second [*27] Amended Complaint was filed 1 June 1993. The Second Amended Complaint added the remaining USR Companies as defendants; in all other respects, the Second Amended Complaint is

substantially identical to the Complaint and the Amended Complaint.

Prudential now moves for summary judgment on Counts II through VI of the Second Amended Complaint on the ground that these counts are time-barred as to Prudential. Prudential also moves for summary judgment on Counts III, V and VI on the ground that these counts are substantively deficient, as a matter of law.

Discussion

A. Summary Judgment Standard of Review

[HN1] To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The present task is to determine whether disputed issues of fact exist, but a district court may not resolve factual disputes in a motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); see also Desvi, Inc. v. Continental Ins. Co., 27 V.I. 408, 968 F.2d 307, 308 (3d Cir. 1992) [*28] ("The threshold inquiry is whether there are 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" (citations omitted); Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992) ("We apply the test ... (1) Is there no genuine issue of material fact and (2) is one party entitled to judgment as a matter of law?") (quotations omitted); Hackman v. Valley Fair, 932 F.2d 239, 241 (3d Cir. 1991) ("Summary judgment is inappropriate when a conflict on a material fact is present in the record."); Nathanson v. Medical College of Pennsylvania, 926 F.2d 1368, 1380 (3d Cir. 1991) (Summary judgment may not be granted "if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed.").

All evidence submitted must be viewed in a light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986); Williams v. New Castle County, 970 F.2d 1260, 1264 (3d Cir. 1992); [*29] Boyle v. Governor's Veterans Outreach & Assistance Center, 925 F.2d 71, 75 (3d Cir. 1991); Weldon v. Kraft, Inc., 896 F.2d 793, 797 (3d Cir. 1990); Todaro v. Bowman, 872 F.2d 43, 46 (3d Cir. 1989). "'Any 'unexplained gaps' in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment.'" Ingersoll-Rand Fin. Corp. v. Anderson, 921 F.2d 497, 502 (3d Cir. 1990) (quoting O'Donnell v. United States, 891 F.2d 1079, 1082 (3d Cir. 1989)).

[HN2] Although the summary judgment hurdle is a difficult one to overcome, it is by no means insurmountable. As the Supreme Court has stated, once the party seeking summary judgment has pointed out to the court the absence of a genuine issue of material fact,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.' Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving [*30] party, there is no 'genuine issue for trial.'

Matsushita, 475 U.S. at 586-87 (emphasis in original, citations and footnotes omitted). In other words, the inquiry involves determining "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Brown v. Grabowski, 922 F.2d 1097, 1111 (3d Cir. 1990) (quoting Anderson v. Liberty Lobby, 477 U.S. at 251-52), cert. denied, 501 U.S. 1218, 111 S. Ct. 2827, 115 L. Ed. 2d 997 (1991).

The Supreme Court elaborated on the summary judgment standard in Anderson v. Liberty Lobby: " [HN3] If the evidence [submitted by a party opposing summary judgment] is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249-50 (citations omitted). The Supreme Court went on to note in Celotex Corp. v. Catrett, 477 U.S. 317, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986): "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and [*31] we think it should be interpreted in a way that allows it to accomplish this purpose." Id. at 323-24 (footnote omitted).

[HN4] Once a case has been made in support of summary judgment, the party opposing the motion has the affirmative burden of coming forward with specific facts evidencing a need for trial. see Fed. R. Civ. P. 56(e); see also Gray, 957 F.2d at 1078 ("there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party"); Carlson v. Arnot-Ogden Memorial Hosp., 918 F.2d 411, 413 (3d Cir. 1990) ("nonmoving party must adduce more than a mere scintilla of evidence in its favor"); Maguire v. Hughes Aircraft Corp., 912 F.2d 67, 72 (3d Cir. 1990) (non-moving party may not rest upon mere allegations); Schoch v. First Fidelity Bancorpora-

tion, 912 F.2d 654, 657 (3d Cir. 1990) (neither unsupported allegations in pleadings and memoranda of law nor conclusory allegations in affidavits will establish genuine issue of material fact); Hozier v. Midwest Fasteners, Inc., 908 F.2d 1155, 1165 (3d Cir. 1990) (cannot [*32] create issue of fact merely by questioning credibility of movant's witnesses; circumstantial evidence may raise issue of fact); Aronow Roofing Co. v. Gilbane Building Co., 902 F.2d 1127, 1128 (3d Cir. 1990) ("summary judgment will be granted where the non-moving party fails to 'establish the existence' of an element essential to the case").

### B. Counts III, V and VI

Count III of the Second Amended Complaint seeks relief under Federal common law. Prudential seeks summary judgment on Count III, arguing that, with respect to Plaintiffs' instant claims, there exists no Federal common law under which Plaintiffs can recover. See Moving Brief at 30 (citing City of Milwaukee v. Illinois and Michigan, 451 U.S. 304, 68 L. Ed. 2d 114, 101 S. Ct. 1784 (1981)). Plaintiffs submitted no response to Prudential's argument in this regard, and indicated at oral argument that they agreed to dismissal of Count III as to Prudential. Tr. at 5. Accordingly, Prudential is granted summary judgment on Count III.

Count V of the Second Amended Complaint alleges negligence on the part of the Defendants under the common law of New Jersey. Prudential seeks summary judgment [*33] on Count V on the ground that Prudential had no legal duty upon which a claim of negligence could be founded. See Moving Brief at 31. Plaintiffs submitted no response to Prudential's argument with respect to Count V, and indicated during oral argument that they agreed to dismissal of this count as against Prudential. Tr. at 5. Accordingly, Prudential is granted summary judgment on Count V.

Count VI of the Second Amended Complaint seeks recovery on the common law theory of nuisance. Prudential seeks summary judgment on Count VI on the ground that Prudential engaged in no conduct which could give rise to a nuisance action. See Moving Brief at 32. Plaintiffs submitted no response to Prudential's argument on Count VI, and indicated during oral argument that they agreed to dismissal of this count as to Prudential. Tr. at 5. Accordingly, Prudential is granted summary judgment on Count VI.

### C. Counts II and IV

The only counts addressed in Prudential's motion which remain to be considered are Counts II and IV. As stated, Count II seeks recovery under the Spill Act. Count IV seeks recovery under the theory of strict liability. Prudential seeks summary judgment on Counts II and [*34] IV on the ground that Plaintiffs' assertion of these counts against Prudential is barred by the applicable limitations period.

1. Relation Back of the Amended Complaint

As stated, the Complaint, filed 15 January 1992, named only Safety Light as a defendant. It was by the Amended Complaint, filed 26 August 1992, that Prudential was brought into the action. Plaintiffs seek to have the Amended Complaint relate back to the date of the filing of the Complaint, so that for limitations purposes, their action against Prudential would be deemed to have been filed 15 January 1992.

[HN5] Rule 15(c) of the Federal Rules of Civil Procedure provides, in relevant part:

> (c) Relation Back of Amendments. An amendment of a pleading relates back to the date of the original pleading when
> ...
> (3) the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) n19 is satisfied and, within the period provided by Rule 4(j) n20 for service of the summons and the complaint, the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the [*35] merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

Fed.R.Civ.P. 15(c)(3) (emphasis added).

> n19 Rule 15(c)(2) allows a pleading to relate back to the original pleading when "the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading...." Fed.R.Civ.P. 15(c)(2).
>
> n20 Rule 4(j) provides that service of a summons and complaint upon a defendant must be made within 120 days after filing of the complaint. Fed.R.Civ.P. 4(j).

[HN6] The language of Rule 15(c)(3), and particularly of subpart (B) thereof, indicates that the rule allows for relation back only where the plaintiff was mistaken as

to the identity of the proper party in filing the original complaint, and had actually intended to sue the party to be added by amendment. The rule also requires that the defendant to be added knew or [*36] should have known there was such a mistake within 120 days of filing of the original complaint. The rule does not appear, on its face, to provide for relation back where the initial party sued was intended to be sued, and the omission of the second defendant was, or reasonably appeared to be, a strategic decision and not a mistake concerning the identity of the proposed defendant.

This interpretation of the language of Rule 15(c)(3) is supported by the purpose behind the rule. The Advisory Committee Note on the 1966 amendment to Rule 15(c), which added subsection (3), states:

> Rule 15(c) is amplified to state more clearly when an amendment of a pleading changing the party against whom a claim is asserted (including an amendment to correct a misnomer or misdescription of a defendant) shall "relate back" to the date of the original pleading.
>
> The problem has arisen most acutely in certain actions by private parties against officers or agencies of the United States. Thus an individual denied social security benefits by the Secretary of Health, Education and Welfare may secure review of that decision by bringing a civil action against that officer within sixty days. In several [*37] recent cases the claimants instituted timely action but mistakenly named as defendant the United States, the Department of HEW, the "Federal Security Administration" (a nonexistent agency), and a Secretary who had retired from office nineteen days before. Discovering their mistakes, the claimants moved to amend their complaints to name the proper defendant; by this time the statutory sixty-day period had expired. The motions were denied on the ground that the amendment "would amount to the commencement of a new proceeding and would not relate back so as to avoid the [statute of limitations]."

Fed.R.Civ.P. 15(c), Advisory Committee Notes, 1966 Amendment (emphasis added). The rule, therefore, was intended to allow for correction of mistakes in pleading, not for an escape from the consequences of poor legal strategy.

" [HN7] The 'mistake condition' ... is not limited to cases of misnamed or misdescribed parties, rather the rule is widely understood to allow the addition of new parties that were never named or described." Heinly v. Queen, 146 F.R.D. 102, 107 (E.D.Pa. 1993); see Advanced Power Systems v. Hi-Tech Systems, 801 F. Supp. 1450, 1457 (E.D.Pa. 1992) [*38] ("In view of the history of the application of Rule 15(c), the phrase 'a mistake concerning a proper party' should clearly not be read to limit its usefulness to cases of misnomer." (citing 3 Moore's Federal Practice P 15.15[4.-2] at 15-167 n.15 (1988)); Hicks v. Resolution Trust Corp., 738 F. Supp. 279, 287 (N.D.Ill. 1990) (same).

[HN8] In accordance with the language and purpose of Rule 15(c)(3), however, courts have repeatedly held that in order for an amendment adding a defendant to relate back under Rule 15(c)(3), "a plaintiff may not merely have failed to sue the proposed party; rather, the plaintiff must have initially [intended to sue the proposed party,] sued the wrong party and [be] attempting to correct the mistake." Jordan v. Tapper, 143 F.R.D. 567, 574 (D.N.J. 1992); see Kilkenny v. Arco Marine, Inc., 800 F.2d 853, 857 (9th Cir.) ("Rule 15(c) was intended to protect a plaintiff who mistakenly names a party and then discovers, after the relevant statute of limitations has run, the identity of the proper party. Rule 15(c) was never intended to ... permit a plaintiff to engage in piecemeal litigation."), cert. denied sub [*39]  nom Kilkenny v. Atlantic Richfield Co., 480 U.S. 934, 94 L. Ed. 2d 766, 107 S. Ct. 1575 (1986); Richardson v. John F. Kennedy Memorial Hospital, 838 F. Supp. 979, 1993 WL 492383 at *4 (E.D.Pa. 1993) ("To satisfy the [mistake condition], plaintiff, at the time he filed his complaint, must have committed some sort of mistake concerning the identity of the proper defendant."); Kress v. Hall-Houston Oil Co., 1993 U.S. Dist. LEXIS 6350,   F. Supp.   , No. 92-543, 1993 WL 166274 at *4 (D.N.J. 12 May 1993) (Rule 15(c)(3) is "designed to protect a plaintiff who mistakenly names a party...."); Great Northeastern Lumber & Millwork Corp. v. Pepsi-Cola Metropolitan Bottling Co., Inc., 785 F. Supp. 514, 516 (E.D.Pa. 1992) ("An amendment should relate back only where there has been an error made concerning the identity of the proper party."); Kinnally v. Bell of Pennsylvania, 748 F. Supp. 1136, 1142 (E.D.Pa. 1990) (relation back permitted where "the wrong party is blamed while the real culprit remains unknown," or where a plaintiff "lists the technically incorrect party in her complaint"); Gabriel v. Kent General Hospital, Inc., 95 F.R.D. 391, 395 (D.Del. 1982) [*40]  (relation back allowed where plaintiff "made a mistake in selecting the original defendants").

" [HN9] Lack of knowledge of the proper party does not permit an amendment to relate back under the mistake prong of Rule 15(c)." Campbell v. Ward, 792 F.

Supp. 1150, 1153 (E.D.Mo. 1992); see Simmons v. South Central Skyworker's, Inc., 936 F.2d 268, 269-70 (6th Cir. 1991) (in products liability action, where plaintiff's discovery revealed none of named defendants had manufactured product, and plaintiff subsequently filed amended complaint, mistake prong not satisfied and amended complaint did not relate back); Rylewicz v. Beaton Services, Ltd., 888 F.2d 1175, 1181 (7th Cir. 1989) ("Lack of knowledge of proper party ... does not permit an amendment to relate back under Rule 15(c)[(3)]...."); Norton v. International Harvester Co., 627 F.2d 18, 22-23 (7th Cir. 1980) (same); Wood v. Worachek, 618 F.2d 1225, 1230 (7th Cir. 1980) (same).

[HN10] As indicated by the language of Rule 15(c)(3), the plaintiff's mistake is not itself sufficient to permit relation back. The defendant added by amendment must, within 120 days of the [*41] filing of the original complaint, have known, or have reasonably been able to know, that it was intended to be sued in the original complaint and was omitted by mistake. See Kilkenny, 800 F.2d at 857 (Plaintiff "may have been mistaken as to the identity of the proper defendants at the time she filed the original complaint, but that is not the critical inquiry under Rule 15(c). What we are concerned with what [defendants] knew or should have known during the limitations period."); Kemper v. URECO, 1994 U.S. Dist. LEXIS 8843, __ F. Supp. __, No. 88-9618, 1991 WL 125178 at *1 (E.D.Pa. 1991) ("In contexts other than misnomer, courts should use 'something akin to a reasonableness test to determine whether the party should have known he was the one intended to be sued.'" (quoting 6A C. Wright & A. Miller, Federal Practice and Procedure § 1498 at 139 (1990)); Ratcliffe v. Insurance Company of North America, 482 F. Supp. 759, 763-64 (E.D.Pa. 1980) (same).

Courts have stressed that it is crucial to fulfillment of the mistake condition that the proposed defendant did not have reason to believe that its omission from the initial complaint was a deliberate [*42] strategy, rather than an error in pleading. See Kilkenny, 800 F.2d at 857 (fact which may cause "the unnamed party to conclude that it was not named because of a strategic reason rather than as a result of the plaintiff's mistake" renders relation-back inappropriate under Rule 15(c)); Heinly, 146 F.R.D. at 107 ("reasonable belief that the failure to join a new defendant was a deliberate strategy" would prevent amendment from relating back); Advanced Power Systems, 801 F. Supp. at 1457 ("The 'mistake' condition does not isolate a specific type or form of error in identifying parties, but rather is concerned fundamentally with the new party's awareness that failure to join it was error rather than deliberate strategy."); Great Northeastern Lumber, 785 F. Supp. at 516 (relation back not permitted where added defendant "may have believed plaintiff

made a deliberate choice rather than a 'mistake' in deciding not to join it").

[HN11] If the party originally named in the complaint was not mistakenly named, and was in fact a proper party, the unnamed defendant will have reason to believe it was not omitted by mistake, but by strategy. [*43] See Kress, 1993 WL 166274 at *4 (where securities fraud plaintiffs named investment house, but omitted source of investment house's misleading information, omission was "seemingly a strategic decision" and not a mistake); Rhyder v. Santos, 1992 U.S. Dist. LEXIS 1676, __ F. Supp. __, No. 91-2920, 1992 WL 25863 at *2 (E.D.Pa. 5 Feb. 1992) ("It cannot be said that plaintiff had made a 'mistake' in naming the original defendant [in the complaint under 42 U.S.C. § 1983] since plaintiff continues to allege that [the original] defendant used excessive force against him."); Kinnally, 748 F. Supp. at 1142 (mistake is either technical error in pleading or "instances in which the wrong party is blamed while the real culprit remains unknown").

Similarly, if the omitted defendant would be liable to the plaintiff under a different theory than is alleged against the named plaintiff, the unnamed defendant may be led to conclude that it was intentionally omitted from the action. See Rhyder, 1992 WL 25863 at *2 (plaintiff could not establish defendant's knowledge of mistake where "the claim for relief against the [original [*44] defendant] is separate and distinct from what would be alleged against the [proposed defendant]"); see also Potts v. Allis-Chalmers Corp., 118 F.R.D. 597, 609 (N.D.Ind. 1987) ("lack of identity" between unnamed defendant and named defendant militated against finding of mistake); compare Potts, 118 F.R.D. at 609, with Advanced Power Systems, 801 F. Supp. at 1457 (where unnamed defendant closely related to named defendant, unnamed defendant should have known it would have been named but for mistake); Kinnally, 748 F. Supp. at 1136 (same).

Also, if the unnamed defendant's potential liability is so apparent that the plaintiff, with the exercise of reasonable diligence, should know of such potential liability, the plaintiff's failure to name the defendant may well appear as a deliberate strategy rather than a mistake. See Engel v. Minissale, 1993 U.S. Dist. LEXIS 952, __ F. Supp. __, No. 90-4400, 1993 WL 21232 at *3 (E.D.Pa. 21 Jan. 1993) (no relation back where plaintiffs were not diligent in their efforts to ascertain the identity of the proper defendant); Kemper, 1991 WL 125178 at *2 ("If plaintiff's [*45] own inexcusable neglect was responsible for the failure to name the correct party, an amendment substituting the proper party will not be allowed, notwithstanding adequate notice to the new party."); Potts, 118 F.R.D. at 609 (Plaintiff "was or should have been fully aware that [new defendant] was a proper party to this litigation long before the statute of limitations ran.

... This lack of justification for delay ... reasonably could make [plaintiff's] initial decision not to name the [new defendant] as a defendant appear to be a strategy decision."); Matthews v. KFC National Management Co., 1986 U.S. Dist. LEXIS 17515, No. 86-1181 slip op. at 3 (E.D.Pa. 20 Nov. 1986) (no relation back where the identity of new defendants "could have been discovered through discovery and a trademark search"); see also Kilkenny, 800 F.2d at 857 ("A plaintiff's failure to amend its complaint to add a defendant after being notified of a mistake concerning the identity of a proper party therefore may cause the unnamed party to conclude that it was not named because of a strategic decision rather than as a result of the plaintiff's mistake."); Campbell, 792 F. Supp. at 1153 [*46] ("Plaintiff's inaction could have been viewed as an intentional decision not to sue and belies his contention that [defendant] should have known that the failure to include it in the original complaint was a mere mistake.").

[HN12] When opposing a motion for summary judgment based on a statute of limitations defense, the "plaintiff bears the burden of establishing a record and a factual basis for [its] assertion that a mistake was made concerning the identity of the party he seeks to add as a defendant." Richardson, 1993 WL 492383 at *5 (granting summary judgment on statute of limitations grounds where plaintiff did not carry burden); see Campbell, 792 F. Supp. at 1152-53 (granting summary judgment on limitations bar because "plaintiff has offered no proof that its failure to name [new defendant] in the original complaint resulted from a mistake within the meaning of Rule 15(c)"); In re School Asbestos Litigation, 768 F. Supp. 146, 151 (E.D.Pa. 1991) (same). n21

> n21 A line of cases in the Northern District of Illinois has held the mistake requirement of Rule 15(c)(3) to be a prudential limitation, rather than an absolute condition to relation back. This line of cases appears to have began with Hampton v. Hanrahan, 522 F. Supp. 140 (N.D.Ill. 1981), where it was held:
>
>> If the notice requirements [of Rule 15(c)] are properly met, there is no unfair prejudice to the proposed defendant, and the delay in joinder is not due to inexcusable neglect by the plaintiffs, it should make no difference whether the amendment to be related back corrects a mistake of fact or law.

Id. at 145; see Hensley v. Soo-Line Railroad Co., 777 F. Supp. 1421, 1424 (N.D.Ill. 1991) (Where mistake prong not satisfied, "relation back is still possible if the added party had notice"); Hicks v Resolution Trust Corp., 738 F. Supp. 279, 287 (N.D.Ill. 1990) (citing Hampton, 522 F. Supp. at 145).

This reading of Rule 15(c)(3), however, appears to contravene the plain language of the rule. The requirements of Rule 15(c)(3) are listed in the conjunctive; none of the requirements, the mistake condition included, are listed as 'considerations' or 'factors.' See Fed.R.Civ.P. 15(c)(3). Moreover, the Supreme Court, in describing the requirements of Rule 15(c)(3), has prefaced them by stating: "Relation back is dependent upon four factors, all of which must be satisfied." Schiavone v. Fortune, 477 U.S. 21, 29, 91 L. Ed. 2d 18, 106 S. Ct. 2379 (1986) (emphasis added).

In light of the plain language of Rule 15(c)(3) and the Supreme Court's interpretation of the rule, the decisions in Hampton and its progeny will not be followed. Rather, consistent with the holdings of other courts, satisfaction of the mistake requirement will be treated as an absolute condition for relation back, and failure to satisfy this requirement will itself be sufficient to bar relation back under Rule 15(c)(3). See, e.g., Richardson, 1993 WL 492383 at *5 (E.D.Pa.) (acknowledging that all other requirements under Rule 15(c)(3) had been satisfied but refusing to allow relation back for failure to satisfy mistake condition); Jordan, 143 F.R.D. at 573-74 (D.N.J.) (failure to satisfy mistake requirement alone barred relation back under Rule 15(c)(3); Campbell, 792 F. Supp. at 1152-53 (E.D.Mo.) (acknowledging that notice requirement had been fulfilled but refusing to allow relation back solely on ground of failure to fulfill mistake requirement); Great Northeastern, 785 F. Supp. at 516 (E.D.Pa.) (refusing to allow relation back solely on ground of failure to satisfy mistake requirement); In re Asbestos School Litigation, 768 F. Supp. at 146 (E.D.Pa.) (same).

[*47]

Plaintiffs have not submitted anything to suggest their failure to name Prudential in the Complaint was due to a "mistake" within the meaning of Rule 15(c)(3). They did not improperly name Safety Light when they had intended to name Prudential. See Jordan, 143 F.R.D. at 574. It appears instead that they properly named Safety Light in the Complaint, and later sought to add Pruden-

tial, not to correct a prior mistake, but as a separate act of trial strategy. Indeed, the fact that Plaintiffs continued, and still continue, to assert their claims against Safety Light after Prudential had been named undercuts any contention that Safety Light was mistakenly named in the Complaint, and that Prudential was intended to be named in the Complaint. See Rhyder, 1992 WL 25863 at *2.

Plaintiffs contend they did not know of Prudential's potential role in this action until after the filing of the Complaint. See Opp. Brief at 30. However, Plaintiffs' "lack of knowledge of the proper party" is irrelevant to the relation back inquiry. Rylewicz, 888 F.2d at 1181. Rather, it is Prudential's understanding of its status that is central to this analysis. [*48] See Kilkenny, 800 F.2d at 857.

The facts at bar indicate Prudential had good reason to understand that its omission from the Complaint was not the result of mistake, but of deliberate strategy on the part of Plaintiffs. The fact that Safety Light was a proper defendant in this action, and was not mistakenly named, gave Prudential reason to believe Plaintiffs had deliberately decided to pursue USR and its successors rather than Prudential. See Kress, 1993 WL 166274 at *4.

Further support for such an understanding is provided by the fact that Prudential could be liable to Plaintiffs, if at all, under a different theory than that asserted against Safety Light. Safety Light would be liable, if at all, as successor to USR, which is alleged to have discharged waste at the Hanover Site. See Complaint, P 8B. Prudential, on the other hand, could be liable only as the owner of a part of the Hanover Site. n22 The difference in theories of recovery reasonably indicates that Plaintiffs had intended to pursue only the successor liability theory, and had intentionally omitted Prudential because it would be liable under a different theory. See Rhyder, 1992 WL 25863 [*49] at *2.

> n22 Plaintiffs do not dispute that Prudential did not conduct operations at the Hanover Site during its ownership of Lot 13, but instead, for the entire period of its ownership, leased the property to USR. Opp. Brief at 1.

In addition, Plaintiffs failed to sue Prudential in the Complaint notwithstanding Prudential's ownership of the Hanover Site, which was public knowledge. Plaintiffs concede Prudential appeared in the chain of title to Lot 13 Tr. at 8, and do not dispute that Prudential appeared on the deed transferring Lot 13 to Van Dyk in 1969. Tr. at 4; Massaia Cert., Ex. C. Plaintiffs' failure to name Prudential in spite of the ease of discovering Prudential's

potential liability reasonably indicates Prudential was intentionally omitted from the Complaint. See Potts, 118 F.R.D. at 609.

After reviewing Prudential's role at the Hanover Site, as described in the May 1992 Safety Light Response, Plaintiffs waited more than three months before naming Prudential as a Defendant. This delay [*50] further indicates Prudential was not mistakenly omitted from the Complaint. See Campbell, 792 F. Supp. at 1153 ("Plaintiff admits that he did not learn of the possible role of [the new defendant] until almost a year after the suit was filed and the statute of limitations had run. ... Even after plaintiff learned that [the new defendant] had a possible role in the suit, he waited several months before filing an amended complaint. Plaintiff's inaction could have been viewed as an intentional decision not to sue and belies his contention that [the new defendant] should have known that the failure to include it in the original complaint was a mere mistake."); Keller v. United States, 667 F. Supp. 1351, 1357-58 (S.D.Cal. 1987) (holding same), aff'd without op., 930 F.2d 920 (9th Cir. 1991).

Finally, Cohen's 8 May Phone Conversation with Sanders gave Prudential perhaps its most compelling indication that its omission from the Complaint was a strategic decision and not a mistake. According to evidence submitted by Plaintiffs, Cohen stated to Sanders that there was a potential for conflict "if" Prudential "were brought into the [*51] picture and at that point in time that it hadn't been decided yet." Id. at 10. It also appears Cohen informed Sanders that Plaintiffs "were considering whether or not to bring Prudential into the case." Id.

These statements plainly indicate that Plaintiffs were 'deciding' and 'considering' whether to bring Prudential into the case. They indicate that Plaintiffs' decision concerning the naming of Prudential was the result of deliberation, not of mistake. If Plaintiffs had truly omitted Prudential by mistake, they would have named Prudential immediately, not after deliberation.

The 8 May Phone Conversation provided Prudential with its only information concerning the instant suit prior to the running of the 120 day period under Rule 15(c)(3). See Pigott Cert., PP 4-5; Cohen Dep. at 8-10. This information did not indicate the omission of Prudential was a mistake, as required by Rule 15(c)(3). Rather, it indicated quite the opposite, that Prudential was deliberately omitted from the Complaint, and could be named depending on the outcome of Plaintiffs' strategic deliberations.

Under these circumstances, the Amended Complaint cannot relate back to the date of the filing of [*52] the Complaint. Plaintiffs did not make a mistake in pleading

within the meaning of Rule 15(c)(3). Moreover, Prudential did not, within 120 days of the filing of the Complaint, know or have reason to know that, but for Plaintiff's mistake, it would have been named in the Complaint. Fed.R.Civ.P. 15(c)(3). Accordingly, for the purposes of this analysis, the date of the filing of this action against Prudential is 26 August 1992.

This application of Rule 15(c)(3) appears to be the soundest way to reconcile the rule with the policy of repose behind New Jersey's statutes of limitations. As the Second Circuit has noted:

> [HN13] The relation back rule "is intimately connected with the policy of the statute of limitations." It is designed to operate equably with that statute, to accommodate the statute of limitations policies that prevent stale claims from being litigated, and permit their repose. Clearly the relation back rule was not designed to provide a means to either circumvent or expand the limitations period.

In re Allbrand Appliance & Television Co., Inc., 875 F.2d 1021, 1025 (2d Cir. 1989) (emphasis added) (quoting Fed.R.Civ.P. 15(c), Advisory Committee Notes, [*53] 1966 Amendment).

[HN14] New Jersey has addressed the limitations problem caused by unknown or unknowable defendants by way of the fictitious party, or 'John Doe,' practice. New Jersey's fictitious party practice permits a plaintiff who does not know the identity of the defendant to file an action against a fictitious name and later amend the complaint to state the defendant's true name. See N.J.Ct.R. 4:26-4. Under this practice, an amendment substituting a known defendant for an unknown 'John Doe' defendant will relate back to the original complaint, even where the amendment is made after the running of the statute of limitations. See id.; Viviano v. CBS, Inc., 101 N.J. 538, 547, 503 A.2d 296 (1986) (Fictitious party practice "suspends the statute [of limitations] when the plaintiff is unaware of the true identity of the defendant.").

There is, therefore, no reason to permit the Amended Complaint to relate back simply because Plaintiffs assert they did not know of Prudential's identity until after the statute of limitations had run. The device chosen by the New Jersey legislature to address such a situation is fictitious party practice under N.J.Ct.R. 4:26-4. Fictitious [*54] party practice was available to Plaintiffs; they could have used it to address the problem of the unknown defendant. See Bryan v. Associated Container Transportation, 837 F. Supp. 633, 1993 WL 485813 at *9

(permitting New Jersey's fictitious party practice in Federal court). Plaintiffs chose not to; they cannot now correct this strategy and circumvent the limitations period through Rule 15(c)(3). See In re Allbrand Appliance & Television Co., Inc., 875 F.2d at 1025. n23

n23 Federal Rule of Civil Procedure 15(c)(1) allows state relation back law to govern a state claim in Federal court if state law "affords a more forgiving principle of relation back than the one provided by [Rule 15(c)]." Fed.R.Civ.P. 15(c), Advisory Committee Notes, 1991 Amendment; see Bryan, 1993 WL 485813 at *9 (quoting id.). Under Fed.R.Civ.P. 15(c)(1), "if New Jersey law would permit [relation back], the Federal Rules permit the amendment [to relate back]." Bryan, 1993 WL 485813 at *8; see In re Sharps Run Associates, L.P., 157 B.R. 766, 779-80 (D.N.J. 1993) (applying New Jersey relation back rule pursuant to Fed.R.Civ.P. 15(c)(1)); Wilson v. City of Atlantic City, 142 F.R.D. 603, 605-06 (D.N.J. 1992) (same).

New Jersey's relation back law does not, in this case, provide a more forgiving outcome to Plaintiffs. Substantially mirroring Rule 15(c)(3), New Jersey's relation back rule requires, inter alia, that the defendant "knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against him." N.J.Ct.R. 4:9-3. As stated, Plaintiffs have not established that the failure to name Prudential in the Complaint was due to a 'mistake' for relation back purposes.

Moreover, N.J.Ct.R. 4:9-3 requires that the notice and mistake requirements be fulfilled not within 120 days after filing of the original complaint, as provided in Rule 15(c)(3), but "within the period provided by law for commencing the action...." N.J.Ct.R. 4:9-3. In other words, unlike the Federal rule, New Jersey's relation back rule does not expand the limitations period 120 days for filing of the amendment; notice of the amendment must be given within the applicable limitations period. Id. In the instant case, it is undisputed that Prudential did not receive notice, formal or informal, of the instant action until at least 8 May 1992. See Pigott Cert., PP 4-5; Cohen Dep. at 8-10. As discussed infra 1994 U.S. Dist. LEXIS 21466, *70-78, this date was at least three months after the statute of limitations had run as to Plaintiffs' state law claims. Accordingly, the Amended Complaint cannot relate back to the

date of the filing of the Complaint under Rule 15(c)(1) and N.J.Ct.R. 4:9-3.

[*55]

2. Statute of Limitations for an Environmental Strict Liability Claim

As stated, Count IV of the Second Amended Complaint seeks recovery on the theory of strict liability. Prudential seeks summary judgment on this count on the ground that it is time barred.

[HN15] Pursuant to N.J.S.A. 2A:14-1, actions at common law for "trespass to real property, for any tortious injury to real or personal property ... [or] for any tortious injury to the rights of another [other than personal injury, libel or slander], ... shall be commenced within six years next after the cause of any such action shall have accrued." N.J.S.A. 2A:14-1. This six-year statute of limitations is applicable to environmental tort actions at common law, and more specifically to environmental actions based on strict liability. See Amland Properties v. Aluminum Co. of America, 808 F. Supp. 1187, 1190 (D.N.J. 1992); Hatco Corp. v. W.R. Grace & Co.--Conn., 801 F. Supp. 1309, 1323 (D.N.J. 1992); Allied Corp. v. Frola, 730 F. Supp. 626, 631 (D.N.J. 1990).

" [HN16] Ordinarily, the statute of limitations for an action begins to run when all the elements of the cause of action are present, [*56] or, more plainly, 'from the moment of the wrong.'" Amland Properties, 808 F. Supp. at 1190 (quoting Lopez v. Swyer, 62 N.J. 267, 274, 300 A.2d 563 (1973)). In some situations, however, the law of New Jersey recognizes the 'discovery rule,' an equitable principle whose purpose is "to avoid harsh results that otherwise would flow from mechanical application of a statute of limitations." Vispisiano v. Ashland Chemical Co., 107 N.J. 416, 426, 527 A.2d 66 (1987).

[HN17] Under the discovery rule, a cause of action does not "accrue," for the purpose of the statute of limitations "until the plaintiff 'learns, or reasonably should learn, the existence of that state of facts which may equate in law with a cause of action.'" Id. (quoting Burd v. New Jersey Telephone Co., 76 N.J. 284, 291, 386 A.2d 1310 (1978) (emphasis in original)); see Apgar v. Lederle Laboratories, 123 N.J. 450, 455, 588 A.2d 380 (1991) (same). As the Supreme Court of New Jersey has explained, the discovery rule places "emphasis upon the factual nature of an injured party's knowledge of a basis for a cause of action. ... [A] plaintiff [*57] must have an awareness of 'material facts' relating to the existence and origin of his injury rather than comprehension of the legal significance of such facts." Lynch v. Rubacky, 85 N.J. 65, 73, 424 A.2d 1169 (1981) (emphasis in original) (citing Burd, 76 N.J. at 291-93); see Hatco Corp., 801 F. Supp. at 1323. Moreover, "the statute is triggered by a plaintiff's knowledge of 'material facts,' not by conclusive proof of every relevant fact." Hatco Corp., 801 F. Supp. at 1324.

" [HN18] It is the province of the court to take into account and balance all the equities of each case for the purposes of determining whether the party invoking the rule is equitably entitled to its benefit." Amland Properties, 808 F. Supp. at 1191; see Lopez, 62 N.J. at 275. "Courts have recognized that the size and complexity of environmental cases ... may present difficulties with regard to statutes of limitations." Amland Properties, 808 F. Supp. at 1191. In light of the difficulty of ascertaining the existence of and responsibility for environmental injuries, courts have commonly applied the discovery [*58] rule in environmental tort cases. See id.; Hatco Corp., 801 F. Supp. at 1323; Frola, 730 F. Supp. at 632; Vispisiano, 107 N.J. at 434. For these reasons, the discovery rule will be applied to the instant case.

Plaintiffs argue that, under New Jersey law, a cause of action does not accrue until the plaintiff is or should be aware of the existence of an injury and that such injury is the fault of an identifiable defendant. Opp. Brief at 31. Plaintiffs cite Frola, 730 F. Supp. at 631, for this proposition.

Plaintiffs correctly point out that in Frola, it was held that a cause of action in an environmental tort case "accrues in New Jersey when a plaintiff knows or reasonably should know of his or her cause of action and of the identity of a party or parties who may be responsible for the injury, in this case the dumping of hazardous substances on land." 730 F. Supp. at 632. The court in Frola based its conclusion on the holding of the New Jersey Supreme Court in Abboud v. Viscomi, 111 N.J. 56, 543 A.2d 29 (1988). See 730 F. Supp. at 631-32. There, it was held [*59] that a person is not "aware of that state of facts which may equate in law with a cause of action" unless and until that person is aware that his or her "injury is due to the fault or neglect of an identifiable individual or entity." Abboud, 111 N.J. at 62-63.

Since the decisions in Abboud and Frola, the New Jersey Supreme Court has revisited and abrogated the rule pronounced by those cases. In the 1991 decision in Apgar, 123 N.J. 450, 588 A.2d 380, the New Jersey Supreme Court addressed a products liability action against a drug manufacturer. In response to a statute of limitations defense, the plaintiff asserted that "the statute of limitations did not begin to run on her claim until she learned the identities of the manufacturers of the drugs she had taken." 123 N.J. at 456. The New Jersey Supreme Court rejected this argument, and held that the plaintiff's cause of action accrued when she knew her injury was the fault of a third party, irrespective of her

knowledge of the identity of that party. Id. The court explained:

> That the specific identity of a potential defendant is not a requirement for commencing an action [*60] is now beyond argument. In Viviano ..., we made it clear that a plaintiff can file a complaint naming "John Doe" defendants if the actual identity of the wrongdoer is unknown. n24

Id.

n24 The court in Apgar apparently relied on the availability of N.J.Ct.R. 4:26-4, which permits a plaintiff who does not know the identity of the defendant to file an action naming a fictitious defendant and later amend the complaint to name the actual defendant. See N.J.Ct.R. 4:26-4. In Viviano, the New Jersey Supreme Court stated that the filing of a fictitious-party complaint "suspends the statute [of limitations] when the plaintiff is unaware of the true identity of the defendant." 101 N.J. at 547. In other words, the amended complaint would relate back to the 'John Doe' complaint. See id. In light of the availability of fictitious party practice, the court in Apgar concluded that it would not be unduly harsh to commence the statute of limitations when the identity of the defendant is not known. See 123 N.J. at 456.

In the past, the Third Circuit has suggested that New Jersey's fictitious-party practice may not be available to toll a statute of limitations in Federal court. See Juzwin v. Asbestos Corp., Ltd., 900 F.2d 686, 690 (3d Cir.) (stating in dicta that "the New Jersey fictitious defendant rule is not available to a plaintiff in Federal court since it is a procedural device, not a rule of substantive law"), cert. denied, 498 U.S. 896, 112 L. Ed. 2d 204, 111 S. Ct. 246 (1990); Talbert v. Kelly, 799 F.2d 62, 66 n.1 (3d Cir. 1986) (John Doe practice will not toll statute of limitations in Federal court even where state law allows such tolling.); Britt v. Arvanitis, 590 F.2d 57, 62 (3d Cir. 1978) (same). These decisions might have cast some doubt on the applicability of the rule of Apgar in Federal court.

These decisions appear, however, to have been superseded by the 1991 Amendments to Rule 15(c). Effective 1 December 1991, Rule

15(c) was amended to permit relation back of an amended complaint "when relation back is permitted by the law that provides the statute of limitations applicable to the action." Fed.R.Civ.P. 15(c)(1). The Advisory Committee Notes on the 1991 amendment to Rule 15(c) state that Rule 15(c)(1) "is intended to make it clear that the rule does not apply to preclude any relation back that may be permitted under the applicable limitations law. Generally, the applicable limitations law will be state law." Fed.R.Civ.P. 15, Advisory Committee Notes, 1991 Amendment, paragraph (c)(1).

The Advisory Committee Notes further state: "Whatever may be the controlling body of limitations law, if that law affords a more forgiving principle of relation back than the one provided in this rule, it should be available to save the claim." Id. It appears, therefore, that notwithstanding the Third Circuit's past suggestions to the contrary, New Jersey's fictitious-party practice would be available to toll the statute of limitations in Federal court. See Bryan, 1993 WL 485813 at *9 (permitting fictitious party practice in Federal court); Wilson, 142 F.R.D. at 606 & n.1 (refusing to dismiss amended 'John Doe' complaint on statute of limitations grounds because New Jersey's fictitious-party practice tolled statute of limitations; distinguishing Britt, 590 F.2d 57, on basis of 1991 amendments to Fed.R.Civ.P. 15(c)). Accordingly, the rationale of Apgar, refusing to toll the limitations period until the identity of the defendant is known, is applicable in Federal court. See Amland Properties, 808 F. Supp. at 1192 (applying rule of Apgar in Federal court).

[*61]

The principle of Apgar is equally applicable to actions grounded in environmental tort. See Amland Properties, 808 F. Supp. at 1192 (applying rule of Apgar to New Jersey common law environmental tort action; declining to follow Frola and Abboud). In accordance with this principle, " [HN19] the discovery rule does not toll the statute of limitations until the precise parties responsible for the injury are known, but only until it is or should be apparent that some other party is at fault. Id. (emphasis in original); see Vispisiano, 107 N.J. at 434 (accrual of action occurs when it is evident that the cause of the injury is "(a) the fault of (b) a third party.").

Because the Amended Complaint does not relate back to the 15 January 1992 filing of the Complaint, in order for Plaintiffs' claims against Prudential to survive the statute of limitations, Plaintiff's cause of action

against Prudential must not have accrued prior to 26 August 1986, six years before the date upon which Plaintiffs filed the Amended Complaint naming Prudential as a defendant. In other words, Plaintiffs must not, before 26 August 1986, have known, or have reasonably [*62] been able to know, the existence of a state of facts giving rise to an action, and that such facts were the fault of another party. See Vispisjano, 107 N.J. at 426; Amland Properties, 808 F. Supp. at 1192.

Plaintiffs contend that the Third Circuit's holding in Goodman v. Mead Johnson & Co., 534 F.2d 566 (3d Cir. 1976), cert. denied, 429 U.S. 1038, 50 L. Ed. 2d 748, 97 S. Ct. 732 (1977), renders the above inquiry an impossibly exacting one to resolve on summary judgment. Opp. Brief at 20, 39. In Goodman, it was held that where there existed disputed issues of fact as to the time of discovery of a cause of action, summary judgment on a statute of limitations defense cannot be sustained. 534 F.2d at 573-75. However, as observed by the court in Amland Properties, the Circuit's decision in Goodman does little to alter the analysis under Rule 56:

> The Third Circuit's holding in Goodman does not preclude this court's consideration of the factual issues surrounding [the plaintiff's] causes of action, but, rather informs and sets the parameters for that consideration. Moreover, even where [*63] the discovery rule is applicable, a jury's involvement is not invariably required; indeed, the Third Circuit recognized after Goodman that the presumption favoring jury determinations of factual issues surrounding the discovery rule was not an absolute. See Van Buskirk v. Carey Canadian Mines, Ltd., 760 F.2d 481, 498 (3d Cir. 1985) ("Since the applicability of the statute of limitations usually involves questions of fact for the jury, defendants bear a heavy burden in seeking to establish as a matter of law that the challenged claims are barred.")

808 F. Supp. at 1192 (granting summary judgment on statute of limitations defense based on finding as to date of discovery of action); see Hatco Corp., 801 F. Supp. at 1323-24 (same).

It therefore remains within the province of this court, even in light of Goodman, to grant judgment as a matter of law on an issue involving the discovery rule where there exists no genuine issue of material fact as to when an action was, or reasonably should have been, discovered. See Amland Properties, 808 F. Supp. at 1193 ("As in other contexts, this court must defer to the [*64]

fact finding function of a jury unless it can be demonstrated that there is no genuine issue of material fact as to when [plaintiff's] cause of action against [the moving party] accrued.").

Prudential may be granted summary judgment if it establishes beyond a genuine issue of material fact that Plaintiffs' cause of action accrued before 26 August 1986. See id.; Matsushita, 475 U.S. at 586-87. It has been held [HN20] that an environmental strict liability claim accrues when the plaintiff "knew [or should have known] of its injury and that the injury was the fault of another." Amland Properties, 808 F. Supp. at 1187 (applying accrual standard to all common law environmental tort claims); see Hatco Corp., 801 F. Supp. at 1323 (applying standard to environmental strict liability claim).

Prudential has carried its burden for summary judgment. The undisputed facts in the record indicate Plaintiffs' cause of action accrued at latest by February 1986, if not earlier. By that time, Plaintiffs knew of the existence of high levels of cadmium and cadmium compounds throughout the Hanover Site, that the cadmium deposits constituted a health hazard [*65] and required removal and that a third party was responsible for the presence of the cadmium deposits.

As early as 1970, Van Dyk was "aware that the [Race Pond] contained cadmium." Moulthrop Cert., Ex. I (Kemp's response to Prudential's Second Set of Interrogatories). Also during that year, chemical analysis of the sludge removed from the Race Pond revealed not only that the sludge contained cadmium, but that it contained "a high content of cadmium sulfide...." Pollack Aff., P 8.

At least as of February 1984, Van Dyk knew the Waste Pile created by dredging the Race Pond contained an estimated 60,000 pounds of cadmium sulfide. Moulthrop Cert., Ex. J at 2 (February 1984 Questionnaire). Van Dyk knew or should have known at that time that this significant quantity of cadmium compound constituted a health hazard. As indicated by Van Dyk in the February 1984 Questionnaire, the Waste Pile was located approximately one hundred yards from a building. n25 Id. at 6. The Waste Pile was also listed under the heading "hazardous substances" in the February 1984 Questionnaire. Id. at 2. Indeed, O'Mara, then president of Van Dyk, confirmed that prior to August 1984, he was "aware that [the [*66] Waste Pile] had cadmium compounds in it," and "that the Waste Pile was something to be concerned about." O'Mara Dep. at 47, 62.

n25 The RSA Report, issued to Van Dyk on 15 January 1985, indicated in a scaled map that

the Waste Pile was less than sixty feet from a metal storage building, and less than two hundred feet from a building containing a machine shop, storage facility and lab. See Moulthrop Cert., Ex. Q.

Apollo also became aware of the presence and significance of the Waste Pile in 1984. The 20 June 1984 TRC Report revealed to Apollo that "a waste pile alleged to contain heavy metals is still present on the [Hanover Site]." Moulthrop Cert., Ex. M. Apollo was further informed that soil analyses conducted where runoff from the Waste Pile was evident revealed "elevated levels of cadmium, lead and zinc." Id. The 20 June 1984 TRC Report also informed Apollo that the Waste Pile was a "potential source of heavy metal contamination to ground water...." Id.

In January 1985, a "hot spot" was detected [*67] at the Hanover Site and brought to Van Dyk's attention. Moulthrop Cert., Ex. Q (RSA Report). While the hot spot was deemed not to constitute an "immediate public health hazard," Plaintiffs were informed that the spot should "be excavated with a health physicist present, and the source of this radiation [should] be identified and disposed of in an appropriate manner." Id. (emphasis added). Also during that month, background radiation at the Hanover Site was found to be two to five times the level which could normally be expected. Id.

Also in January 1985, in a submission to the DEP, Van Dyk listed among "areas of environmental concern" at the Hanover Site the Waste Pile and "possible radiological contamination throughout the [Hanover] Site." Moulthrop Cert., Ex. P. (Sampling Plan) (emphasis added). The Sampling Plan also recognized health hazards from the Waste Pile could result from seepage into the ground water, noting that "radiological contamination has been detected in the ground water at the adjacent gradient site." Id. Moreover, the Sampling Plan noted that such ground water contamination could spread to the Whippany River. Id.

Finally and significantly, [*68] the Sampling Plan stated that the Waste Pile was "a result of the excavation of an effluent disposal lagoon used by [USR] during [its] manufacturing operations." Id. Accordingly, by January 1985 at the latest, Plaintiffs knew that a third party was responsible for the existence of hazardous substances at the Hanover Site.

The Third Sampling Plan, submitted by Van Dyk to DEP on 20 September 1985, made further reference to USR's role in causing the hazardous conditions at the Hanover Site. From the Third Sampling Plan, it is evident that in September 1985, Van Dyk knew USR operated an "above ground tank farm" and three settling la-

goons which were a "possible source of radiation." n26 Moulthrop Cert., Ex. V. The Third Sampling Plan also expressed concern over "ground water quality in general." Id. at 2.

> n26 The 27 May 1986 TRC Letter also informed Plaintiffs that "the metal contamination [at the Hanover Site] is probably the result of improper waste generated by [USR], the former property owner. Likewise, the localized area of high radioactivity is probably from [USR] activities." Moulthrop Cert., Ex. X.

[*69]

Any doubts, reasonable or otherwise, Plaintiffs may have had as to the significance of the cadmium deposits at the Hanover Site were resolved during February 1986. During that month, upon receipt of the September 1985 Soil Analysis, Plaintiffs learned the Hanover Site had surface cadmium levels of up to 7,700 ppm, and cadmium levels well above 1,000 ppm at depths up to six feet. Moulthrop Cert., Ex. W, Table 1.

Plaintiffs point to the difficulty of ascertaining the amount of environmental harm caused by the increased levels of cadmium at the Hanover Site, and the difficulty of ascertaining whether these levels exceeded DEP standards. Opp. Brief at 7 n. 11, 20 n.13. It is absurd to suggest, as Plaintiffs do, that they could not reasonably have known the level of environmental and health risk caused by the cadmium concentrations at the Hanover Site. For example, Plaintiffs put forth that proposed DEP cleanup standards for cadmium are 1.0 ppm for residential sites, and 100 ppm for non-residential sites. Opp. Brief at 7 n.11. Plaintiffs therefore assert it was impossible to know whether the DEP would have required cleanup of the cadmium at the Hanover Site, and whether the presence of [*70] the groundwater constituted "contamination," until the DEP Meeting. Id.; see id. at 22-23.

As indicated, the September 1985 Soil Analysis revealed levels of cadmium several hundred times higher than the range referred to by Plaintiffs. See Moulthrop Cert., Ex. W., Table 1. Plaintiffs should have known that such levels would constitute an environmental hazard under any standard. Moreover, as early as 1984, Plaintiffs had estimated the amount of cadmium compound in the Waste Pile at 60,000 pounds. Moulthrop Cert., Ex. J at 2. As cadmium and cadmium compounds were classified as a "hazardous substance" by the DEP in 1984, see N.J.A.C. 7:1E, Appendix A, R.1980, d.185 (effective 28 April 1980), Plaintiffs knew or should have known at that time that such a large amount of cadmium would require removal. Indeed, any contention by Plaintiffs to the contrary was undercut by their own actions when, in

1985, they commenced removal of the Waste Pile. O'Mara Cont. Dep. at 120.

To the extent that awareness of "contamination, i.e. that cadmium was present in levels that would be a health concern," Opp. Brief at 22, was required for the Plaintiffs' cause of action to accrue, n27 this requirement [*71] was also satisfied before the DEP Meeting. In internal documents and DEP submissions in 1984 and 1985, Plaintiffs themselves documented the risk of cadmium seepage into ground water and thereby into local rivers. Moulthrop Cert., Ex. P at 2; id., Ex. M. The Plaintiffs in fact noted "elevated levels of radiation and phenols in the ground water" at the Adjacent Lands in early 1985, and further noted that the Waste Pile was the likely source of the ground water contamination. Id., Ex. P at 12.

> n27 The Plaintiffs have not cited any authority for the proposition that accrual of a cause of action in environmental tort requires knowledge of "contamination," as they define that term.

Plaintiffs at the very least should have known that the introduction of such large quantities of this hazardous substance into ground water and rivers would constitute a health hazard. On at least two occasions before the DEP Meeting, Plaintiffs in fact referred to conditions at the Hanover Site as constituting "contamination." [*72] See Moulthrop Cert., Ex. M (20 June 1984 TRC Report); id., Ex. P at 2 (Sampling Plan); see also Moulthrop Cert., Ex. X (27 May 1986 Letter, informing Plaintiffs that "much of the surface and subsurface soils in the northern 1/3 of the property are contaminated with ... cadmium ....").

Any difficulties Plaintiffs may have encountered in ascertaining the significance of the cadmium problem at the Hanover Site were certainly resolved at the DEP Meeting on 13 February 1986. At that time, Plaintiffs were informed by the DEP that the levels of cadmium at the Hanover Site were "greatly in excess of those permissible under DEP's standards." Berger Cert., P 15. Plaintiffs concede they "learned of the existence of possible contamination in the [DEP Meeting] on February 13, 1986." Opp. Brief at 28; see id. at 33 ("Plaintiffs knew of the existence of contamination at the Hanover Site ... on February 13, 1986.").

Under the undisputed facts at bar, Plaintiffs' cause of action in strict liability against Prudential accrued, at the latest, on 13 February 1986. At that time, they knew or should have known of the existence of contamination at the Hanover Site and that the contamination [*73] constituted a health risk and required removal. Moreover, by

that date, they knew or should have known that such contamination was the fault of another. n28 Plaintiffs were therefore aware, or should have been aware, by 13 February 1986 of the state of facts which might give rise to their strict liability claim. See Vispisiano, 107 N.J. at 426; Amland Properties, 808 F. Supp. at 1192. Because the Amended Complaint, naming Prudential as a defendant, was filed more than six years after this date, Plaintiffs' strict liability claim is time-barred as to Prudential. N.J.S.A. 2A:14-1. n29

> n28 Plaintiffs have conceded: "Plaintiffs knew prior to August 26, 1986 that the contamination was 'the fault of another.' Once they learned of the contamination [at the DEP Meeting], Plaintiffs suspected that the former operator of the facility on the Hanover Site was responsible." Opp. Brief at 33.

> n29 Similar results were reached on similar facts by the courts in Amland Properties, 808 F. Supp. 1187, and Hatco Corp., 801 F. Supp. at 1309. In Amland Properties, the court granted the defendant summary judgment on the plaintiff's common law environmental tort claims on the ground that they were time-barred under N.J.S.A. 2A:14-1. In defining the date of accrual of the cause of action, the court noted that the plaintiff knew of the existence of "significant concentrations" of hazardous substances on the property, that the problem "was serious" and that "it was not the responsible party" more than six years before the filing of the complaint. 808 F. Supp. at 1193-94. The court held that the facts of which the plaintiffs were aware constituted "a state of facts which may give rise to a cause of action" in environmental tort. Id. at 1194.
>
> In Hatco Corp., the court granted the defendant summary judgment pursuant to the statute of limitations on an environmental strict liability claim. There, the court stated that the cause of action accrued when the plaintiff received notice from the DEP that "extensive groundwater contamination" and "high concentrations" of hazardous chemicals existed on their site. 801 F. Supp. at 1323. Though the plaintiff claimed that it did not know of the extensive nature of the environmental problems until it conducted further studies, the court concluded that the DEP's information put plaintiffs "on notice of facts sufficient to trigger the running of the statute of limitations...." Id.
>
> Plaintiffs attempt to rely on Bowen Engineering, 799 F. Supp. 467, where the court re-

jected the defendant's contention that the plaintiff's environmental tort claims were time-barred. There, however, the court relied heavily on the fact that "early test results were inconclusive at best, with no indication that the site was contaminated." Id. at 481. In contrast, tests results on the Hanover Site, available to Plaintiffs in February 1986, indicated conclusively the presence of greatly elevated levels of a hazardous substance. See Moulthrop Cert., Ex. W, Table 1 (September 1985 Soil Analysis). That the Hanover Site was contaminated and contained health risks was confirmed to Plaintiffs by the DEP no later than 13 February 1986. See Berger Cert., P 15. The holding in Bowen Engineering is inapposite to the instant facts. Rather, the instant facts are more akin to those presented in Amland Properties and Hatco Corp.

[*74]

Plaintiffs argue that even though they knew of the existence of some contamination in February 1986, they did not know of other discharges of cadmium by USR, which are also the subject of the Complaint, until 1992. Plaintiffs point specifically to the plastic bags of buried cadmium uncovered in 1992 by ESI, and USR's channelling of cadmium waste from a settling pond into a local brook, revealed in the 4 December 1992 Supplemental Response. See Opp. Brief at 29; Nimensky Cert., Ex. K at 7; id., Ex. L. Plaintiffs contend that each of these discharges gave rise to causes of action separate from that based on the Waste Pile, and that the statute of limitations on these causes of action did not begin to run until the discovery of these discharges in 1992. Opp. Brief at 29-30.

Plaintiffs appear to ignore that [HN21] under the discovery rule, the statute of limitations begins to run when the plaintiff knew or reasonably should have known of the facts which would support the cause of action. See Apgar, 123 N.J. at 455; Vispisiano, 107 N.J. at 426. The discovery rule, therefore, "requires diligence and reasonable investigative efforts on the part of the [*75] plaintiff" to determine the existence of injury. Hatco Corp., 801 F. Supp. at 1324; see Vispisiano, 107 N.J. at 416. Moreover, "the statute is triggered by a plaintiff's knowledge of 'material facts,' not by conclusive proof of every relevant fact." Hatco Corp., 801 F. Supp. at 1324.

By February 1986, Plaintiffs had been notified by the DEP that the cadmium levels at the Hanover Site greatly exceeded DEP standards. See Berger Dep. at 52-53. Plaintiffs concede that "the data that the [DEP] highlighted during the [DEP Meeting] indicated that cadmium was present in elevated levels not only in the

[Race Pond] area, but also in other locations throughout the Hanover Site." Opp. Brief at 5 (emphasis in original). Plaintiffs further state that this information "indicated [USR's] use of the [Race Pond] was not the only source of cadmium on the Hanover Site:"

> The [DEP Meeting] first revealed to Plaintiffs not only that cadmium in elevated levels was present in locations throughout the Hanover Site, but also that the presence of such far-reaching contamination was caused by another abnormally dangerous activity -- [*76] one that was entirely distinct from that which caused the presence of cadmium in the lagoon area.

Id. at 5-6.

Indeed, Plaintiffs knew before the DEP Meeting that the Waste Pile was not an isolated incidence of contamination at the Hanover Site. In January 1985, the RSA Report identified the radioactive "hot spot" on the eastern end of the Hanover Site. Moulthrop Cert., Ex. Q. The RSA Report also reported background radiation levels two to five times normal. Id. The Sampling Plan, submitted by Van Dyk to DEP in January 1985, indicated Van Dyk's knowledge of "possible radiological contamination throughout the [Hanover] Site." Id., Ex. P at 2 (emphasis added). The Third Revised Sampling Plan, submitted by Van Dyk to DEP in September 1985, indicated that three settling lagoons and an above ground tank, all used by USR, were areas of environmental concern to Van Dyk. See Moulthrop Cert., Ex. V at 2. The "ground water quality in general" at the Hanover Site was also an environmental concern to Van Dyk as of the date of the Third Revised Sampling Plan. Id.

Plaintiffs therefore knew by February 1986, at the latest, that cadmium-related and other contamination [*77] existed throughout the Hanover Site and not just near the Waste Pile. Plaintiffs also knew by February 1986 that the presence of cadmium contamination throughout the Hanover Site was the result of activity distinct from that which caused the Waste Pile. See Opp. Brief at 5-6. Under these facts, Plaintiffs knew of the "material facts" required for their cause of action by, at the latest, February 1986; it was not necessary that they had conclusive proof of every fact. See Hatco Corp., 801 F. Supp. at 1324. Moreover, by February 1986, Plaintiffs were on inquiry notice such that they, at the very least, should have discovered the other sources of contamination shortly thereafter. n30 See id. at 1324. Accordingly, that part of Plaintiffs' claim which is based on these other

discharges also accrued in February 1986, and was time-barred by August 1992 when the Amended Complaint was filed naming Prudential. N.J.S.A. 2A:14-1.

> n30 The ease with which Plaintiffs could have discovered the buried plastic bags of cadmium in 1986 is revealed by the ease with which they discovered the bags in 1992. The bags were discovered at a depth of only four feet, and within the immediate vicinity of the area where the Waste Pile had been located. Nimensky Cert., Ex. L at 4.

[*78]

An argument similar to Plaintiffs' was addressed by the court in Hatco Corp., 801 F. Supp. 1309. There, it was held that a DEP notice put the plaintiff "on notice of facts sufficient to trigger the running of the statute of limitations as to the [environmental] problems directly addressed [in the DEP notice]." Id. at 1324. The court noted, however, that other problems had been discovered at the site, which the DEP's notice did not address. The court stated: "To the extent that the [DEP's notice] did not address specifically every problem that has since been discovered at the site, it nonetheless triggered a duty on [plaintiff's] part to 'exercise reasonable diligence and intelligence' to investigate and discover those problems." Id. (quoting Vispisiano, 107 N.J. at 416).

The court then pointed out that when the plaintiff received the DEP's notice, "it was not as if it had for the first time been made aware that substantial polluting activities had occurred on the site." Id. Nothing that all that is required for the accrual of a cause of action is the plaintiff's knowledge of "material facts" behind the cause of action, [*79] the court stated:

> As to the problems not specifically addressed in the [DEP's Notice], the Court finds that the [DEP] put [plaintiff] on inquiry notice such that [plaintiff] "should have" discovered their existence shortly thereafter, through the exercise of "reasonable diligence and intelligence." The court finds that such diligence would have revealed facts sufficient to equate [plaintiff's] strict liability claim more than six years before [it] filed this action...

Id. (quoting Vispisiano, 107 N.J. at 419).

The reasoning of Hatco Corp. is directly apposite to the instant facts. Whether Plaintiffs knew of every discharge for which Defendants could be liable before August 1986, they knew in February 1986 of the 'material facts' necessary for their cause of action to accrue. See 801 F. Supp. at 1324. Moreover, these facts put the Plaintiffs on inquiry notice such that, through the exercise of reasonable diligence, they could and should have quickly discovered the extent of the environmental damage to the Hanover Site. Id. Plaintiffs' cause of action in strict liability therefore accrued, in its entirety, in [*80] February 1986, and was time-barred when the Amended Complaint was filed. n31 N.J.S.A. 2A:14-1.

> n31 To conclude otherwise would allow plaintiffs to litigate their claim in piecemeal fashion, contrary to the policy of repose behind the statute of limitations. For example, a party who had purchased a building could discover, shortly after the purchase, that a part of the building was infested with termites. At that point, he could elect not to sue the seller, and allow the statute of limitations to expire. Years later, after the statute of limitations had expired, the buyer could discover termites in other areas of the building.
>
> Under Plaintiffs' approach, the buyer could, upon discovering other infestation, sue the seller, notwithstanding that the seller gained repose from the buyer's failure to sue on the initial discovery of infestation. Such an approach strains logic and the policy behind the limitations period. The sounder conclusion is that the initial discovery of infestation put the buyer on inquiry notice such that he should have discovered other existing infestations, and provided him with the material facts sufficient for his claim to accrue. The cause of action accrued, in its entirety, at the initial discovery of termite infestation. Similarly, in the instant case, Plaintiffs' entire cause of action accrued when it was informed at the DEP Meeting of the extensive cadmium contamination problems at the Hanover Site.

[*81]

Plaintiffs also argue that they did not know until 1992, after the filing of the Complaint, of Prudential's potential liability in this matter. As stated, however, knowledge of the responsible party's identity is not necessary for the accrual of a cause of action; it is only necessary that "it is or should be apparent that some other party is at fault." Amland Properties, 808 F. Supp. at 1192; see Apgar, 123 N.J. at 456. Moreover, even if knowledge of Prudential's identity were necessary to the

accrual of Plaintiffs' cause of action, Plaintiffs are chargeable with such knowledge. As stated, Prudential's ownership of Lot 13 was public record, and was in fact reflected on the deed transferring the property to Van Dyk in 1969. Tr. at 4, 7; Massaia Cert., Ex. C. Plaintiffs therefore should have known of Prudential's potential responsibility for the contamination on the Hanover Site when it learned of such contamination in February 1986.

Plaintiffs argue that "even if the Court were to hold that Plaintiffs should have known that Prudential had owned [Lot 13], mere knowledge of Prudential's ownership would have been insufficient to give Kemp and [*82] Apollo a cause of action. ... A cause of action for environmental contamination requires a showing not only of ownership, but of ownership at the time of discharge." Opp. Brief at 36 (emphasis in original) (citing State v. Ventron Corp., 94 N.J. 473, 468 A.2d 150 (1983)).

The validity vel non of Plaintiffs' characterization of the law in this regard is irrelevant to the instant analysis. It was not necessary to the accrual of the cause of action under the statute of limitations that Plaintiffs knew of Prudential's specific acts with respect to the discharge. As noted, the statute of limitations is triggered by Plaintiffs' "knowledge of 'material facts,' not by conclusive proof of every relevant fact." Hatco Corp., 801 F. Supp. at 1324. Plaintiffs knew in February of 1986 of the contamination at the Hanover Site, and knew or should have known by that time of Prudential's ownership of Lot 13. n32 At this time, Plaintiffs knew, or should have known, of the "material facts" necessary to support a cause of action against Prudential, and that cause of action had therefore accrued. Id. Under Plaintiff's interpretation of the discovery rule, a [*83] cause of action would not be 'discovered,' and the statute of limitations would not be triggered, until the jury makes findings of fact.

n32 Plaintiffs also should have known by February 1986 that discharges could have taken place during Prudential's ownership. Prudential owned Lot 13 for more than thirteen years. See Plaintiffs' 12G Statement, P 1. In light of the extent of USR's discharges, Plaintiffs should have anticipated that discharges may have taken place during Prudential's ownership.

Plaintiffs further argue that equitable considerations should preclude the barring of their strict liability claim on statute of limitations grounds. "It would be derelict for the Court to apply strictly and uncritically a statutory period of limitations without considering conscientiously the circumstances of the individual case and assessing the Legislature's objective in prescribing the time limita-

tion as related to a particular claim." Kaczmarek v. New Jersey Turnpike Authority, 77 N.J. 329, 338, 390 A.2d 597 (1978). [*84] However, [HN22] statutes of limitations "serve[] important policies which may not lightly be disregarded." Id. As the New Jersey Supreme Court has stated:

> A statute of limitations has two purposes. The first is to stimulate litigants to pursue a right of action within a reasonable time so that the opposing party may have a fair opportunity to defend, thus preventing the litigation of stale claims. The second function of to "penalize dilatoriness and serve as a measure of repose."

Ochs v. Federal Insurance Co., 90 N.J. 108, 112, 447 A.2d 163 (1982) (citing Kaczmarek, 77 N.J. at 337; Farrell v. Votator Division of Chemetron Corp., 62 N.J. 111, 299 A.2d 394 (1975)).

Such policies of repose and fairness are particularly compelling where, as here, a defendant last held title to the subject property nearly than thirty years ago. Prudential certifies that it now has few, if any, documents which may be related to the instant litigation. Pigott Cert., P 6. Moreover, the Plaintiffs knew of the presence of the cadmium at the Hanover Site, and of Prudential's ownership over Lot 13, over twenty years ago. In light of Plaintiff's dilatoriness, [*85] and Prudential's strong interest in repose from concern about a twenty-year old problem, the application of the statute of limitations in this case does not "unnecessarily sacrifice individual justice...." Zaccardi v. Becker, 88 N.J. 245, 259, 440 A.2d 1329 (1982). Accordingly, the equities of this case argue in favor of barring Plaintiffs' strict liability claims on statute of limitations grounds.

Prudential has established, beyond a genuine issue of material fact, that Plaintiffs' cause of action against them in strict liability accrued more than six years prior to the filing of the Amended Complaint. Count IV of the Amended Complaint was therefore time-barred as to Prudential. Accordingly, Prudential is granted summary judgment on Count IV of the Second Amended Complaint.

### 3. Statute of Limitations Under the Spill Act

As stated, Count II seeks contribution under the Spill Act. Prudential's argument for summary judgment on this count is also based on statute of limitations grounds. The Spill Act was enacted in 1976 "to control the transfer and storage of hazardous substances and to provide liability for damage sustained within [New Jer-

sey] as a result of [*86] any discharge of said substances, by requiring the prompt containment and removal of such pollution...." N.J.S.A. 58:10-23.11a.

Pursuant to section 23.11f of the Spill Act:

> Whenever any hazardous substance is discharged, the department may, in its discretion, act to clean up and remove or arrange for the cleanup and removal of such discharge or may direct the discharger to clean up and remove, or arrange for the cleanup and removal of, such discharge.

N.J.S.A.58:10-23.11f(a)(1).

The Spill Act imposes strict liability for pollution cleanup and removal costs, "no matter by whom incurred," upon "any person who has discharged a hazardous substance, or is in any way responsible for any hazardous substance." n33 N.J.S.A. 58:10-23.11g(c)(1). Such persons are liable "jointly and severally." Id. Under the Spill Act, "such person shall also be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs incurred by the [DEP] or a local unit pursuant to ... [section] 23.11f." Id.

> n33 "Hazardous substances" for the purposes of the Spill Act are those substances listed on the "environmental hazardous substance list" adopted by the Department pursuant to N.J.S.A. 34:5A-4(a), and those which are otherwise "defined as such by the [DEP], after public hearing...." N.J.S.A. 58:10-23.11b. Cadmium and cadmium compounds have been listed as hazardous substances by the DEP at least since 1980. See N.J.A.C. 7:1E, Appendix A, R.1980, d. 185 (effective 28 April 1980); 12 N.J.R. 68(a), 314(a).

[*87]

Prior to 1992, the Spill Act did not provide for a private right of action for recovery of cleanup costs and other damages due to the discharge of hazardous substances. See Bowen Engineering, 799 F. Supp. at 478; Jersey City Redevelopment Auth. v. PPG Industries, 655 F. Supp. 1257, 1263 (D.N.J. 1987).

Effective 10 January 1992, section 23.11f was amended to include a private right of contribution among joint tortfeasors. See N.J.Pub.L. 373; Bowen Engineering, 799 F. Supp. at 478. The amendment provides, in relevant part:

> Whenever one or more dischargers or persons cleans up and removes a discharge of a hazardous substance, those dischargers and persons shall have a right of contribution against all other dischargers and persons in any way responsible for a discharged hazardous substance who are liable for the cost of cleanup and removal of that discharge of a hazardous substance. In an action for contribution, the contribution plaintiffs need prove only that a discharge occurred for which the contribution defendant or defendants are liable pursuant to the provisions of [N.J.S.A. 58:10-23.11g(c)]... In the resolving of [*88] contribution claims, a court may allocate the costs of cleanup and removal among liable parties using such equitable factors as the court determines are appropriate.

N.J.S.A. 58:10-23.11f(a)(2). It is under this provision that Count II seeks recovery.

The Spill Act does not contain a statute of limitations for private contribution actions brought under section 23.11f(a)(2). "Therefore, the limitations period applicable to this action must be selected from among those statutes of limitation available for actions seeking comparable relief at common law." Skadegaard v. Farrell, 578 F. Supp. 1209, 1214 (D.N.J. 1984); see Montells v. Haynes, 133 N.J. 282, 292, 627 A.2d 654 (1993) (New Jersey Law Against Discrimination ("NJLAD"), which does not specify limitations period, is governed by New Jersey's two-year residual statute of limitations for common law personal injury actions); see also White v. Johnson & Johnson Products, Inc., 712 F. Supp. 33, 37 (D.N.J. 1989) ("The NJLAD does not specify a statute of limitations, so the Court must select from among the general statutes of limitations enacted in New Jersey.").

The New Jersey [*89] Supreme Court has not yet ruled on the limitations period applicable to contribution actions under the Spill Act. " [HN23] In the absence of an authoritative pronouncement from the state's highest court, the task of a Federal court is to predict how that court would rule." Blum v. Witco Chemical Corp., 829 F.2d 367, 376 (3d Cir. 1987); see Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co., 652 F.2d 1165, 1167 (3d Cir. 1981).

[HN24] Pursuant to N.J.S.A. 2A:14-1, actions at common law for "trespass to real property, for any tortious injury to real or personal property ... [or] for any tortious injury to the rights of another [other than personal injury, libel or slander], ... shall be commenced

within six years next after the cause of any such action shall have accrued." N.J.S.A. 2A:14-1. This six-year statute of limitations is applicable to environmental tort actions at common law. See Amland Properties, 808 F. Supp. at 1190; Hatco Corp., 801 F. Supp. at 1323; Frola, 730 F. Supp. at 631. Such environmental actions are the common law actions most analogous to a private action for contribution under the [*90] Spill Act. Accordingly, it appears that New Jersey's six-year limitations period for property damage actions, N.J.S.A. 2A:14-1, would be applicable to private actions under the Spill Act. n34

> n34 The parties are in agreement that the six-year limitations period should apply to Count II. See Moving Brief at 29; Opp. Brief at 15.

Plaintiffs argue that this six-year period began running on 10 January 1992, the date upon which the contribution provision was added to the Spill Act. See Opp. Brief at 12. For this proposition, Plaintiffs rely primarily on the decision in T & E Industries v. Safety Light Corp., 680 F. Supp. 696 (D.N.J. 1988).

In T & E Industries, the court addressed a statute of limitations defense to an action under CERCLA to recover the costs of hazardous waste removal, 42 U.S.C. § 9607. As the court there pointed out, prior to the enactment of the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), 42 U.S.C. § 9613 [*91] (h), a cost recovery action under 42 U.S.C. § 9607 existed without a statute of limitations. See 680 F. Supp. at 704; see also 42 U.S.C. § 9607 (West 1983). SARA, upon its enactment, imposed a limitations period on CERCLA cost recovery actions, requiring that such actions be commenced "within three years after completion of the removal action." 42 U.S.C. § 9613(g)(2). The defendant sought to use the SARA limitations period to bar the plaintiff's CERCLA claim, which had existed prior to SARA's enactment. 680 F. Supp. at 704; see also United States v. Kramer, 757 F. Supp. 397, 437 (D.N.J. 1991) (applying rationale of T & E Industries to SARA statute of limitations defense to CERCLA cost recovery action).

The court rejected the limitations argument, stating:

> Where, as here, a statute creates a period of limitations where none had previously existed, the period will begin to run with respect to preexisting claims on the effective date of the statute.

Id. In arriving at this conclusion, the court relied principally on the Supreme Court's decision [*92] in Sohn v. Waterson, 84 U.S. 596, 599, 21 L. Ed. 737 (1873). 680 F. Supp. at 704.

In Sohn, the Supreme Court held that the retroactive application of a statute of limitations to an existing cause of action could be unconstitutional:

> A statute of limitations may undoubtedly have effect upon actions which have already accrued as well as upon actions which will accrue after its passage. Whether it does so or not will depend upon the language of the act, and the apparent intent of the legislature to be gathered therefrom. When a statute declares generally that no action ... of a certain class shall be brought, except within a certain limited time after it shall have accrued, the language of the statute would make it apply to past actions as well as to those arising in the future. But if an action accrued more than the limited time before the statute was passed a literal interpretation of the statute would have the effect of absolutely barring such action at once. It will be presumed that such was not the intent of the legislature. Such an intent would be unconstitutional. To avoid such a result, and to give the statute [of limitations] a construction [*93] that will enable it to stand, courts have given it a prospective operation.

Id. at 599. The court therefore concluded that a new statute of limitations should begin to run on existing claims at the time of the limitations statute's enactment. Id. at 600.

It is recognized that "the century-old Sohn rule still enjoys great viability." Reuther v. Trustees of the Trucking Employees of Passaic and Bergen County Welfare Fund, 575 F.2d 1074, 1078 n.4 (3d Cir. 1978). However, the rule of Sohn is inapposite to the instant facts. In Sohn and in T & E Industries, the defendants sought to use a newly-enacted statute of limitations to bar a cause of action which pre-dated the statute of limitations, and which had theretofore not been subject to a limitations period. See Sohn, 84 U.S. at 597; T & E Industries, 680 F. Supp. at 704-705. In such a situation, it would be unfair to allow the new statute of limitations to destroy claims that had existed prior to its enactment.

Where, as in the case of a CERCLA cost recovery action, Congress has allowed a cause of action to exist

without a limitations period, potential [*94] plaintiffs, in reliance on that fact, may have elected to postpone the bringing of an action. It would be unjust to allow a new statute of limitations to cut off such actions without allowing the plaintiff reasonable time to bring the pre-existing suit. See Block v. North Dakota, 461 U.S. 273, 286 n.23, 75 L. Ed. 2d 840, 103 S. Ct. 1811 (1983) ("The Constitution ... requires that statutes of limitations must allow a reasonable time after they take effect for the commencement of suits upon existing causes of action."); Texaco, Inc. v. Short, 454 U.S. 516, 527 n.21, 70 L. Ed. 2d 738, 102 S. Ct. 781 (1982) ("A statute [of limitations] could not bar the existing rights of claimants without affording this opportunity; if it should attempt to do so, it would not be a statute of limitations, but an unlawful attempt to extinguish rights arbitrarily." (citation omitted)).

Courts applying the Sohn rule have repeatedly indicated that it is tailored specifically to avoid the unfairness of extinguishing existing causes of action with a newly-enacted statute of limitations, and should be confined to such situations. See Block, 461 U.S. at 286 n.23 [*95] (Where a newly-created limitations period allowed 12 years for suit against officers of United States, "if an 'officer's suit' was available prior to [the date of enactment of the limitations period] and if the laches or limitations period for such a suit was longer than 12 years ... [the new statute of limitations] arguably was unconstitutional to the extent it extinguished claims that could have been brought at the time of its passage." (emphasis in original)); Texaco, Inc., 454 U.S. at 527 n.21 (1982) ("A statute [of limitations] could not bar the existing rights of claimants without affording this opportunity; if it should attempt to do so, it would not be a statute of limitations, but an unlawful attempt to extinguish rights arbitrarily." (citation omitted)); United States v. Morena, 245 U.S. 392, 397, 62 L. Ed. 359, 38 S. Ct. 151 (1918) (Sohn rule applies to "a limitation of time ... upon the assertion of a right theretofore having no limitation upon its assertion...."); United States v. Lindsay, 202 F.2d 239, 240 (1st Cir. 1953) (The Sohn rule "was openly resorted to only for the purpose of preventing the [*96] statutes [of limitations] from cutting off existing rights."), aff'd, 346 U.S. 568, 98 L. Ed. 300, 74 S. Ct. 287 (1954); Superior Engraving Co. v. National Labor Relations Board, 183 F.2d 783, 789 (7th Cir. 1950) (The Sohn rule provides "that where a statute creates a period of limitations where none had previously existed, the period will begin to run with respect to preexisting claims, on the effective date of the statute."), cert. denied, 340 U.S. 930, 95 L. Ed. 671, 71 S. Ct. 490 (1951); Scardina v. Wood, 649 F. Supp. 793, 796 (N.D.Ohio 1986) ("To the extent a legislative act amends a statute of limitations so as to bar accrued causes of action which were not barred by the pre-

vious statute, it is unconstitutional." (citing Sohn, 84 U.S. at 599)).

The situation is entirely different where, as here, the defendant seeks to bar a newly-created cause of action based on a pre-existing statute of limitations. In such a case, the plaintiff could not have relied on a legislative pronouncement that the cause of action was not subject to a limitations period. Indeed, [HN25] where an applicable statute of [*97] limitations precedes the enactment of a cause of action, it would appear that, absent an expression of legislative intent to the contrary, the new cause of action should be subject to the limitations period to the same extent as any other cause of action. In other words, the new cause of action should be barred to the extent it accrued further in the past than the limitations period allows.

As stated, a private cause of action for contribution under the Spill Act did not exist prior to the enactment of section 23.11f(a)(2). See Bowen Engineering, 799 F. Supp. at 478. Section 23.11f(a)(2) is not, therefore, a statute which bars an existing cause of action, such as are affected by the rule of Sohn. See Block, 461 U.S. at 286 n.23. Requiring that Plaintiffs' cause of action have accrued no more than six years before the filing of the Amended Complaint would not "extinguish" a preexisting claim under the Spill Act, and therefore does not invoke the protections of the Sohn rule. Id.

The ramifications of Plaintiffs' position need only be considered in order to conclude that the Sohn rule cannot apply here. Plaintiffs could have incurred cleanup [*98] and removal costs resulting from the discharge of hazardous waste, as are now recoverable under the Spill Act, one hundred years ago. Plaintiffs could have been fully aware of the relevant discharges and the responsible parties at that time. Under Plaintiffs' application of the Sohn rule, once the Spill Act's contribution provision had been enacted, they could have then brought suit against those responsible parties, without regard to how long before the enactment they knew of the facts behind the discharge. Indeed, under Plaintiffs' position, any costs for removal of hazardous waste, no matter when incurred, would now be recoverable under the Spill Act. The spate of Spill Act contribution suits which would follow from such an interpretation cannot, absent a legislative expression to the contrary, be presumed to have been within the intention of the New Jersey legislature in enacting section 23.11f(a)(2).

Because the Sohn rule does not apply to the instant circumstances, the date upon which Plaintiffs' Spill Act claim accrued was, for limitations purposes, the date upon which Plaintiffs learned, or reasonably should have learned, "the existence of that state of facts which [*99]

may equate in law with a cause of action'" for contribution under the Spill Act. Vispisiano, 107 N.J. at 426. n35

> n35 The parties have not cited, and there does not appear to be, a published decision of a New Jersey state or Federal court interpreting when a cause of action for contribution under section 23.11f(a)(2) "accrues" for the purposes of the limitations period. However, cases involving contribution claims against the New Jersey Spill Compensation Fund (the "Spill Fund") under the Spill Act, N.J.S.A. 58:10-23.11g(a), are instructive on the issue.
>
> Under section 23.11g(a), the Spill Fund is strictly liable for cleanup and removal costs resulting from discharges of hazardous wastes "no matter by whom sustained." The Spill Act provides for recovery of such costs by the Spill Fund against responsible parties "without regard to fault." See N.J.S.A. 58:10-23.11g(b), (c).
>
> Pursuant to section 23.11k: "Claims [against the Spill Fund] shall be filed ... not later than one year after discovery of damage." N.J.S.A. 58:10-23.11k. Cases interpreting the 'accrual' of an action against the Spill Fund for limitations purposes have applied New Jersey's common law 'discovery rule' to the inquiry. One court stated: "We think it fair to infer that the Legislature contemplated that 'discovery rule' principles would be applicable in determining 'the date of discovery of the damage [for the purposes of section 23.11k]." Enertron Industries, Inc. v. Mack, 242 N.J. Super. 83, 90, 576 A.2d 28 (App.Div. 1990); see Buonviaggio v. Hillsborough Township Committee, 122 N.J. 5, 7, 583 A.2d 739 (1991) (quoting Enertron Industries, 242 N.J. Super. at 90, with approval).
>
> Applying the discovery rule to actions against the Spill Fund, the court in Enertron Industries stated that the cause of action accrued on "the date [plaintiffs] learned or should have learned 'of that state of facts which might equate in law with a cause of action." 242 N.J. Super. at 91 (quoting Burd, 76 N.J. at 291 (emphasis in original)). Reasoning that the Spill Fund was liable under section 23.11g(a) for "costs and damages arising from a 'discharge' of 'hazardous substances,'" the court concluded that a cause of action against the Spill Fund accrued for limitations purposes when the plaintiffs knew or should have known "that a 'discharge' of 'hazardous substances' [as those terms are defined by the Spill Act] had occurred." Id. The New Jersey Supreme

> Court later refined the rule of Enertron Industries by holding that a claim against the Spill Fund does not accrue until the plaintiff incurs, or is directed by the DEP to incur, cleanup costs. See Buonviaggio, 122 N.J. at 16-17 (section 23.11k's statute of limitations does not begin to run until plaintiff is assured by DEP that it would be directed to incur cleanup costs and damages were fixed); see also In re NL Industries, Inc., 240 N.J. Super. 162, 170, 572 A.2d 1177 (App.Div. 1990) (same).

[*100]

Section 23.11f(a)(2) sets forth the requirements of a cause of action for contribution:

> "Whenever one or more dischargers or persons cleans up and removes a discharge of hazardous substance, those dischargers and persons shall have a right of contribution against all other dischargers and persons in any way responsible for a discharged hazardous substance. ... In any action for contribution, the contribution plaintiffs need prove only that a discharge occurred for which the contribution defendant or defendants are liable pursuant to the provisions of subsection c. of... [N.J.S.A] 58:10-23.11g."

N.J.S.A. 58:10-23.11f(a)(2). Section 23.11g(c), in turn, provides:

> Any person who has discharged a hazardous substance, or is in any way responsible for any hazardous substance, shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred.

N.J.S.A. 58:10-23.11g(c)(1).

Under the Spill Act, the term "discharge" is defined as

> any intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping of hazardous [*101] substances into the waters or onto the lands of [New Jersey], or into waters outside the jurisdiction of the State when damage may result to the lands, waters or

natural resources within the jurisdiction of the State.

N.J.S.A. 58:10-23.11b(h).

"Hazardous substances" under the Spill Act are those substances defined as such by the DEP under their statutory authority to do so. N.J.S.A. 58:10-23.11b(k). Such substances "shall include the list of hazardous substances adopted by the Federal Environmental Protection Agency." Id. As stated, cadmium and cadmium compounds were listed as hazardous substances under the Spill Act as early as 1980. See N.J.A.C. 7:1E, Appendix A, R.1980, d.185.

Accordingly, Plaintiffs' cause of action accrued when they became aware, or should have become aware, that (1) a discharge of cadmium had occurred, (2) for which a third party may be responsible, and (3) they engaged in cleanup of this discharge. See N.J.S.A. 58:10-23.11f(a)(2); Vispisiano, 107 N.J. at 426. As stated, Plaintiffs' knowledge of the identity of the responsible third party was not necessary for the cause of action to accrue. See Amland Properties, 808 F. Supp. at 1192. [*102]

The undisputed facts at bar indicate that, with respect to Plaintiffs' removal of the Waste Pile, Plaintiffs' cause of action for contribution accrued, at the latest, in February 1986. It is undisputed that Plaintiffs knew, by February 1986, of the presence of cadmium at the Hanover Site, a "hazardous substance" within the meaning of the Spill Act. See supra 1994 U.S. Dist. LEXIS 21466, *70-78; N.J.A.C. 7:1E, Appendix A, R.1980, d.185. It is also undisputed that, by that time, Plaintiffs knew or should have known that a third party had "discharged" the cadmium onto the property, within the meaning of the Spill Act. See supra 1994 U.S. Dist. LEXIS 21466, *70-78. Finally, the record indicates that Plaintiffs had completed removal of the Waste Pile by January 1985. Moulthrop Cert., Ex. S at 2; id., Ex. T at 4. Plaintiff's Spill Act claim for contribution to removal of the Waste Pile, therefore, accrued no later than February 1986. Because that claim accrued more than six years prior to the filing of the Amended Complaint, it is time-barred as to Prudential.

Plaintiffs assert that they could not have 'discovered' a cause of action under section 23.11f(a)(2) until the date of enactment of that provision, 10 January 1992, because [*103] the cause of action did not exist prior to that date. Opp. Brief at 15. Plaintiffs argue that until that date, the facts of which they were aware could not "equate in law with a cause of action." Id.

Plaintiffs' assertion in this regard is irrelevant. The New Jersey legislature enacted the Spill Act's contribu-

tion provision without a statute of limitations, and therefore subject to New Jersey's existing residual statutes of limitations. In this enactment was the implicit recognition that hazardous substance removals which had taken place further in the past than the applicable limitations period allowed would not be subject to the contribution provision. To hold otherwise would be to allow any removal, whenever effected, to now be actionable under the Spill Act; such an approach cannot be read into the intent of the legislature absent some affirmative indication to the contrary. n36

n36 The Senate Environmental Quality Committee Statement to section 23.11(f)(a)(2) states, in relevant part: "Wording changes intend to clarify that the committee substitute applies to any cleanup or removal, irrespective of the date of discharge." N.J.S.A. 58:10-23.11f, Senate Environmental Quality Committee Statement, Senate No. 2657 and Assembly No. 3659, L. 1991, c. 372 (emphasis added). This statement does not imply that the legislature intended all removals, whenever effected, to be actionable under section 23.11f(a)(2). It merely states that removals which are effected to remedy discharges which occurred at any time in the past are actionable under the section.

In the instant case, the removal itself occurred prior to the date permitted by the limitations period. It is on this ground that Plaintiffs' Spill Act claim is time-barred. Nothing in the legislative history of section 23.11(f)(a)(2) militates against this conclusion.

[*104]

Accordingly, if Plaintiffs' cause of action under the Spill Act accrued prior to 10 January 1986, it would not be actionable under the Spill Act's contribution provision. n37 Because Plaintiffs' Spill Act claim against Prudential accrued, at the latest, in February 1986, it was actionable only if brought within six years thereafter. Because it was not brought within that time, it is time-barred.

n37 This is not to suggest that the Spill Act's contribution provision does not apply retroactively to removals which took place before its effective date. See Bowen Engineering, 799 F. Supp. at 480 (holding that Spill Act contribution provision applies retroactively). Rather, the rule adopted herein only limits the retroactive application of section 23.11f(a)(2) to the extent required

by the six-year statute of limitations applicable to such actions.

Plaintiffs further argue that the barring of their Spill Act claim on statute of limitations grounds is rendered inappropriate by equitable considerations. [*105] It is recognized that the Spill Act is grounded in important policies of allocation of blame and responsibility for environmental cleanup costs. See N.J.S.A. 58:10-23.11a (Spill Act statement of purpose). However, as stated, important considerations of repose and fairness also underlie the statute of limitations. See Ochs, 90 N.J. at 112. As stated, these policies are particularly compelling in the instant circumstances, and do not unnecessarily sacrifice the right of Plaintiffs to their day in court. See supra at 69. Accordingly, equitable considerations do not preclude application of the statute of limitations to bar Plaintiffs' Spill Act claim.

Prudential has established, beyond a genuine issue of material fact, that Plaintiffs' Spill Act claim for contribution with respect to removal of the Waste Pile accrued more than six year prior to the filing of the Amended Complaint; that claim is therefore time barred as to Prudential. Accordingly, Prudential is granted summary judgment on Count II to the extent that count seeks contribution for costs incurred in removing the Waste Pile.

Summary judgment cannot be granted, however, on that part of Count II which [*106] seeks contribution for cleanup costs not related to the Waste Pile. As stated, section 23.11f(a)(2) provides that a contribution plaintiff can recover "whenever [he] cleans up and removes a discharge of a hazardous substance...." N.J.S.A. 58:10-23.11f(a)(2). Similarly, under section 23.11g(c), defendants under section 23.11f(a)(2) are liable only "for all cleanup and removal costs." [HN26] N.J.S.A. 58:10-23.11g(c). Therefore, a cause of action under section 23.11f(a)(2) can accrue only when a plaintiff has engaged in cleanup and removal of a discharge of a hazardous substance. See Hatco Corp. v. W.R. Grace & Co.-Conn., 836 F. Supp. 1049, 1093 (D.N.J. 1993) ("To qualify as a contribution plaintiff [under the Spill Act], [plaintiff] must demonstrate that it has cleaned up and removed a discharge of a hazardous substance."); Bowen Engineering, 799 F. Supp. at 480 (Spill Act contribution claim premature where DEP had not yet commenced removal of hazardous substance and fixed liability on plaintiff; granting summary judgment to defendant on Spill Act claim); see also Buonviaggio, 122 N.J. at 16-17 (cause of action for claim against Spill [*107] Fund under section 23.11g(b) does not accrue until plaintiff is assured by DEP that it would be directed to incur cleanup costs and damages were "fixed" on plaintiff); cf. McPherson v. Cleveland Punch & Shear Co., 816 F.2d 249, 250 (6th Cir. 1987) ("[A] cause of action for contribution does not accrue until the joint tortfeasor has paid more than his proportionate share of liability." (citation omitted)); United New York Sandy Hook Pilots Assoc. v. Rodermond Industries, Inc., 394 F.2d 65, 75 (3d Cir. 1968) (For the purposes of N.J.S.A 2A:14-1, "a claim for indemnity does not accrue until the indemnitee's liability is fixed by a judgment against or payment by the indemnitee." (emphasis added)).

Though the facts in the record establish the date of the removal of the Waste Pile, they do not even address when the other removals, if any, which are the subject of Count II took place. As such other removals, Prudential has not established beyond a genuine issue of material fact that Plaintiffs' Spill Act contribution claim is time-barred. Accordingly, summary judgment cannot be granted on Count II to the extent that count seeks contribution for [*108] cleanup costs not incurred in removing the Waste Pile.

Conclusion

For the reasons stated, Prudential's motion for summary judgment is granted as to Counts III, IV, V and VI of the Second Amended Complaint. Summary judgment is granted to Prudential on Count II to the extent that count seeks contribution for Plaintiffs' removal of the Waste Pile; summary judgment on Count II is denied to the extent that count seeks contribution for other removal costs incurred by Plaintiffs.

Dated: 25 January 1994

LEXSEE

## LEHIGH CEMENT COMPANY f/k/a LEHIGH PORTLAND CEMENT COMPANY v. STEADFAST INSURANCE COMPANY

### CIVIL ACTION, NO. 04-4906

### UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### 2006 U.S. Dist. LEXIS 429

### January 6, 2006, Decided
### January 6, 2006, Filed; January 9, 2006, Entered

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant insurer filed a motion for summary judgment in plaintiff insureds breach of contract action against the insurer.

**OVERVIEW:** The insured alleged that the insurer breached its contract with the insured by failing to indemnify the insured for damages under an "owner's protective professional and environmental liability insurance policy" (OPEL). The policy was meant to cover damages arising out of an act, error, or omission by any "design professional" (DP) retained by the insured to assist in the modernization of one of the insured's cement plant. The insured sought to recover under the policy when significant problems arose with the work performed by one such DP. The DP entered bankruptcy. Although the insured made a claim against the DP, no determination had been made regarding the DP's liability. Rather than grant summary judgment, the court dismissed the insured's action as not yet ripe for consideration. The OPEL policy limited the insurer to indemnifying the insured for "damages" or the monetary amount the insured was legally entitled to recover from each DP. As no adjudication, settlement, or other resolution of the negligence claim against the DP had occurred, that condition precedent had not yet been satisfied. In such a situation, dismissal of the insured's action was appropriate.

**OUTCOME:** The insured's action was dismissed without prejudice. The motion for summary judgment was denied.

**CORE TERMS:** refractory, summary judgment, lining, anchor, plant, proof of claim, purchase order, settlement, coverage, omission, ripe, bankruptcy proceedings, genuine issue, non-moving, favorable, ripeness, competent

jurisdiction, entitled to recover, breach of contract, dispute resolution, coverage limit, named insured, cement, installation, arbitration, manufacture, engineering, indemnify, monetary, supplied

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN1] Under Fed. R. Civ. P. 56(c), court's may grant summary judgment only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law.

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN2] In the summary judgment context, a dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof*
*Civil Procedure > Summary Judgment*
[HN3] Courts review all evidence and make all reasonable inferences from the evidence in the light most favorable to the non-movant. The non-moving party may not rest upon mere allegations or denials but must set forth specific facts showing there is a genuine issue for trial.

*Civil Procedure > Justiciability > Ripeness*

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*

*Civil Procedure > Summary Judgment*

[HN4] Because ripeness affects justiciability, unripe claims should ordinarily be disposed of on a motion to dismiss, not summary judgment.

**COUNSEL:** [*1] For LEHIGH CEMENT COMPANY, F/K/A LEHIGH PORTLAND CEMENT COMPANY, Plaintiff: KRISTINA D. PASKO, RICHARD F. RICCI, LOWENSTEIN SANDLER, P.C., ROSELAND, NJ; MALCOLM J. GROSS, GROSS, MCGINLEY, LABARRE & EATON, LLP, ALLENTOWN, PA.

For STEADFAST INSURANCE COMPANY, Defendant: CATHERINE MIRAGLIA LECKY, LOUIS A. BOVE, BODELL BOVE GRACE & VAN HORN P.C., PHILADELPHIA, PA.

**JUDGES:** Harvey Bartle III, C.J.

**OPINIONBY:** Harvey Bartle III

**OPINION:**

MEMORANDUM

Bartle, C.J.

January 6, 2006

Plaintiff Lehigh Cement Company ("Lehigh") has brought this diversity action against defendant Steadfast Insurance Company ("Steadfast"). Lehigh asserts a breach of contract claim due to Steadfast's refusal to indemnify it for damages allegedly covered under an "Owner's Protective Professional and Environmental Liability Insurance Policy" (the "OPEL Policy") issued to it by Steadfast. In addition, Lehigh requests declaratory relief.

Before the court is the motion of Steadfast for summary judgment under Rule 56 of the Federal Rules of Civil Procedure on both claims.

I.

[HN1] Under Rule 56(c), we may grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions [*2] on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998). [HN2] A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Boyle, 139 F.3d at 393. [HN3] We review all evidence and make all reasonable inferences from the evidence in the light most favorable to the non-movant. See Wicker v. CONRAIL, 142 F.3d 690, 696 (3d Cir. 1998). The non-moving party may not rest upon mere allegations or denials but must set forth specific facts showing there is a genuine issue for trial. Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990).

II.

The following facts are either undisputed or stipulated to by the parties solely for purposes of this motion, and they are viewed in the light most favorable to plaintiff.

Lehigh is a Pennsylvania corporation, with its principal place of business in [*3] Allentown, Pennsylvania. On or about December 15, 2000, Lehigh entered into an agreement with National Refractories and Minerals Corporation ("NRM") whereby NRM would furnish "the labor, materials and supervision required to supply refractory materials for lining" furnace equipment in Lehigh's cement manufacturing plant in Union Bridge, Maryland. These refractory lining materials include anchors, wear lining and insulation for various equipment. The process of manufacturing cement requires that rock be calcined (changed from calcium carbonate to calcium oxide), partially liquified, and then cooled, all under highly specific operating conditions. The agreement, memorialized in refractory purchase order number 45-88056 (the "NRM purchase order"), required NRM to manufacture the required materials as well as provide certain engineering and technical work.

The NRM purchase order was part of Lehigh's larger effort to modernize the Union Bridge plant in several respects. Before Lehigh entered into the agreement with NRM, it purchased the OPEL Policy from Steadfast, a Delaware corporation with its principal offices in Illinois. The coverage period was from February 11, 1999 to February 11, 2002. n1 [*4] Lehigh obtained the OPEL Policy to insure against any errors or omissions of the third-party "design professionals" n2 with whom it would contract to perform work on the Union Bridge plant. Pursuant to the terms of the OPEL Policy, Steadfast agreed to indemnify Lehigh "for 'Damages' arising out of an act, error, or omission by a 'Design Professional' during the rendering of 'Professional Services,' to the extent said 'Damages' are in excess of the 'Design Professional's Insurance.'" OPEL Policy § I. The OPEL Policy also contains several exclusions, including a prohibition of coverage for the "design or manufacture of any goods or products which are sold or supplied by the

'Design Professional.'" OPEL Policy § III.F. Lehigh, the named insured, paid $ 260,000 to procure a coverage limit of $ 15 million for claims covered under the policy. This coverage limit sits in excess of a $ 500,000 minimum "Design Professional's Insurance" required to be held by the "Design Professional" as the named insured. The policy also contains a required $ 500,000 self-insured retention.

n1 At some point, the parties apparently extended the policy period to January 1, 2003.

[*5]

n2 The OPEL Policy defines "design professionals" as "those persons or entities or successors legally qualified to perform architecture, engineering, land surveying, construction management 'Professional Services,' or environmental consulting services." OPEL Policy § II.J.

Shortly after the completed installation of NRM's refractory lining work in late 2001, the Union Bridge facility began encountering serious problems. The refractory linings did not expand properly in a horizontal direction, causing them to buckle and fail, and the metal anchor system failed to withstand the operation temperatures at the plant. The parties dispute the reasons behind these failures.

The refractory problems have necessitated substantial repairs following the installation, with total costs to Lehigh in excess of $ 6 million to date. Before the work for Lehigh was completed, NRM filed a petition for bankruptcy under Chapter 11 with the United States Bankruptcy Court for the Northern District of California, Oakland Division on Octover 20, 2001. On August 6, 2002, Lehigh first sent written notice to NRM of "defects, [*6] failures, and other problems with the refractory material and anchors supplied by" NRM. On or around Devember 10, 2002, Lehigh, through its broker J&H Marsh & McLennan ("Marsh"), wrote to Steadfast that it was putting the insurer on notice of "potential claims arising from design errors in the refractory material and the refractory anchors" at the Union Bridge plant. Lehigh filed an amended proof of claim with the Bankruptcy Court on June 13, 2005 for an amount "not less than $ 5,254,106.49." There has not yet been any determination in the Bankruptcy Court or otherwise concerning NRM's liability for those damages.

III.

Steadfast moves for summary judgment on several grounds. First, it argues that it has no responsibility to indemnify Lehigh for its losses because Lehigh did not provide it with timely notice of the refractory problems as required under the OPEL Policy. Second, Steadfast maintains there are no "Damages" as that term is defined in the OPEL Policy and thus Lehigh has no basis for recovery. Third, Steadfast contends that NRM did not maintain required "Design Professional's Insurance," an alleged condition precedent to Lehigh's ability to seek coverage under the OPEL Policy. [*7] Fourth, according to Steadfast, Lehigh has no right to sue because of its alleged non-compliance with certain conditions precedent to bringing an action under the OPEL Policy. Finally, Steadfast submits that even if Lehigh's conduct does not vitiate the OPEL Policy, certain exclusions under the policy bar any recovery.

We turn first to Steadfast's argument that Lehigh has failed to obtain the necessary prior determination of "Damages" against NRM before seeking to collect from Steadfast under the OPEL Policy.

The OPEL Policy is limited to indemnifying Lehigh for "damages," or "the monetary amount [Lehigh] is legally entitled to recover from each 'Design Professional' ... either by adjudication by a court of competent jurisdiction or by settlement, arbitration or other method of dispute resolution to which [Steadfast] agrees in writing." OPEL Policy § II.I. These "damages" must arise from "a negligent act, error or omission on the part of the Design Professional." Id. It is conceded that Lehigh has not obtained an adjudication, settlement, or other resolution of its claim against NRM for its negligence as a "Design Professional" under the OPEL Policy, and NRM is not a party [*8] to this action.

Lehigh counters that NRM's ongoing bankruptcy proceedings have precluded their ability to obtain any adjudication against NRM. Any damages Lehigh would seek to recover from NRM are property of the bankruptcy estate, says Lehigh, and thus governed by the automatic stay provision contained in 11 U.S.C. § 362(a). Lehigh thus contends that it has availed itself of the only avenue currently open to it by filing a proof of claim (and subsequent amended proof of claim) in the Bankruptcy Court for the Northern District of California. It further argues that the question of NRM's negligence in designing the refractory linings is the proper subject of the instant action.

Lehigh's argument is not persuasive. The plain language of the OPEL Policy requires Lehigh to secure the specific monetary amount it is entitled to recover from NRM "either by adjudication by a court of competent jurisdiction or by settlement, arbitration or other method of dispute resolution to which [Steadfast] agrees in writing." OPEL Policy § II.I. The NRM bankruptcy proceedings are still pending in which Lehigh has filed an

Page 3

amended claim for "not less than $ 5,254,106.49." Lehigh [*9] advances no reason why the Bankruptcy Court cannot resolve its underlying dispute with NRM. Even if Lehigh has proceeded, as it states, to the best of its ability to prove the validity and amount of its claim against NRM, the matter as of now remains undecided. The existence of the claim without more is simply not enough to satisfy the precedent condition set forth in the OPEL Policy. There must be a final resolution of Lehigh's underlying claim against NRM by one of the means outlined in the OPEL Policy before Steadfast has any obligation to indemnify Lehigh.

We conclude that both the breach of contract and declaratory judgment claims are not ripe for adjudication absent the required underlying determination of the amount of damages Lehigh is entitled to recover from NRM as a result of services covered by the OPEL Policy. Since the pending dispute between Lehigh and Steadfast is not at a point where it can be decided by this court, we need not reach the other issues raised by Steadfast.

There is one final matter, however, with which we must deal. Our Court of Appeals has held that [HN4] "because ripeness affects justiciability, ... unripe claims should ordinarily be disposed of on a motion [*10] to dismiss, not summary judgment." Taylor Inv. Ltd. v. Upper Darby Twp., 983 F.2d 1285, 1290 (3d Cir. 1993). To that end, the Court of Appeals agreed with the District Court in Taylor that plaintiff's civil rights claims were not yet ripe but vacated judgment for defendants and remanded with instructions to dismiss the complaint. Id. at 1295. Accordingly, for the foregoing reasons, the motion of Steadfast for summary judgment pursuant to Rule 56 must be denied. Instead, the complaint will be dismissed without prejudice for lack of ripeness.

ORDER

AND NOW, this 6th day of January, 2006, for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that the motion of defendant Steadfast Insurance Company for summary judgment is DENIED. Because plaintiff's claims are not yet ripe, however, the complaint is DISMISSED without prejudice.

BY THE COURT:

/s/ Harvey Bartle III

C.J.

LEXSEE

**FLORENCE WATSON, Power of Attorney for Dorothy Briscoe (Deceased), Plaintiff, v. BENEFICIAL DELAWARE, INC., Defendant.**

**Civil Action No. 04-382 JJF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2005 U.S. Dist. LEXIS 17482**

**August 22, 2005, Decided**
**August 22, 2005, Field**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff borrower filed a complaint against defendant lender alleging violations of various provisions, including 15 U.S.C.S. § § 1601, 1635, 1638, 12 C.F.R. § 226, 12 U.S.C.S. § § 85, 2601, 2610. The lender moved to dismiss.

**OVERVIEW:** The borrower's claims were barred by the statute of limitations. The statutes relied upon by the borrower to support her allegations required a plaintiff to file a complaint within three years of the alleged occurrence, 15 U.S.C.S. § § 1640(e), 1635(f), 12 C.F.R. § 226.23, 12 U.S.C.S. § § 86, 2614. In this case, the facts alleged occurred more than six years before the borrower filed her complaint. Further, the borrower did not assert any facts that would justify tolling of the limitations period.

**OUTCOME:** The lender's motion to dismiss was granted.

**CORE TERMS:** motion to dismiss, statute of limitations, mortgage, limitations period, reasons discussed

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN1] A motion to dismiss tests the legal sufficiency of the complaint. In reviewing a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), courts must accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom. A court will grant a motion to dismiss only when it appears that a plaintiff can prove no set of facts that would entitle him or her to relief.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses*
*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
*Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally*
[HN2] Failure to comply with the statute of limitations will justify granting a motion to dismiss where the claim is facially non-compliant with the limitations period and the affirmative defense of failure to comply with the statute of limitations clearly appears on the face of the pleading.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*
*Banking Law > National Banks > Interest & Usury*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN3] 15 U.S.C.S. § § 1640(e), 1635(f); 12 C.F.R. § 226.23; 12 U.S.C.S. § § 86, 2614, require a plaintiff to file a complaint within three years of the alleged occurrence.

**COUNSEL:** [*1] Florence Watson, Pro se, for Plaintiff.

Robert J. Katzenstein, Esquire and Joelle E. Polesky, Esquire of SMITH, KATZENSTEIN & FURLOW LLP, Wilmington, Delaware, for Defendant.

**JUDGES:** Farnan, District Judge.

**OPINIONBY:** Joseph J. Farnan Jr.

## OPINION:

### MEMORANDUM OPINION

August 22, 2005
Wilmington, Delaware

#### Farnan, District Judge.

Pending before the Court is a Motion To Dismiss (D.I. 5) filed by Defendant Beneficial Delaware, Inc. ("Beneficial"). For the reasons discussed, Defendant's Motion To Dismiss will be granted.

### I. BACKGROUND

On May 14, 1998, Beneficial loaned Plaintiff Florence Watson $ 64,000 pursuant to a three-year mortgage and credit line account agreement. On June 17, 2004, Watson filed a complaint against Beneficial alleging that the Mortgage and Note "contain usurious interest rates and unfair trade practices involving predatory lending practices." Watson further alleged "non-disclosure of Plaintiff's right to cancel [the contract]" ... and Federal violations of numerous consumer rights..." Specifically, Watson alleges violations of 15 U.S.C. § 1601, 1635, 1638; 12 C.F.R. § 226; Regulation Z; 12 U.S.C. § § 85, [*2] 2601, 2610. Watson seeks rescission of the Mortgage and Note, as well as damages.

### I. PARTIES' CONTENTIONS

By its motion, Beneficial contends that the Court should dismiss Watson's Complaint as time-barred. Beneficial also contends that the Complaint should be dismissed because Watson fails to state a claim upon which relief may be granted. Watson has failed to respond to Beneficial's motion, despite the Court's August 19, 2004 Order (D.I. 7), granting her additional time to file her Answering Brief (D.I. 7). Therefore, pursuant to the Court's Order (D.I. 7), the Court will render its decision on the papers submitted.

### III. DISCUSSION

[HN1] A motion to dismiss tests the legal sufficiency of the complaint. Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957). In reviewing a motion to dismiss pursuant to Rule 12(b)(6), courts "must accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn

therefrom." Langford v. Atlantic City, 235 F.3d 845, 847 (3d Cir. 2000). A court will grant a motion to dismiss only when it appears that a plaintiff can prove no set of facts that would entitle him or her to relief. [*3] Id.

[HN2] Failure to comply with the statute of limitations will justify granting a motion to dismiss "where the claim is facially non-compliant with the limitations period and the affirmative defense [of failure to comply with the statute of limitations] clearly appears on the face of the pleading." See Oshiver v. Levin, Fishbein, Sedran, & Berman, 38 F.3d 1380, 1385 n.1 (3d Cir. 1994) (citing Trevino v. Union Pacific R.R. Co., 916 F.2d 1230 (7th Cir. 1990)).

Reviewing the Complaint in light of these standards, the Court concludes that Watson's claims are barred by the statute of limitations. The statutes relied upon by Watson to support her allegations [HN3] require a plaintiff to file a complaint within three (3) years of the alleged occurrence. See 15 U.S.C. § 1640(e), 1635(f); 12 C.F.R. § 226.23; 12 U.S.C. § § 86, 2614. In this case, the facts alleged occurred more than six (6) years before Watson filed her Complaint. Further, Watson has not asserted any facts that would justify tolling of the limitations period. Accordingly, the Court will grant Beneficial's Motion To Dismiss [*4] (D.I. 5).

### IV. CONCLUSION

For the reasons discussed, the Court will grant Beneficial's Motion To Dismiss (D.I. 5). An appropriate order will be entered.

### ORDER

At Wilmington, this 22 day of August 2005, for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that:

1. Defendant's Motion To Dismiss (D.I. 5) is **GRANTED;**

2. Plaintiff's Complaint is **DISMISSED** with prejudice.

August 22, 2005
DATE

Joseph J. Farnan Jr.

UNITED STATES DISTRICT JUDGE

## CERTIFICATE OF SERVICE

I, Steven L. Caponi, hereby certify that on this 27th day of March, 2006, I caused true and correct copies of the foregoing *DEFENDANT KEY EQUIPMENT FINANCE INC.'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO DISMISS* to be served on the following counsel via e-filing:

Adam Hiller, Esquire
Pepper Hamilton LLP
1313 Market Street, Suite 5100
P.O. Box 1709
Wilmington, DE 19899

Thomas W. Briggs, Jr., Esquire
Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899

Ricardo Palacio, Esquire
Ashby & Geddes
222 Delaware Ave.
P.O. Box 1150
Wilmington, DE 19899

Brian A. Sullivan, Esquire
Werb & Sullivan
300 Delaware Ave., 10th Fl.
P.O. Box 25046
Wilmington, DE 19899

_____
Steven L. Caponi (DE I.D. No. 3484)