## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re:* | Civil Action No. 04-407 (GMS) |
| BROADBAND OFFICE, INC., | Bankruptcy Case No. 01-172 (GMS) |
| Debtor. | Chapter 11 |
| | |
| BROADBAND OFFICE, INC., | |
| Plaintiff, | |
| vs. | |
| TECHNOLOGY CREDIT CORPORATION d/b/a EXTREME NETWORKS CREDIT CORPORATION, EXTREME NETWORKS, INC., and KEY EQUIPMENT FINANCE, INC. f/k/a KEY CORPORATE CAPITAL, INC. f/k/a LEASTEC CORPORATION | |
| Defendants. | |

## OPENING BRIEF IN SUPPORT OF
## DEFENDANT EXTREME NETWORKS INC.'S
## MOTION FOR SUMMARY JUDGMENT

ASHBY & GEDDES, P.A.
William P. Bowden (I.D. #2553)
Ricardo Palacio (I.D. #3765)
500 Delaware Avenue
8th Floor
Wilmington, Delaware 19899
Telephone: (302) 654-1888
Facsimile: (302) 654-2067

WINSTON & STRAWN LLP
David A. Honig
Todd J. Dressel
101 California Street
San Francisco, California 94111
Telephone: (415) 591-1000
Facsimile: (415) 591-1400

*Co-Counsel for Defendant Extreme Networks, Inc*

Dated: March 15, 2007

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................................................1

II.   NATURE AND STAGE OF THE PROCEEDINGS ...........................................2

III.  STATEMENT OF FACTS ...................................................................................3

IV.   ARGUMENT .......................................................................................................8

     A.    Legal Standard ........................................................................................8

     B.    Extreme Networks Never Received or Benefited From The Alleged Voidable Transfers ................................................................................................9

     C.    Broadband's Claims Against Extreme Networks Are Barred by the Applicable Statutes of Limitation Under 11 U.S.C. § 546. ....................................10

V.    CONCLUSION ..................................................................................................16

# TABLE OF AUTHORITIES

**Page**

## CASES

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..................................................................... 9

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)..................................................................... 8

*Coregis Insurance Co. v. Barrata & Fenerty, Ltd.*,
    264 F.3d 302 (3d Cir. 2001) ........................................................ 8

*Cunningham v. Insurance Co. of N. Am.*,
    530 A.2d 407 (1987), *cert. denied*, 484 U.S. 1008 (1988) ....................... 14

*Hill v. Citizens Nat. Trust & Sav. Bank of Los Angeles*,
    9 Cal.2d 172 (1937) ..................................................................... 12

*Nation Union Fire Insurance Co. of Pittsburgh, Pa. v. C.P.P. Ins. Agency, Inc.*,
    563 F. Supp. 1216 (D.C.N.Y. 1983) ............................................... 12

*Nelson v. County of Allegheny*,
    60 F.3d 1010 (3rd Cir. 1995) ................................................... 14, 15

*Saldana v. Kmart Corp.*,
    260 F.3d 228 (3d Cir. 2001) ........................................................ 8

*Shea v. Esensten*,
    208 F.3d 712 (8th Cir. 2000) ................................................ 13, 14, 15

*Tomerlin v. Canadian Indem. Co.*,
    61 Cal.2d 638 (Cal. 1964).......................................................... 11

## FEDERAL STATUTES

11 U.S.C. § 544............................................................................... 9, 10

11 U.S.C. § 546....................................................................... 1, 10, 11, 16

11 U.S.C. § 546(a) ....................................................................... 10, 11

11 U.S.C. § 547............................................................................... 10

11 U.S.C. § 547(b)........................................................................... 9

11 U.S.C. § 548............................................................................... 10

11 U.S.C. § 548(b) ................................................................................................ 9

Fed. R. Bankr. P. 7056 ....................................................................................... 8

Fed. R. Bankr. P. 9014 ....................................................................................... 8

Fed. R. Civ. P. 15(c)(3) ................................................................................. 13, 14

Fed. R. Civ. P. 56 ............................................................................................... 8

Fed. R. Civ. P. 56(a) ........................................................................................... 8

Fed. R. Civ. P. 56(e) ........................................................................................... 8

## STATE STATUTES

Cal. Civ. C. § 2316 ............................................................................................. 11

Cal. Civ. C. § 2317 ............................................................................................. 12

This brief, with the accompanying Affidavit of Ricardo Palacio and Appendix of Evidence ("Appendix"), is submitted in support of Defendant Extreme Networks, Inc.'s Motion for Summary Judgment (the "Motion") which seeks an order of this Court, under and pursuant to Rule 56 of the Federal Rules of Procedure (the "Federal Rules"), granting summary judgment in its favor, and dismissing, with prejudice, any and all claims asserted against it by plaintiff Broadband Office, Inc. ("Broadband").  In further support of its Motion, Extreme Networks, Inc. ("Extreme Networks") respectfully represents as follows:

## I.    <u>INTRODUCTION</u>

1.    In its Amended Complaint, plaintiff Broadband asserted claims against Extreme Networks for allegedly having received certain prepetition voidable transfers from Broadband in connection with an equipment lease between Broadband, as lessee, and Technology Credit Corporation, doing business as "Extreme Network Credit Corporation" ("TCC"), as lessor.

2.    Undisputed evidence establishes that, notwithstanding the similarity in names, Extreme Networks is not related to TCC and did not receive the transfers in question or obtain any benefit therefrom.  Instead, the allegedly voidable transfers were actually received by TCC's assignee, Key Equipment Finance, Inc. ("Key").   Therefore, the claims against Extreme Networks for avoidance of the transfers received by Key must be dismissed with prejudice.

3.    Furthermore, to the extent that Broadband has any avoidance claims against Extreme Networks, such claims have been time barred by the applicable statute of limitations set forth in 11 U.S.C. § 546, as the Amended Complaint naming Extreme Networks as a defendant in the current action was not filed until over four and a half years after Broadband filed its bankruptcy case.

4.      Broadband has tried to circumvent the statute of limitations by arguing that (a) a tolling agreement between Broadband and TCC is somehow binding upon Extreme Networks, and (b) the claims against Extreme Networks relate back to the filing of the original complaint against TCC.  Undisputed evidence shows that Broadband cannot carry the burden of proof on either point.

5.      First, the evidence shows that neither TCC nor the lawyer signing the tolling agreement on behalf of TCC was acting on behalf of Extreme Networks.  The tolling agreement between Broadband and TCC therefore is not binding upon Extreme Networks.

6.      Second, even if the tolling agreement is somehow deemed to be binding upon Extreme Networks, the claims against Extreme Networks do not relate back to the filing of the original complaint.  Undisputed evidence shows that Broadband knew that TCC and Extreme Networks were two separate entities; yet Broadband sought, by choice or inexcusable neglect, to proceed solely against TCC in the original complaint.  In other words, Broadband made no mistake concerning the identity of the party.  More importantly, as TCC and Extreme Networks are unrelated entities, Extreme Networks had no reasonable notice that Broadband may also have claims against it.  Given the lack of notice and the length of delay, Extreme Networks will suffer undue prejudice if the claims are allowed to proceed against it.

## II.      NATURE AND STAGE OF THE PROCEEDINGS

7.      Broadband filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code on May 9, 2001.  The original complaint commencing this action was filed on December 23, 2003.  An amended complaint, adding Extreme Networks as a defendant, was filed on December 23, 2005.  Factual discovery closed on December 15, 2006, and expert

2

discovery closed on February 15, 2007.  A trial of this matter is set to commence before this Court on May 29, 2007.

### III.    <u>STATEMENT OF FACTS</u>

8.    Extreme Networks designs, manufactures, and sells Internet infrastructure hardware, including network switches and related systems implementing them.  TCC is a broker of leases, primarily covering high technology equipment.  *See* Deposition of James Hartigan ("Hartigan Depo.," Appendix, <u>Exhibit A</u>) at 8:7-8.  On or about June 9, 1999, Extreme Networks and TCC entered into an Agreement For The Purchase of Equipment (the "Purchase Agreement").  *See* Purchase Agreement, Appendix, <u>Exhibit C</u>.  Under the Purchase Agreement, TCC was granted a restricted and limited license to use the term "Extreme Networks" as part of the name "Extreme Networks® Credit Corporation."  *See Id.*, at Section 13.  TCC was to use Extreme Networks' trademark only in connection with products manufactured by Extreme Networks and acquired by TCC under the Purchase Agreement.  *Id.*  TCC filed a fictitious business statement for the use of Extreme Networks Credit Corporation.  *See* Appendix, <u>Exhibit D</u>.

9.    This arrangement between Extreme Networks and TCC, referred to as a 'vendor program,' was very common and well known throughout the technology industry during the 2000 – 2001 time period.  *See* Hartigan Depo., at 46:21-47:6.  During the approximate same time period TCC also had similar agreements with other companies whereby TCC would conduct business under a fictitious business with "Credit Corporation" in its name.  *See* Deposition of Richard Salhany ("Salhany Depo.," Appendix, <u>Exhibit B</u>) at 108:24-110:17.  The vendor program would provide leasing capacity to manufacturers, such as Extreme Networks.  *See* Hartigan Depo., at 48:2-8.

3

10.    Pursuant to the vendor program, TCC assigned one employee, Richard Salhany, to work at Extreme Networks' headquarters located at 3585 Monroe Street, Santa Clara, CA 95091. Mr. Salhany had his own telephone and fax number. *See* Salhany Depo. at 100:1-3; 100:24-101:11. Customers would be referred to Mr. Salhany from various Extreme Networks employees. *See* Salhany Depo., at 101:16-102:10. Mr. Salhany would always introduce himself to new customers as an employee of Extreme Networks® Credit Corporation. *See* Salhany Depo., at 101:2-16; *see also* Hartigan Depo., at 47:11-16. TCC never conducted business with its customers as Extreme Networks, Inc. *See* Hartigan Depo., at 47:7-10.

11.    Broadband was in the business of providing communication infrastructures and delivery systems for office buildings. As a part of this business, Broadband was interested in using networking equipment manufactured and sold by Extreme Networks. *See* for Amended Complaint for Avoidance of Prepetition Transfers ("Amended Complaint," Docket Entry No. 9) at ¶ 9. Broadband subsequently sought to enter into a lease for the use of equipment manufactured by Extreme Networks. On or about March 9, 2000, Broadband entered Master Lease Agreement No. X163 and lease related schedules (the "Lease") with TCC. *See* BBO225-226, 1-3, 260-262, 21-23, 128-130, 138-140, 147-153 (Appendix, Exhibit E); *see also* Proof of Claim of Key ("Key Claim," Appendix, Exhibit F). The Lease was signed by Perry G. Fabi, in his capacity as Broadband's director of finance and controller, and James E. Hartigan, in his capacity as TCC's chief financing officer. Attached to the Lease were six schedules listing the leased equipment, the equipment value, the lease term for such equipment, the monthly rent amount, as well as other terms and conditions (collectively the "Lease Schedules"). Each Lease Schedule listed the parties as TCC as lessor, Broadband as lessee, and Extreme Networks as the supplier. *Id.*

12.    Pursuant to the Purchase Agreement and in connection with the Lease, Extreme Networks sold the equipment to TCC, which then leased the equipment to Broadband. *See* BBO91, 204, 126, 136, 145, 160 (Appendix, Exhibit G). TCC, as a lease broker, subsequently sold its interest in the leased equipment and assigned the Lease to Leasetec Corporation, Key's predecessor. *See* BBO92, 203, 125, 219, 144, 42 (Appendix, Exhibit H); *see also* Key Claim.

13.    In connection with the above, Extreme Networks provided a limited guarantee of Broadband's obligations under the Lease (the "Lease Guaranty"). *See* BBO110-111 (Appendix, Exhibit I). Under the Lease Guaranty, Extreme Networks guaranteed the performance of Broadband under the Lease and that all sums payable under the Lease will be promptly paid when due. Extreme Networks further agreed that it would not be subrogated, in whole or in part, to any rights against Broadband under the Lease until all sums due under the Lease had been paid. Notwithstanding the foregoing, the maximum liability of Extreme Networks under the Lease Guaranty was limited to 35% of the aggregate equipment values as shown on the Lease. *Id*.

14.    On May 9, 2001 (the "Petition Date"), Broadband filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Broadband filed its schedules on June 28, 2001. On Attachment G-5 – Miscellaneous Executory Contracts, Broadband lists the Lease with TCC, and a Domestic End User Support Agreement with Extreme Networks. *See* Schedules of the Debtor, Attachment G-5 (Appendix, Exhibit J).

15.    On February 14, 2002, TCC filed its proof of claim against Broadband in the name of Extreme Networks Credit Corporation, asserting $3,205,791.50 in amounts alleged as outstanding on the Lease (the "ENCC Claim"). *See* Proof of Claim of ENCC ("ENCC Claim," Appendix, Exhibit K).

16.     On April 10, 2003, Broadband, through its counsel Adam Hiller of the law firm Pepper Hamilton LLP, sent a letter to "Extreme Networks Credit Co." The letter stated that TCC had received payments from Broadband within 90 days prior to the Petition Date totaling $1,158,520.74.[1] The letter further stated that Broadband believed it was entitled to the return of such payments as a preference or fraudulent conveyance but would agree to execute a tolling agreement in order for the parties to continue potential settlement discussions. *See* April 10, 2003 Letter (Appendix, Exhibit M, BBO00354-355).

17.     On April 28, 2003, Jeffry Davis, of the law firm Gray Cary, sent a letter to Mr. Hiller on behalf of TCC. Attached to Mr. Davis' letter was an executed tolling agreement between Broadband and TCC (the "Tolling Agreement"), extending the time by which Broadband must commence certain actions against TCC from May 9, 2003, to December 31, 2003. *See* April 28, 2003 letter (Appendix, Exhibit N, BBO00359-363).

18.     On July 25, 2003, Mr. Hiller sent an additional letter to Mr. Davis. In the July 25, 2003 Letter, Mr. Hiller seeks additional documents from Mr. Davis regarding the potential action by Broadband involving "Technology Credit Corporation D/B/A Extreme Networks Credit Corporation ("Transferee")." *See* July 25, 2003 Letter (Appendix, Exhibit O, BBO00356-357).

19.     On December 23, 2003, just before the Tolling Agreement expired, Broadband filed a Complaint for Avoidance of Prepetition Transfers against Technology Credit Corporation D/B/A Extreme Networks Credit Corporation (the "Original Complaint"). The Original Complaint seeks the avoidance of two check payments by Broadband made payable to "Extreme Networks Credit Co" in the amounts of $276,164.63 and $495,710.44 (collectively, the "Transfers"). *See* September 27, 2004 Letter (Appendix, Exhibit P, TCC000034-40).

---

[1] Broadband's statement of financial affairs filed on June 28, 2001, lists "Extreme Networks Credit Co" as the recipient of $1,158,520.74 in payments from Broadband in the 90 days prior to the Petition Date. *See* Statement of Financial Affairs - Attachment SOFA.3.a (Appendix, Exhibit L), at p. 8.

20.    On May 20, 2004, counsel for TCC submitted a letter to Broadband's current counsel, Werb & Sullivan. The letter states that TCC was not the recipient of the Transfers, and that the Transfers were instead received by Key as assignee of the Lease. The letter also attaches an affidavit of Jeffry Davis, stating that when Mr. Davis signed the Tolling Agreement with Broadband he thought Extreme Networks Credit Corporation was a division of Extreme Networks. Mr. Davis states further that he did not understand, at that time, that Extreme Networks Credit Corporation was a fictitious name for TCC. *See* May 20, 2004 Letter (Appendix, <u>Exhibit Q</u>, TCC00001-33).

21.    On November 4, 2004, TCC served its responses to Broadband's first set of discovery requests. Included in TCC's production was a September 27, 2004 Letter from Jonathan Braun, Vice President & Senior Workout Counsel for Key, to TCC's counsel regarding the claims asserted by Broadband against TCC. The letter states, in part, that the allegedly preferential payments were deposited into Key bank accounts. *See* September 27, 2004 Letter (Appendix, <u>Exhibit P</u>).

22.    On November 1, 2005, Broadband filed its Motion for Leave to File Amended Complaint and Brief in Support of Motion (the "Motion to Amend"). *See* Docket Entry No. 6. In the Motion to Amend, Broadband sought to amend the Original Complaint to include Extreme Networks, Inc. and Key as defendants. As stated above, Broadband asserts that it had not unduly delayed its motion to amend but that it "is only the (sic) because of the convoluted construct of the defendants' relationships that all of them were not originally named as defendants." Motion to Amend, at p. 6. The Court granted the Motion to Amend and Broadband filed its Amended Complaint on December 23, 2005.

23.    As shown below, the evidence produced in this matter does not support Broadband's claims against Extreme Networks, and the Amended Complaint should be dismissed, with prejudice, as against Extreme Networks.

## IV.    ARGUMENT

### A.    Legal Standard

24.    Extreme Networks brings this motion pursuant to Rule 56 of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Bankruptcy Rules 7056 and 9014.  Rule 56(a) provides in pertinent part:

> A party seeking to recover upon a claim, counterclaim or cross-claim or to obtain a declaratory judgment may . . . move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

25.    Summary judgment is appropriate where the movant shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Id*.  The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *See, e.g., Coregis Insurance Co. v. Barrata & Fenerty, Ltd.*, 264 F.3d 302, 306 (3d Cir. 2001).  The movant may discharge this burden by showing an absence of evidence to support the nonmoving party's position.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The burden then shifts to the nonmoving party to set forth specific facts showing a genuine triable issue.  Fed. R. Civ. P. 56(e).  The nonmoving party must present "more than a scintilla of evidence" to overcome the motion, and the evidence must be more than the nonmovant's own pleadings and affidavits."  *See Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (citations omitted).  The U.S. Supreme Court has stated:

> There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a [trier of fact] to return a verdict for that party.  If the [nonmovant's] evidence is merely colorable,

> or is not significantly probative, summary judgment may be
> granted.

*See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted). Even with all reasonable inferences in favor of Broadband, the record here, taken as a whole, shows that no genuine issue of material fact exists with respect to the liability of Extreme Networks. Therefore, this Court should grant summary judgment and dismiss the Amended Complaint against Extreme Networks, with prejudice.

**B.    Extreme Networks Never Received or Benefited From The Alleged Voidable Transfers**

26.    In order to avoid and recover the transfers allegedly received by Extreme Networks, Broadband must first prove that Extreme Networks actually received the Transfers or at least benefited from the Transfers. *See* 11 U.S.C. §§ 544, 547(b), and 548(b). Yet, no such evidence exists.

27.    There is no evidence that Extreme Networks was the recipient of the Transfers. The only evidence produced in this case regarding the receipt of the check payments shows that the checks were deposited in accounts controlled by Key. *See* May 20, 2004 Letter (Appendix, Exhibit Q); September 27, 2004 Letter (Appendix, Exhibit P).

28.    There is also no evidence that Extreme Networks benefited from the Transfers. Extreme Networks' exposure under the Lease Guaranty was limited to 35% of the aggregate equipment value as shown on the Lease. As the aggregate equipment value listed on the Lease Schedules is $6,879,613.75, Extreme Networks' liability under the Lease Guaranty would be limited to $2,407,864.81 ($6,879,613.75 x 35%). As of the Petition Date, Broadband's outstanding payment obligations under the Lease totaled over $3.8 million. *See* Key Claim. Furthermore, Broadband was required to return the leased equipment if it did not renew the lease or purchase the leased equipment at the end of the Lease. The Key Claim listed an equipment

value of $2.2 million. As the remaining financial obligations under the Lease were well above Extreme Networks' maximum liability under the Lease Guaranty, the alleged Transfers did not reduce its obligations under the Lease Guaranty as stated in the Amended Complaint. In other words, Extreme Networks did not benefit, directly or indirectly, from these Transfers.

29.    Furthermore, under the Lease Guaranty, Extreme Networks waived any subrogation rights against Broadband until all of Broadband's obligations under the Lease had been satisfied. Therefore, Extreme Networks was not even a creditor of Broadband when the alleged Transfers were made, as Extreme Networks was foreclosed from asserting a claim against Broadband.

30.    Given the foregoing, Broadband cannot prove its claim under 11 U.S.C. §§ 547, 544, or 548 against Extreme Networks because Extreme Networks never received or benefited from any transfers from Broadband. Therefore, all the avoidance claims should be dismissed, with prejudice.

## C.    Broadband's Claims Against Extreme Networks Are Barred by the Applicable Statutes of Limitation Under 11 U.S.C. § 546.

31.    Furthermore, to the extent Broadband has any avoidance claims against Extreme Networks, such claims are time barred. Broadband did not raise its claims against Extreme Networks until it filed the Amended Complaint on December 23, 2005. At the time of filing the Amended Complaint, the deadline to commence causes of action against Extreme Networks under 11 U.S.C. §§ 544, 547 and 548 had long expired. This deadline is imposed under the applicable statute of limitations contained in 11 U.S.C. § 546 which provides:

> (a)  An action or proceeding under section 544, 545, 547, 548 or 553 of this title may not be commenced after …
>
> (1)  the later of—
>
> (A)  2 years after entry of an order for relief… .

11 U.S.C. § 546(a).

32.    Here, the order for relief was granted on the Petition Date (i.e., May 9, 2001), which means the statute of limitations under 11 U.S.C. § 546 expired on May 9, 2003.  As the Amended Complaint was not filed until December 23, 2005, over four and a half years after the Petition Date, Broadband's claims against Extreme Networks are barred by 11 U.S.C. § 546(a).

33.    To overcome the statutes of limitation, Broadband must show that the Tolling Agreement is binding upon Extreme Networks, **and** that its causes of action against Extreme Networks relate back to the filing of the Original Complaint.  There is no evidence to support the finding of either situation, as discussed below.

      a.    <u>**The Tolling Agreement Is Not Binding on Extreme Networks**</u>

34.    The Tolling Agreement is not binding on Extreme Networks, as Mr. Davis did not have the authority, actual or ostensible, to act on Extreme Networks' behalf when he executed the Tolling Agreement.

*(i)    Actual Authority*

35.    Actual authority may be given to an agent expressly, either orally or by writing, or impliedly, by conduct of the principal indicating an intent to confer it, or causing the agent to believe that the agent possesses it.  *See* Cal. Civ. C. § 2316; *Tomerlin v. Canadian Indem. Co.*, 61 Cal.2d 638, 644 (Cal. 1964).

36.    Here, there is no evidence to support any actual authority, whether express or implied, for Mr. Davis to execute the Tolling Agreement on behalf of Extreme Networks.  There is simply no evidence of any communications, whether oral or in writing, between Extreme Networks and Mr. Davis prior to his execution of the Tolling Agreement.  The only known conversation with Mr. Davis prior to execution of the Tolling Agreement was an April 25, 2003

telephone conversation between Mr. Davis and James Hartigan, chief financial officer of TCC. *See* TCC Discovery Responses, at p. 18. While the Tolling Agreement is made effective as of April 10, 2003, Mr. Davis did not return the executed Tolling Agreement to Broadband until April 28, 2003, after this conversation. *See* April 28, 2003 Letter. No one claims or can point to any evidence that any Extreme Networks representative ever discussed the Tolling Agreement with Mr. Davis, much less authorized him to sign it.

37.    At the time of entering the Tolling Agreement, Mr. Davis apparently had a mistaken belief that "Extreme Networks Credit Co" was a subdivision of Extreme Networks. However, Mr. Davis' subjective belief as to the relationship between TCC and Extreme Networks is entirely irrelevant and does not constitute actions on the part of Extreme Networks giving rise to any claim of implied authority to act on Extreme Network's behalf. Simply put, there is no evidence of any actions by Extreme Networks, whether intentional or by want of ordinary care, that would have allowed Mr. Davis to believe he possessed the authority to execute the Tolling Agreement on behalf of Extreme Networks.

*(ii)    Ostensible Authority*

38.    Ostensible authority is the authority that the principal, either intentionally or by want of ordinary care, causes a third person to believe the agent possess. *See* Cal. Civ. C. § 2317. The act or declaration of the agent alone can never establish ostensible authority; there must be some conduct on the part of the alleged principal. *See Hill v. Citizens Nat. Trust & Sav. Bank of Los Angeles*, 9 Cal.2d 172, 175 (1937); *see also Nation Union Fire Insurance Co. of Pittsburgh, Pa. v. C.P.P. Ins. Agency, Inc.*, 563 F. Supp. 1216, 1218 (D.C.N.Y. 1983) (where there is no proof that any conduct of the principal engendered a third party's belief that an agency relationship extended to the transaction claimed, the principal will not be bound).

12

39.     Here, there is no evidence that Extreme Networks caused Broadband to believe that Mr. Davis was acting on its behalf when he executed the Tolling Agreement.  There is no evidence of any contacts or communications by Extreme Networks with Broadband regarding the Tolling Agreement.  Nor was Extreme Networks even referred to in these communications. Broadband's April 10, 2003 Letter was addressed to "Extreme Networks Credit Co" and only sought the return of the payments made on the Lease.  The letter does not mention Extreme Networks.  Without any evidence of communications between Broadband and Extreme Networks regarding the Tolling Agreement, there cannot be any basis for ostensible authority.

40.     In short, Mr. Davis did not have the actual or ostensible authority to execute the Tolling Agreement on behalf of Extreme Networks.  Indeed, the ensuing correspondence shows that Broadband did not think Extreme Networks had tolled anything.  The Tolling Agreement therefore did not extend Broadband's deadline to commence the claims asserted against Extreme Networks in the Amended Complaint.

### b.     Broadband Sought, By Choice or Inexcusable Neglect, to Proceed Solely Against TCC

41.     In any event, even if the Tolling Agreement could be deemed to be binding upon Extreme Networks, there is no evidence to support Broadband's contention that the claims asserted against Extreme Networks in the Amended Complaint should relate back to the filing of the Original Complaint.

42.     An amendment to a pleading relates back to the date of the original pleading if the party has received notice of the action so it will not be prejudiced in maintaining a defense on the merits, and if the party knew or should have known that but for a mistake concerning the identity of the proper party, the action would have been brought against this party in the first instant. *Shea v. Esensten*, 208 F.3d 712, 720 (8th Cir. 2000) (*citing* Fed. R. Civ. P. 15(c)(3).

43. In *Shea*, the plaintiff brought a wrongful death action against her deceased husband's physicians, the medical clinic, and the husband's health maintenance organization. The plaintiff later amended her complaint adding the owner-operator of the clinic pursuant to Federal Rule 15(c)(3) as the statute of limitations had expired. The district court subsequently dismissed the claims against the owner-operator on statute of limitations grounds. On appeal, the court found that the claims against the owner-operator did not relate back to the original complaint and upheld the lower court's dismissal. The court concluded that the plaintiff did not make a mistake as to the identity of the owner-operator, as she knew the identity of the owner-operator before the expiration of the statute of limitations but did not bring suit. *Shea*, 721 F.3d at 720.

44. Statutes of limitation ensure that defendants are "protected against the prejudice of having to defend against stale claims, as well as the notion that, at some point, claims should be laid to rest so that security and stability can be restored to human affairs." *Nelson v. County of Allegheny*, 60 F.3d 1010, 1014 (3rd Cir. 1995) (*quoting Cunningham v. Insurance Co. of N. Am.*, 530 A.2d 407, 409 (1987), *cert. denied*, 484 U.S. 1008 (1988)). In order to preserve this protection, the relation-back rule requires plaintiffs to show that the already commenced action sufficiently embraces the amended claims so that **defendants are not unfairly prejudiced** by these late-coming plaintiffs and that **plaintiffs have not slept on their rights**. *Id.* (emphasis added).

45. In *Nelson*, the plaintiffs in a class-action lawsuit sought to add new defendants pursuant to Federal Rule 15(c)(3). The lower court dismissed these claims as barred by the applicable statute of limitations. On appeal the court found that the plaintiffs knew of their claims against the new defendants but failed to add them to the complaint until after expiration of

14

the statute of limitations.  Although the relation-back rule ameliorates the effect of statutes of limitations, it does not save the claims of complainants who have sat on their rights, and the court upheld the lower court's dismissal of the claims against the new defendants on statute of limitations grounds.  60 F.3d at 1015.

46.     Applying the above in the present case, it is clear that Broadband's claims against Extreme Networks in the Amended Complaint do not relate back to the Original Complaint for at least two reasons.

47.     First, there is no evidence to support a finding that the Original Complaint failed to include Extreme Networks because Broadband mistakenly thought that TCC and Extreme Networks were the same entity.  Indeed, undisputed evidence establishes that Broadband knew TCC and Extreme Networks were separate entities with separate obligations, but simply failed to assert any claim against Extreme Networks before the statute of limitations expired.  In its Motion to Amend, Broadband stated that only after it filed the original complaint and received discovery responses from TCC was it "able to unravel and decipher the complicated and misleading transactions that were arranged by the three Defendants."  This confusion, Broadband asserts, is the result of Extreme Networks allowing TCC to use the fictitious business name of Extreme Networks® Credit Corporation, its corporate logo, and the same business address.  Discovery between the parties, however, has revealed otherwise.  Undisputed evidence shows that Broadband was well aware of the fact that both Extreme Networks and TCC were separate entities.  Broadband's own schedules list Extreme Networks and TCC separately, indisputably showing that it understood they were separate entities.  Broadband had entered into separate agreements with TCC (the Lease) and Extreme Networks (a Domestic End User Support

Agreement). Broadband also knew of the Lease Guaranty. Extreme Networks obviously did not guarantee Broadband's obligations under the Lease to itself.

48.     Like the plaintiffs in *Shea* and *Nelson*, supra, Broadband knew of Extreme Networks but failed to raise any potential claims against Extreme Networks until after the statute of limitations had expired. There was no mistake made at the time of filing the Original Complaint. It simply did not proceed against Extreme Networks. After sitting on its rights for over four and a half years after the statute of limitations had expired, Broadband can no longer belatedly assert claims against Extreme Networks on the theory that the claims related back to the Original Complaint.

49.     Second, Broadband's delay has also severely prejudiced Extreme Networks ability to defend itself. Extreme Networks has been unable to locate documents related to the underlying transactions. Personnel involved in the underlying transactions have subsequently left the employment of Extreme Networks or no longer recall their involvement in the transactions. Extreme Networks has therefore been forced to defend itself upon the documents and testimony of other parties. Broadband should not benefit from its unreasonable delay. The Amended Complaint should be dismissed, with prejudice, as to Extreme Networks.

## V.     CONCLUSION

50.     Summary judgment should be granted as to all claims asserted against Extreme Networks. Undisputed evidence establishes that Extreme Networks never received the transfers Broadband now seeks to avoid. Furthermore, the claims asserted against Extreme Networks are barred by the applicable statute of limitations set forth in 11 U.S.C. § 546, as they were not raised until nearly four and a half years after Broadband filed its bankruptcy case.

16

WHEREFORE, for all of the reasons set forth above, Extreme Networks respectfully requests that the Court enter an order granting summary judgment (i) dismissing the Amended Complaint with prejudice as against Extreme Networks, and (ii) granting such other relief as the Court deems just and proper.

Dated:  March 15, 2007                    ASHBY & GEDDES, P.A.


                                          William P. Bowden (I.D. #2553)
                                          Ricardo Palacio (I.D. #3765)
                                          500 Delaware Avenue, 8th Floor
                                          Wilmington, Delaware  19899
                                          Telephone: (302) 654-1888
                                          Facsimile: (302) 654-2067

                                                   -and-

                                          WINSTON & STRAWN LLP

                                          David A. Honig
                                          Todd J. Dressel
                                          101 California Street
                                          San Francisco, California  94111
                                          Telephone: (415) 591-1000
                                          Facsimile: (415) 591-1400

                                          Co-Counsel for Defendant Extreme Networks, Inc.

178918v1

17

SF:156208.4