# *Exhibit B*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

IN RE:

BROADBAND OFFICE, INC.,

        Debtor.

_____

BROADBAND OFFICE, INC.,

        Plaintiff,

    vs.

TECHNOLOGY CREDIT
CORPORATION d/b/a EXTREME
NETWORKS CREDIT CORPORATION,
and EXTREME NETWORKS, INC.,
and KEY EQUIPMENT FINANCE,
INC., f/k/a KEY CORPORATE
CAPITAL, INC. f/k/a
LEASETEC CORPORATION,

        Defendants.

_____

**CERTIFIED COPY**

CIVIL ACTION NO.
04-407 (GMS)

BANKRUPTCY CASE NO.
01-1720 (GMS)

CHAPTER 11


DEPOSITION OF RICHARD SALHANY

DATE:       December 18, 2006

TIME:       9:57 a.m.

LOCATION:   Pulone & Stromberg
            Certified Shorthand Reporters
            1550 The Alameda
            Suite 150
            San Jose, California  95126

REPORTED BY: Irene A. Resler
             Certified Shorthand Reporter
             License Number C-7685


PULONE & STROMBERG, INC.
CERTIFIED SHORTHAND REPORTING
AND VIDEOCONFERENCING SERVICES
— Serving the Legal Community Since 1978 —

Offices in San Jose and Santa Cruz
Conference rooms throughout Northern California

1-800-200-1252
depos@pulone.com  •  www.pulone.com

1   Q.  Did you have your own fax machine over at
2   Extreme Networks?
3   A.  Yes.
4   Q.  What was that fax number?
5   A.  I couldn't tell you.
6   Q.  Would you know if it was 408-579-2881?
7   A.  I don't recall.
8   Q.  Is it -- would it be fair to say that you did
9   not fax this document that's been marked as Exhibit 22
10  out from Extreme Networks, Inc.?  Is that fair?
11  A.  That I did not fax this document out?
12  Q.  Yes.
13  A.  That's a fair statement.
14      MR. WILCOX:  Okay.  I have nothing further.
15      MS. CLARK:  Okay.  Can we take a short break to
16  grab a sandwich and come back in a half hour?
17      MR. DRESSEL:  I might have some few questions
18  for him.
19      MS. CLARK:  Oh, okay.
20      MR. DRESSEL:  It should be quick.  Just give me
21  a second.  I want to make sure.
22          EXAMINATION BY MR. DRESSEL
23  BY MR. DRESSEL:
24  Q.  Earlier you stated that you were assigned to
25  Extreme Networks, Inc.  Who assigned you to Extreme

100

```
 1   Networks, Inc.?
 2        A.  Who internally to our company assigned?
 3        Q.  Correct.
 4        A.  James Hartigan.
 5        Q.  So it was TCC that had assigned you to Extreme
 6   Networks, Inc.?
 7        A.  Yes.
 8        Q.  Okay.  And was that in connection with the
 9   program that was between Extreme Networks, Inc. and TCC
10   and its dba Extreme Networks Credit Corporation?
11        A.  Yes.
12        Q.  Okay.  When you dealt with customers in that
13   capacity, did you always introduce yourself as a part of
14   Extreme Networks Credit Corporation?
15        A.  Yes.
16        Q.  Okay.  I think before you stated that the
17   customers would come to you through the sales
18   department -- Extreme Networks, Inc.; is that correct?
19        A.  As one avenue, yes.
20        Q.  And there were other avenues?
21        A.  Um-hmm.
22        Q.  What would those be?
23        A.  It could have been one of the credit analysts.
24   It could have been Vito himself.  It could have been the
25   controller, credit manager.
```

101

```
 1        Q.  But it would have been an employee of Extreme
 2   Networks, Inc.?
 3        A.  Yes.
 4        Q.  So is it fair to say that the customer would
 5   have been originally dealing with Extreme Networks, Inc.
 6   before meeting with you?
 7        A.  Absolutely, yes.
 8        Q.  After that point, would you then -- would you
 9   then speak directly to the customer?
10        A.  Yes.
11        Q.  And when you spoke to the customer at that
12   time, would you be speaking to that person in the
13   capacity as an employee of Extreme Networks Credit
14   Corporation?
15        A.  Yes.
16            MR. WILCOX:  I'm going to object to that.  I
17   think that does ask for a legal conclusion, but --
18   BY MR. DRESSEL:
19        Q.  Were any employees of Extreme Networks, Inc. to
20   your knowledge located in the main offices of TCC?
21        A.  No.
22        Q.  Wear with me.  I'm trying to make this go as
23   painless as possible.
24            If you can look at Exhibit 12.  I believe you
25   testified before that this is a basic form master lease
```

102

```
 1      Q.   Are you -- during the ten years you've been at
 2  Technology Credit Corporation, to the best of your
 3  knowledge, has that type of arrangement where an
 4  employee of Technology Credit Corporation is physically
 5  present on a daily basis --
 6      A.   Yes.
 7      Q.   -- you're familiar with other similar
 8  arrangements?
 9      A.   Yes.
10      Q.   Okay.  With whom?
11           MS. CLARK:  Well, I'm going to object now that
12  this seeks proprietary information.  You're asking for
13  clients of our customers, people that -- companies that
14  have done leases or leasing programs with Technology
15  Credit Corporation.  What's the relevance of that?
16           MR. WILCOX:  The relevance is to what extent
17  this was -- well, I don't really need to explain the
18  relevance to you unless you're going to direct him not
19  to answer which I would advise you not to.  However, if
20  you want to discuss it off the record, I'm happy to do
21  it.  There's nothing sinister about this.  He's
22  testified that there were other similar arrangements.  I
23  think I'm entitled to verify that and understand them.
24           THE WITNESS:  Okay.  What are you looking for,
25  the names of the companies?
```

108

```
 1  BY MR. WILCOX:
 2      Q.  Yeah.
 3      A.  Ascend Communications.
 4      Q.  And during what period of time?
 5      A.  I want to say --
 6          MS. CLARK:  Is this an estimate or a guess?
 7  Give him an estimate.
 8          THE WITNESS:  It's an estimate.  '94 to 2000.
 9  BY MR. WILCOX:
10      Q.  Who else?
11      A.  3Com.
12      Q.  Okay.  During what period, approximately?
13      A.  '99 to 2001.
14      Q.  Anyone else?
15      A.  NET.
16      Q.  During what period?
17      A.  '96 to '99.
18          MR. DRESSEL:  Did you say NET?
19          THE WITNESS:  NET.
20  BY MR. WILCOX:
21      Q.  Anyone else?
22      A.  No.  Well, I'm not sure if anyone else was
23  onsite on a day-to-day basis.
24      Q.  Okay.  Any other situations other than ones
25  you've mentioned in which Technology Credit Corporation
```

```
 1   had an employee who used a dba of -- strike that.
 2           Did Technology Credit Corporation do business
 3   as 3Com Credit Corporation?
 4       A.  To the best of my knowledge, yes.
 5       Q.  Did it -- did Technology Credit Corporation do
 6   business as NET Credit Corporation?
 7       A.  To the best of my knowledge, yes.
 8       Q.  Are there any other situations other than the
 9   ones you've described where Technology Credit
10   Corporation did business as another entity with the
11   name, quote, "Credit Corporation," unquote, in its name?
12       A.  With someone onsite?
13       Q.  Not necessarily.
14       A.  Yes.
15       Q.  Was that part of Technology Credit
16   Corporation's standard business practices?
17       A.  Yes.
18       Q.  Did you ever see Mr. Hartigan sign documents on
19   behalf of 3Com Credit Corporation?
20       A.  No.
21       Q.  Have you ever seen documents that Mr. Hartigan
22   signed on behalf of 3Com Credit Corporation?
23       A.  No.
24       Q.  How about on behalf of any of those other
25   credit corporations?
```

110

```
STATE OF CALIFORNIA    )
                       ) ss.
COUNTY OF SANTA CLARA  )
```

I, Irene A. Resler, a Certified Shorthand Reporter in and for the State of California, hereby certify that the witness in the foregoing deposition,

<u>RICHARD SALHANY</u>,

was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause, and that the foregoing is a full, true and correct transcript of the proceedings had at taking of said deposition, reported to the best of my ability and transcribed under my direction.

Date: *January 14*, 20*07*.   *Irene A. Resler*
                              CSR Number C-7685