# Exhibit C

# AGREEMENT FOR THE PURCHASE OF EQUIPMENT

This Agreement For The Purchase Of Equipment (the "Agreement") is made as of JUNE 9, 1999, by and among Technology Credit Corporation (the "Buyer") and Extreme Networks, Inc. (the "Seller").

Whereas, Seller is an equipment manufacturer and Buyer is engaged in the equipment leasing business and purchases equipment for lease to others;

Whereas, the parties anticipate that in a typical transaction (1) Seller will identify potential purchasers of such equipment and associated quantities, prices and other terms and conditions; (2) Buyer will verify whether each such purchaser qualifies for lease financing through Buyer; (3) qualifying purchasers will issue a purchase order to Seller and will enter into a corresponding lease arrangement with Buyer; and (4) such purchase order will be assigned to Buyer and, following Seller's receipt of Buyer's purchase order, the equipment specified therein will be sold to Buyer and concurrently with such sale will be shipped to the end purchaser and will become subject to a lease between such purchaser and Buyer; and

Whereas, Buyer's purchase of such equipment may also include the assignment of software license fees and charges for services by Seller;

Now, therefore, in consideration of the mutual covenants set forth herein, Seller hereby agrees to sell and Buyer hereby agrees to buy the personal property described on lease schedules upon the terms stated herein.

1. Definitions
(a) "Closing Date" shall mean, with respect to a System, the fifth (5th) business day after Buyer receives the document identified in Section 2(e).
(b) "Equipment" shall mean equipment sold and serviced by the Seller and identified in a Lease.
(c) "Lease" shall mean an executed Lease Schedule and Master Lease Agreement as it relates to such Lease Schedule in the form of Attachment A (or in such other form as Buyer, in its sole discretion, may approve in writing) between Buyer and one or more of Seller's customers covering one or more items of Systems purchased hereunder.
(d) "Lessee" shall mean any party to a Lease who is obligated to pay rent under such a Lease.
(e) "List Price" shall mean the price at which Seller shall from time to time offer its Equipment for sale in the ordinary course of its business to end users.
(f) "Monthly Rental" shall mean the amount that a Lessee is required to pay each month under the provisions of a Lease as rental for the System sold and assigned hereunder, net of sales, use and personal property taxes.
(g) "Purchase Price" shall mean the price which Buyer shall pay Seller for purchase of the Systems hereunder set forth in a purchase order accepted by Seller.
(h) "Rental Start Date" shall mean the first day a Lessee is committed to pay rent for the System.
(i) "Software" shall mean all computer programs and instructions (in whatever form), firmware, microcode and documentation marketed or licensed by Seller for use on, in or with the Equipment.
(j) "Transferee" shall mean a person or entity (including, without limitation, a corporation, trust, partnership or association) to whom a transfer is made by Buyer as provided in Section 8.
(k) "Upgrade" shall mean any modification, addition or replacement to Equipment which Seller identifies as an "upgrade" to its customers or which otherwise increases or enhances the capabilities or performance of the Equipment.
(l) "Off-Lease Equipment" shall mean Equipment purchased hereunder for which (i) the Lease relating thereto has expired and for which Monthly Rental is not being paid, or (ii) the Lease has been terminated for any reason whatsoever, or (iii) the Lease or applicable law permits removal and Remarketing because of a Lessee's default under the Lease; and in any such event a new Lease for the Equipment has not become effective.
(m) "Remarket" and "Remarketing" shall mean to re-lease or sell Off-Lease Equipment and does not include sale, Lease renewal or Lease extension to the then-current Lessee.
(n) "Services" shall mean the training, shipping, installation, maintenance, programming, technical and support services provided by or on behalf of Seller.
(o) "Systems" shall mean all Equipment, Software and/or Services identified in Leases.
(p) "Term" shall mean the period which commences on the date of this Agreement, up to and including December 31, 1999. Subsequently, this Agreement will automatically renew for successive six (6) month renewal terms, unless, at least ninety (90) days prior to the end of any renewal term, one party gives the other party written notice of its intent not to renew this Agreement.

2. Purchase
(a) Subject to the terms and conditions specified herein, Seller agrees to sell and assign from time to time to Buyer, and (subject to Buyer's prior approval as provided in Section 2(d) hereof) Buyer agrees to purchase from Seller at the Purchase Price, the Systems that (unless otherwise agreed by Buyer) are new. Such sales and assignments of Systems by Seller may include both Equipment and also the rights to receive Software license fees and charges for Services supplied or to be supplied by or for Seller to a Lessee. References elsewhere herein to the sale and assignment of Systems shall generally be deemed to mean the sale and license of Equipment and/or the assignment of Software license fees and charges for Services.
(b) All Systems to be purchased and sold and assigned in accordance with Section 2(a) will be subject to Leases with Lessees.
(c) Upon Seller's request that Buyer purchase Systems on behalf of prospective Lessees, Seller shall transmit to Buyer for Buyer's approval and selection:

(i) the prospective Lessees who are anticipated to lease the Systems that the Seller is requesting Buyer to purchase, and (ii) a description of the System. In order to enable Buyer to make an informed judgment as to the Lessee's financial stability and creditworthiness, Seller agrees to provide reasonable assistance, as may be reasonably requested by Buyer, to facilitate communications between Buyer and each prospective Lessee with respect to credit information.

(d) The sale and assignment of Systems may be offered by Seller to Buyer at any time during the Term of this Agreement and shall become binding on the parties only upon written acceptance of such offer by Buyer. Buyer shall notify Seller in writing within six (6) days from the date Buyer receives all of the items described in Section 2(c) whether the Buyer approves and agrees to enter into any of the transactions proposed by the Seller. Buyer may also notify Seller that it will provide approval upon certain terms and conditions, in which case Seller shall notify Buyer in writing if such conditions are acceptable. Failure to notify Seller within such six (6) day period shall constitute disapproval of such transactions by Buyer. Buyer's approval of any transaction shall be in its sole discretion and, notwithstanding any other provision hereof (including Section 2(a)), Buyer shall have no liability for, nor shall Seller's obligations hereunder be affected in any way by, Buyer's disapproval, for (or without) any reason, of any transaction or transactions proposed by Seller or for Buyer's failure to complete any transaction by reason of such disapproval.

(e) With respect to any Systems which Buyer approves for purchase (as provided in Section 2(d) hereof), Buyer shall pay the Purchase Price on the Closing Date, provided Buyer shall have received Seller's invoice for the Systems purchased and a copy of the shipping document verifying the date that Seller shipped the Equipment to the Lesee.

(f) The purchase of the Equipment hereunder and closing with respect thereto shall be deemed to have occurred at Buyer's offices in San Jose, California. All shipments will be made FOB shipping point to the shipping address designated in Buyer's purchase order. Delivery will be deemed complete and risk of loss or damage to the Equipment or Software will pass to Buyer upon delivery to the carrier. Buyer will pay all costs of transportation, any insurance requested by Buyer, export and import fees, customs brokerage expenses and similar charges. Buyer, at its expense, will make and negotiate any claims against any carrier, insurer, customs broker, freight forwarder or customs collector. All Systems shall be deemed accepted upon receipt by Lessee.

(g) During the Term of this Agreement, Buyer shall have an option to purchase features and Upgrades for Equipment sold and Software for which license fees are assigned to Buyer, to the extent they are available generally to Seller's other customers. The Purchase Price for such features and Upgrade(s) shall not exceed the List Price which would be paid by any of Seller's other customers under similar terms and conditions for similar quantities.

(h) Buyer shall, without additional charge, receive with the Equipment purchased hereunder all Software furnished by Seller to its end-user purchasers of Equipment. During the Term of this Agreement Seller shall, on request, make available to Lessees any additional Software (as well as corrections, additions and enhancements to Software previously supplied) which Seller makes available generally to its end-user purchasers. Subject to any amounts due under the terms referred to in the preceding sentence, and for purposes of Remarketing, Buyer shall have the right to transfer use of the Software provided hereunder (including any corrections, additions and enhancements thereto) with the Equipment purchased by Buyer. Seller also agrees to make available maintenance services, training and support with respect to the Software and related Equipment under comparable price, terms and conditions as Seller provides its own end-user customers for similar equipment.

(i) Upon receipt from Seller of the document identified in Section 2(e), Buyer may deliver to Lessee a letter in the form attached hereto as Attachment B confirming that the Equipment has been shipped and notifying Lessee of its Rental Start Date.

3. Seller's Representations, Warranties and Covenants

(a) Seller represents, warrants and covenants as of the date hereof and again, at all times pertinent to the sale thereof, to and including the applicable Closing Date, that:

(i) Seller will have the absolute right to sell, assign and transfer pursuant to this Agreement, the Systems offered to Buyer; that upon each sale and assignment of Systems to Buyer, Buyer will acquire good and marketable title to the Equipment, the license fees for the Software and charges for Services (which comprise the System), free and clear of all liens, interests and encumbrances, except for the interest of the Lessee under the applicable Lease; and that such title shall effectively pass to Buyer upon payment of the Purchase Price. Notwithstanding the foregoing, Seller's sole warranty regarding intellectual property infringement is as set forth in Section 3(a)(ii).

(ii) All Systems sold and assigned by Seller to Buyer under this Agreement will conform to Seller's applicable specifications and will be free from defects in material, workmanship and design under normal use and service as set forth in Seller's then current standard published warranty. In addition, such Systems will conform to Seller's then current standard published warranty and any warranty actually made by Seller to the Lessee thereof. Seller agrees to provide such warranty services as are required under those warranties. The Equipment and Software do not infringe any United States patent, United States copyright, United States trade secret or United States trademark. Seller's sole obligation for breach of such infringement warranty is as set forth in Section 4 ("Patents"). Buyer is and shall remain an intended third party beneficiary of Seller's applicable end user agreement, including the terms and conditions of sale and license, with respect to Equipment purchased by Buyer hereunder.

(b) With respect to any Equipment purchased hereunder and the Software provided on, with or for such Equipment or for which license fees are assigned to Buyer, to the extent expressly permitted under Seller's contract with its suppliers, Seller hereby assigns to Buyer any applicable warranties, express or implied, and indemnities, including but not limited to product liability indemnifications with respect to the Equipment and Software, of the manufacturer, licensor and other suppliers of the Equipment and Software, if other than Seller.

(c) Seller will use all reasonable commercial efforts to provide the support requested by Buyer under this Agreement in a professional and workmanlike manner, but Seller cannot guarantee that every question or problem raised by Buyer will be

resolved.

(d) Seller represents, covenants and agrees that (i) all necessary licenses for use by the Lessee of the Software will be granted by Seller, (ii) each Lessee shall be entitled to use such Software in accordance with Seller's standard terms and conditions of sale and license. Buyer shall have no duties or obligations with respect to such license. Seller's warranty regarding intellectual property infringement is as set forth in Section 3(a)(ii).

(e) Seller has not made and will not at any time make any agreements, representations, or warranties with or to the parties signing the Lease which would (or which would attempt to) amend, modify or affect the Lease or any obligations thereunder or waive any provisions thereof; and Seller has not received any payments from the parties signing the Lease, except those, if any, paid or credited to Buyer upon payment of the Purchase Price. Seller represents and warrants that, except as may be set forth in the Lease, no representations have been made to the Lessee concerning the price or terms for which the Equipment can be purchased by the Lessee during or upon expiration of the Lease term or for which the Software can be licensed upon expiration of the Lease term.

(f) Buyer and Seller each hereby represent and warrant to the other that: (a) the party making such representation and warranty is duly incorporated and existing and in good standing under the laws of the jurisdiction of its incorporation and has the power and authority to enter into and perform its obligation under this Agreement; (b) the person executing and delivering this Agreement on behalf of such party is duly authorized to make such execution and delivery and, upon the execution and delivery hereof, this Agreement will constitute a valid obligation binding upon and enforceable against the party so representing and warranting in accordance with its terms; (c) neither the execution and delivery of the Agreement or the due performance hereof will result in any breach of or constitute any default under the certificate of incorporation or bylaws of the party making such representation or warranty, or under any agreement to which such party is bound or by which any interest of such party is affected or will violate any statute, law, regulation, or judicial order or decree binding on or applicable to such party; and (d) there are no suits or proceedings pending or, to the best of the knowledge of the party making such representation and warranty, threatened in any court or before any regulatory commission, board or other administrative agency against or affecting such party which, if adversely determined, would have a material adverse effect on the ability of such party to fulfill its obligation hereunder.

(g) NOTWITHSTANDING ANY PROVISION TO THE CONTRARY, SELLER'S SOLE AND EXCLUSIVE LIABILITY AND BUYER'S AND LESSEES' SOLE AND EXCLUSIVE REMEDY WITH RESPECT TO PERFORMANCE WARRANTIES SHALL BE AS SET FORTH IN SELLER'S THEN CURRENT STANDARD PUBLISHED WARRANTY FOR THE SYSTEMS.

THE WARRANTIES SET FORTH ABOVE AND IN SELLER'S THEN CURRENT STANDARD PUBLISHED WARRANTY FOR THE SYSTEM ARE EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES EXPRESS OR IMPLIED, IN FACT OR BY OPERATION OF LAW OR OTHERWISE, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, NONINFRINGEMENT OF THIRD PARTY RIGHTS AND MERCHANTABILITY.

4. Patents

Seller agrees that it will, at its own expense, defend Buyer against any claims and suits and indemnify and hold them harmless from and against (i) any award of damages and costs by a final judgment of a court of last resort in any suit, (ii) any amounts paid in settlement or compromise of such claim or suit, and (iii) any reasonable attorneys' fees incurred in connection with such claim or suit, insofar as such claims or suits are based on allegations that the Equipment and Software sold and assigned by Seller to Buyer hereunder infringes a United States patent, United States copyright, United States trade secret or United States trademark; provided that Buyer gives Seller immediate notice in writing of any such claim or suit and permits Seller through its counsel to defend the same and gives Seller all available information, assistance and authority to enable Seller so to do, and provided further that Seller shall have control of the defense of any suit (including appeals) and of all negotiations for, including the right to effect, the settlement or compromise thereof. The foregoing indemnity obligation shall not extend to any claims of infringement arising out of or related to (i) a modification of the Equipment or Software by anyone other than Seller; (ii) a combination of the Equipment or Software with any third party software or hardware where such combination is the cause of such infringement; or (iii) the use of a version of the Equipment or Software other than the then current version if infringement would have been avoided by the use of the then current version. In case the Equipment or Software or any part thereof is, in any such suit, held to constitute such infringement and its use is enjoined or if in Seller's opinion such claim is likely, Seller shall, at its option and expense, either (i) procure for Buyer the right to continue using the Equipment or Software, or (ii) replace or modify the same so that it becomes noninfringing, or (iii) repurchase the Equipment or Software from Buyer for an amount equal to the outstanding Monthly Rentals for the Equipment and Software and its residual value as estimated by Buyer upon its purchase from Seller, all adjusted to then present value. No settlement of any such suit or claim shall be made unless such settlement provides for the unconditional release of Buyer from any liabilities or obligations with respect thereto. THIS SECTION SETS FORTH SELLER'S SOLE AND EXCLUSIVE LIABILITY AND BUYER'S SOLE AND EXCLUSIVE REMEDIES FOR INFRINGEMENT BY THE EQUIPMENT AND SOFTWARE OF THIRD PARTY INTELLECTUAL PROPERTY RIGHTS OF ANY KIND.

5. Remarketing

(a) Seller hereby agrees to employ commercially reasonable efforts to Remarket Off-Lease Equipment for a term of thirty (30) days commencing from the date of written notification by Buyer to Seller that the Equipment has become Off-Lease Equipment. Seller's publishing of the availability of the Off-Lease Equipment to its field sales organization shall be deemed to be commercially reasonable efforts. Seller shall have the exclusive right and shall use commercially reasonable efforts to Remarket the Off-Lease Equipment on behalf of Buyer. No priority is required to be given by Seller to Remarket Equipment owned by

Buyer or any assignee thereof, but in Remarketing, Seller will not discriminate with respect to Seller's used equipment against Buyer in favor of Seller's or other owners' used equipment.

(b) If Seller is successful in arranging acceptable Remarketing of Off-Lease Equipment, Buyer agrees to pay Seller fifty percent (50%) of the Remarketing proceeds (as and when received by Buyer) in excess of twelve percent (12%) of the Purchase Price paid by Buyer (not including shipping costs) for such Equipment (the "Commission"); provided, however, that any cost incurred by Seller for the services associated with Seller's Remarketing of the Off-Lease Equipment as outlined in Section 5(d) below and as evidenced by Seller's invoice to Buyer shall first be deducted from the Commission (provided that such costs incurred by Seller will be reimbursed by Buyer regardless of whether they exceed the Commission). All sales expenses, salaries and commissions incurred in the process of Seller's Remarketing shall be borne by Seller, subject to Section 5(d).

(c) If Seller does not arrange acceptable Remarketing of Off-Lease Equipment during its thirty (30) day Remarketing period as provided in Section 5(a), Buyer will assume primary Remarketing responsibility for any such Equipment; provided, however, that prior to any resale by Buyer of such Equipment to a third party, Buyer receives Seller's written consent to such resale which shall not be unreasonably withheld.

(d) Upon Buyer's or Seller's re-lease or sale of the Off-Lease Equipment, Seller will provide or arrange the following services for Off-Lease Equipment: removal, transportation, storage, maintenance, refurbishing and reconditioning. All expenses for such services shall be borne by Buyer and shall be reimbursed by Buyer upon invoice, provided Buyer's approval of the nature and amount of maintenance, refurbishing and reconditioning expenses has been obtained by Seller before they are incurred (removal, transportation and storage expenses need to be approved by Buyer); and Buyer shall be entitled to any payments made by Lessees or purchasers (under their agreements concerning the Equipment) with respect to such expenses.

(e) Upon any Remarketing of the Equipment, Seller agrees to certify to the new Equipment user (at no cost to Buyer or such user) that the Equipment will qualify for maintenance at Seller's then standard prices, terms and conditions, provided such Equipment has been continuously subject to a maintenance agreement with Seller or a third party maintenance provider approved by Seller.

(f) For any Remarketing of the System either by sale or re-lease to the existing Lessee or to a new user, Seller waives any licensing fees for the Software in the System to the extent that such Software can be sustained by and operate as intended with the System hardware. To the extent that upgrades or refurbishment of the Software requires modifications or upgrades to the System hardware, Seller's refurbishment of the System will be subject to Seller's then current list prices.

6. Indemnification

Buyer represents and warrants that Buyer has no authority to, and shall not, do business under the DBA or otherwise as Seller's agent except as expressly authorized in this Agreement. Buyer shall not vary or add to the terms and conditions set forth in Seller's end user agreements, including, without limitation, Seller's terms and conditions of sale and license. Buyer agrees to defend, indemnify and hold Seller harmless against any and all damages, costs, liabilities, expenses (including reasonable attorneys' fees) and settlement amounts incurred in connection with any suit, claim, or action by any third party against Seller as a result of (i) breach of the foregoing warranty by Buyer or its representatives; (ii) negligence, misrepresentation, error or omission on the part of Buyer or its representatives relating to or concerning the Systems; (iii) Buyer's failure to lease each System pursuant to a Lease; or (iv) Buyer's breach of its obligations under Section 9(h).

7. Engineering

Seller shall from time to time, at Buyer's expense, make such design and/or engineering changes on Systems purchased hereunder as are generally offered to purchasers or lessees of similar equipment marketed and/or maintained by Seller.

8. Transfer to Transferee

Seller hereby agrees that Buyer may assign one or more Leases, and Seller's rights under Sections 3, 4, 7, 9 and 10 (including the right to collect payments under the assigned Leases but not including the right to invoice or use the name "Extreme Networks Credit Corporation unless such invoicing and name use is specifically authorized by Buyer and Buyer remains responsible for such invoicing and name use") as they relate to such assigned Leases, to a bank or other financial institution in the normal course of business, together or separately (individually or collectively, a "transfer"), to one of more Transferees, without the prior written consent of Seller. Upon any such transfer, Seller may agree, at Seller's discretion, to execute such further instruments as may be reasonably requested by Buyer or the Transferee with respect to such transfer. Unless otherwise expressly agreed by Transferee and Seller, a transfer will not include any of the obligations of Buyer under this Agreement or any other agreement concerning the Leases or Systems; and Buyer shall retain all such obligations. Upon any transfer, unless notified to the contrary by Buyer, Seller shall continue to honor notices from, report to, and be accountable to the Buyer only (and not its Transferees) with respect to the Systems, Leases and Services to be provided and moneys to be paid hereunder and other rights, duties and obligations under this Agreement."). The Transferee will be an intended third party beneficiary of Seller's applicable end user agreement, including the terms and conditions of sale and license, with respect to Equipment which is covered by the Lease that is assigned to Transferee.

9. General

(a) Neither party shall, directly or indirectly, assign in whole or in part, any of its obligations hereunder without the prior written consent of the other party to such assignment, and any such assignment or attempted assignment shall be void. Notwithstanding the foregoing, either party may assign its rights and obligations in whole or in part under this Agreement to the successor in a merger or other corporate reorganization, or to the purchaser of all or substantially all the business of the assigning party, without the consent of the other party. For purposes of this Section, a change in the persons or entities who control fifty percent

(50%) or more of the equity securities or voting interest of Buyer shall be considered an assignment of Buyer's right.

(b) This Agreement is for the benefit of the parties hereto and shall, to the extent permitted hereby, be binding upon and inure to the benefit of their successors, assigns and surviving entitles of any merger, sale, consolidation or reorganization.

(c) In the event that any of the terms of this Agreement are or become illegal or unenforceable, such terms shall be null and void and shall be deemed deleted from this Agreement, and all the remaining terms of this Agreement shall remain in full force and effect.

(d) This Agreement shall be construed and interpreted in accordance with the laws of the State of California, as such laws apply to contracts made therein and to be fully performed therein by residents thereof.

(e) Seller and Buyer agree to perform acts and to execute and deliver any further documents as may be reasonably necessary to carry out the intent and provisions of this Agreement.

(f) The waiver by either party of a breach of any provisions contained herein shall be in writing and shall in no way be construed as a waiver of any succeeding breach of such provision or the waiver of the provision itself.

(g) Nothing contained herein shall be construed as creating any agency, partnership, or other form of joint enterprise between the parties.

(h) Buyer acknowledges that the laws and regulations of the United States may restrict the export and re-export of certain commodities and technical data of United States origin, including the Equipment and Software in any medium. Buyer agrees that it will not export or re-export the Equipment or Software in any form without the appropriate United States and foreign government licenses. Buyer also agrees that its obligations pursuant to this Section shall survive and continue after any termination or expiration of the rights under this Agreement.

10. Administration, Billing and Collections

Buyer shall prepare and issue invoices to Lessees for all payments due under the Leases, with such invoices being in the name of "Extreme Networks Credit Corporation", and directing the payments to Buyer's lock box as Buyer may from time to time designate. Such bank lock box shall be accessible only by Buyer or its assigns, and Seller shall have no rights with respect thereto or with respect to any payments from or on behalf of Lessee's payments received in such lock box. Notwithstanding the foregoing, Seller retains all contractual rights for payments made in error to Buyer or its assigns by Lessees, which are due to Seller. With respect to the matters expressly set forth in this Section 10, Seller does hereby irrevocably constitute and appoint Buyer its true and lawful agent and attorney-in-fact with full power of substitution for it in its true name, place and stead, to endorse all checks or drafts made payable to Seller and to which Buyer is entitled as provided in this Agreement. The powers above conferred upon Buyer are for the benefit of Buyer and its assigns, and Buyer and its assigns are not required to exercise any of the same. Buyer reserves the right upon notice to Seller, to terminate the billing arrangement set forth in this Section 10 with respect to any Lease hereunder in the event that, in Buyer's and Seller's reasonable opinion, invoicing the related Lessee in Buyer's own name is necessary in order to protect its unrecovered investment. In such event, it is agreed and understood that Buyer may deliver to the Lessee the notice letter in the form of Attachment C hereto and thereafter invoice and collect all Monthly Rentals and/or all payments under such Lease in the name of Buyer.

11. Termination and Amendment

This Agreement may be terminated (i) by Buyer upon three (3) months prior written notice to Seller or by Seller upon thirty (30) days prior written notice to Buyer, at any time without cause; (ii) by either party upon thirty (30) days prior written notice of a material breach of this Agreement by the other party, if such breach (including but not limited to, a failure to pay Seller any amount due under this Agreement) is not cured within such thirty (30) day period; or (iii) by either party immediately upon written notice if the other party becomes insolvent or fails to pay its obligations as they arise, or if a proceeding by or against the other party under any law providing relief to the other party as debtor is commenced and is not dismissed within sixty (60) days of commencement. This Agreement may be amended or modified only in writing, specifying the amendment or modification, signed by each party hereto. In the event of termination of this Agreement due to other than Buyer's breach, any such termination shall not affect the respective rights of the parties with respect to the sale and assignment of Systems closing prior to the effective date of such termination or such other sale and assignment of Systems to Buyer entered into by Buyer subsequent to such termination based on Buyer commitments with Lessees outstanding as of such date of the termination. Notwithstanding the expiration or any termination of this Agreement (due to other than Buyer's breach), all rights, privileges, duties, obligations and liabilities set forth herein shall survive and continue to apply (in accordance with the terms of the applicable provisions) with respect to the Systems sold and assigned hereunder. Sections 3(g), 4 ("Patents"), 6 ("Indemnification"), 9 ("General"), 12 ("Notices"), 14 ("Consequential Damages Waiver; Limitation of Liability"), 15 ("Ownership of Intellectual Property Rights and Non-Disclosure"), 16 ("Records and Audit"), 17 ("Taxes") and 18 ("Entire Agreement") shall survive termination or expiration of this Agreement

12. Notices

All notices and communications provided for in this Agreement shall be in writing and shall be sent by certified mail or registered mail, postage prepaid, as follows: if intended for Seller, addressed to: Extreme Networks, 3585 Monroe Street, Santa Clara, CA 95051 and if intended for Buyer, addressed to: Technology Credit Corporation, 1650 Zanker Road, #236, San Jose, CA 95112. Any such notice or other communication shall be deemed to have been given upon sending. Either party may designate a new address to which notices shall be sent by notice to the other party as herein provided.

13. Trademark License

(a) Seller hereby grants to Buyer a non-exclusive, restricted and limited license to use the term "Extreme Networks" (the "Trademark") only as part of the name "Extreme Networks™ Credit Corporation" (the "DBA"), under which name Buyer shall

F:\shared\RICHARD\Extreme\Legal Docs\extremeEPAMayRev7.doc
Created on 06/09/99 3:19 PM                   5

enter into Leases. invoice and collect monies due and owing under the Leases and otherwise conduct its business operations as contemplated by this Agreement. Buyer will not use any other trademark or service mark confusingly similar to the Trademark, in proximity to the Trademark or combine the Trademark with other marks without prior written approval of Seller. Buyer further agrees not to use the Trademark in connection with products other than the Systems sold and assigned to Buyer hereunder. Buyer agrees that the nature and quality of any products or services it supplies in connection with the Trademark or using the DBA shall be substantially in conformance with Buyer's then current standards. Buyer agrees to cooperate with Seller in facilitating Seller's monitoring and control of the nature and quality of any products and services that Buyer supplies in connection with the Trademark or the DBA. and to supply Seller with specimens of use of the Trademark or the DBA upon request. Buyer understands and agrees that the use of any Trademark in connection with this Agreement shall not create any right, title or interest, in or to the use of the Trademark and that all such use and goodwill associated with the Trademark will inure to the benefit of Seller. Only Seller, and not Buyer, is entitled to register the Trademark or similar trademarks in any class of products or services.

(b) Buyer's use of the DBA which includes the term "Extreme Networks" shall, in connection with the first or the most prominent use of such term in any document or material, attach the symbol ™ and a corresponding footnote, stating that: "The trademark 'Extreme Networks' is owned by Extreme Networks, Inc. and may be registered or pending registration in certain jurisdictions."

(c) Notwithstanding any provision to the contrary. Seller may terminate this Agreement immediately upon written notice, if Buyer breaches this Section 13. Upon any termination or expiration of this Agreement, Buyer shall immediately cease using the DBA and the Trademark and discontinue all representation that it is a leasing agent of Seller.

14. Consequential Damages Waiver; Limitation of Liability

IN NO EVENT SHALL SELLER BE LIABLE FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES, SUCH AS BUT NOT LIMITED TO, LOSS OF ANTICIPATED PROFITS OR OTHER ECONOMIC LOSS, EVEN IF SELLER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT WILL SELLER BE LIABLE FOR THE COST OF PROCUREMENT OF SUBSTITUTE GOODS. NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, SELLER'S AGGREGATE LIABILITY FROM OR IN RELATION TO THIS AGREEMENT AND THE SYSTEMS, WHETHER ARISING IN CONTRACT, TORT, STRICT LIABILITY OR OTHERWISE, SHALL BE LIMITED TO THE AMOUNT EQUAL TO THE AGGREGATE PURCHASE PRICE OF ALL UNITS OF EQUIPMENT INVOLVED IN SUCH CLAIM. THIS LIMITATION SHALL APPLY TO ALL CAUSES OF ACTION IN THE AGGREGATE.

15. Ownership of Intellectual Property Rights and Non-Disclosure

(a) Buyer acknowledges that the Systems and their sequence, structure and organization are proprietary to Seller and that Seller or its suppliers retain exclusive ownership of all intellectual property rights embodied in the Systems, including the Software, and the Trademark. Buyer will take all reasonable measures to protect Seller's intellectual property rights in any System. Except as provided herein. Buyer is not granted any rights to any intellectual property rights with respect to any System.

(b) Buyer may be exposed to certain information concerning the Systems and proposed new Systems or other technical or business information which Buyer knows or should know is Seller's confidential and proprietary information (herein "Confidential Information"). Buyer agrees that during and for a period of two (2) years after the termination or expiration of this Agreement, it will not use or disclose to any third party any Confidential Information without the prior written consent of Seller. Buyer may disclose the Confidential Information only to its employees as is reasonably necessary to allow Buyer to perform under this Agreement and to obtain the benefits thereof; provided that each such employee is under a written obligation of nondisclosure which protects the Confidential Information under terms substantially similar to those herein. This Section shall not apply to Confidential Information after such information is made public by Seller.

(c) Upon any termination or expiration of this Agreement, or upon request by Seller, Buyer shall return or destroy all copies of the Confidential Information. At the request of Seller, the president or the equivalent officer of Buyer will certify in writing that Buyer has complied with its obligations hereunder.

16. Records and Audit

Buyer agrees to maintain complete, clear and accurate records for at least two (2) years backwards at any point in time of its activities under this Agreement, including, without limitation, its inventory. Lease of each System and the identity and address of each Lessee. in accordance with standard business practices and Generally Accepted Accounting Principles. Buyer shall permit Seller or persons designated by Seller to inspect records pertaining to the Systems and any other materials provided to Buyer by Seller to ensure compliance by Buyer with its obligations to Seller. Any such inspection and audit shall be conducted during regular business hours and in such a manner as not to unduly interfere with normal business activities of Buyer.

17. Taxes

In addition to any payments due to Seller under this Agreement. Buyer agrees to pay. indemnify and hold Seller harmless from any sales. use. excise. import or export. value added or similar tax, not based on Seller's net income or any duty or fee (collectively the "Taxes") and any penalties or interest associated with any of the Taxes, imposed by any governmental authority with respect to either or both of any payment to be made by Buyer to Seller under this Agreement or any Systems to be delivered by Seller under this Agreement.

18. Entire Agreement

This Agreement constitutes the entire agreement between the parties hereto concerning the matters covered herein and supersedes all prior agreements and/or understandings, between the parties, whether written or oral, concerning the matters addressed herein; and there are no understandings, agreements, representations or warranties, expressed or implied, which are not specified in writing and signed by the parties hereto.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement by their duly authorized officers.

Buyer: Technology Credit Corporation
By: _Lawrence Clark_
Name: LAWRENCE CLARK
Title: PRESIDENT

Seller: Extreme Networks, Inc.
By: _Vito Palermo_
Name: VITO PALERMO
Title: CFO

## ATTACHMENT A

<u>LEASE FORM</u>
(To Be Attached)

ATTACHMENT B

## CONFIRMATION OF SHIPMENT AND RENTAL START DATE NOTIFICATION FORM LETTER

<<EXTREME NETWORKS™ CREDIT CORPORATION LETTERHEAD>>

<<Date>>

<<Lessee Name
Address>>

RE:    Master Lease Agreement No. <<_____>>, Schedule No. <<_____>>

Dear <<_____>>:

We have attached a copy of the Shipping Document evidencing the Ship Date of <<_____, 19___>> as provided under Section 2 of the above-referenced Master Lease Agreement. Accordingly, your lease payments for the above-referenced schedule shall commence on <<_____, 19___>>. Invoices from our Billing Department will follow shortly.

Sincerely,

EXTREME NETWORKS™ CREDIT CORPORATION


<<_____>>

Encl.

cc: <<_____>>

*The trademark "Extreme Networks™" is owned by Extreme Networks, Inc. and may be registered or pending registration in certain jurisdictions.*

## ATTACHMENT C

## FORM OF NOTICE TO SELLER

>Date<

                                                                     <u>P.O.</u>
                                                         *Sales Rep:*

Mr/s.
Extreme Networks, Inc.
3585 Munroe Street
Santa Clara, CA 95051

Dear [       ],

Please allow this letter to serve as our notice to you of our agreement to and approval of the purchase of System(s) pursuant to the Master Lease Agreement referenced below as follows:

Lessee:

Location:

Ship To:

System(s) Amount:

Freight (yes):    Freight charges are included in the amount above and should be billed into the amount listed above.

Freight (no):    Freight charges are not included and should be billed directly to the Lessee by Extreme Networks, Inc.

Total this PO:    $
                      ========

Our agreement to purchase the system(s) is subject to receipt of all required documents and expires [       ]. This is a non taxable transaction, re-sale certificate on file.

| Upon shipment, please send all invoices to: | Extreme Networks™ Credit Corporation<br>1650 Zanker Road, Suite 236<br>San Jose, CA 95112<br>Att: Richard |
|---|---|

Very truly yours,

Mr/s.
Program Manager

                                                                 Telephone: 408-436-7130
                                                                  FAX 408-436-8583

TCC00356